Annika L. Jones (16483)
Brandon S. Fuller (17215)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
aljones@swlaw.com
bfuller@swlaw.com

Lindsay C. Harrison *(pro hac vice forthcoming)*
Jessica Ring Amunson *(pro hac vice forthcoming)*
Daniel Schwei *(pro hac vice forthcoming)*
**JENNER & BLOCK LLP**
1099 New York Ave. NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
lharrison@jenner.com
jamunson@jenner.com
dschwei@jenner.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AYLO FREESITES LTD, and AYLO GROUP LTD,<br><br>*Plaintiffs*,<br><br>v.<br><br>UTAH DIVISION OF CONSUMER PROTECTION; KATIE HASS, *in her official capacity as Director of the Utah Division of Consumer Protection*, UTAH DEPARTMENT OF COMMERCE; and MARGARET BUSSE, *in her official capacity as Executive Director of the Utah Department of Commerce*,<br><br>*Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____<br><br>District Judge:_____<br><br>Magistrate Judge:_____ |

Plaintiffs, Aylo Freesites Ltd and its parent company Aylo Group Ltd, file this suit against

the Utah Division of Consumer Protection; Katie Hass, in her official capacity as Director of the

Utah Division of Consumer Protection; the Utah Department of Commerce; and Margaret Busse, in her official capacity as Executive Director of the Utah Department of Commerce.[1]

This suit seeks preliminary and permanent injunctive relief against the enforcement of a recently enacted provision of Utah law, S.B. 73 § 14, 66th Leg., 2026 Gen. Sess. (Utah 2026) (to be codified at Utah Code § 78B-3-1002(3)), which is scheduled to become effective on May 6, 2026, and which threatens Aylo with significant fines and penalties unless Aylo modifies its worldwide operations to comply with Utah law even though Aylo has exited the relevant Utah market. This new law is unconstitutional for three independent reasons: it constitutes impermissible extraterritorial legislation, it violates the dormant Commerce Clause, and it also violates the Foreign Commerce Clause by interfering with purely international transactions involving foreign entities and foreign nationals. Given the significant harms that Aylo faces if Utah's law is allowed to go into effect, preliminary and permanent injunctive relief is necessary.

## INTRODUCTION

1.      Plaintiffs are international technology and media companies that operate a broad portfolio of adult-entertainment platforms. In particular, Aylo operates several popular adult-content platforms that will soon be subject to a recently enacted Utah law threatening them with liability, notwithstanding Aylo's exit from the adult-content market within Utah.

2.      In 2023, Utah enacted an age-verification mandate for adult-content providers. *See* Utah Code § 78B-3-1002(1) (eff. May 3, 2023). Aylo does not object in principle to limiting access to adult content to only age-verified users, but any government-mandated age-verification system must be technically feasible, practicably and equitably enforced across the industry, and sufficiently protective of user privacy. Aylo determined that Utah's law failed to meet those core principles, and in particular failed to sufficiently protect user privacy. Accordingly, Aylo chose to

---

[1] For purposes of this case, "Aylo" is intended to refer only to Aylo Freesites, Ltd., except where otherwise indicated.

comply with the new law by withdrawing from the Utah adult-entertainment market. Aylo initially blocked access to its free sites in Utah, displaying only a message explaining why the sites were no longer available in the jurisdiction. Recently, Aylo made the sites accessible to Utah users again, but Aylo displays only "safe for work" content that does not fall within the scope of Utah's age-verification law. Aylo has thus withdrawn from the Utah adult-entertainment market.

3.     Some of Aylo's affiliated companies distribute adult content to known users located in Utah in connection with paid accounts. Users who establish such paid accounts have already voluntarily provided payment and some identity information to Aylo as part of the account-creation process. For those users creating such paid accounts, the incremental privacy burden of age verification is limited, and Aylo has determined that it is feasible using the least-intrusive available verification method. With respect to Aylo's free sites, by contrast, users primarily access content anonymously and have not consented to providing sensitive personal information. Accordingly, Aylo's free platforms have ceased distributing adult content to any user identified as being located within Utah.

4.     Although Aylo believes that Utah's age-verification law is not sufficiently protective of users' privacy, that law is not at issue in this case. Instead, this lawsuit challenges a new law that Utah recently enacted that goes significantly further—threatening adult entertainment companies with significant civil penalties and potential criminal liability unless they implement Utah's age-verification system for every user of their platforms, anywhere in the world. That is impermissible extraterritorial legislation: Utah is projecting its policy choices onto conduct occurring entirely outside its borders, in states and countries that have made different legislative judgments. Moreover, this law, S.B. 73, violates both the dormant Commerce Clause and Foreign Commerce Clause by imposing significant burdens on, and purporting to regulate, the national and international markets for adult entertainment.

5.      Utah recently enacted the Online Age Verification Amendments, S.B. 73, 66th Leg., Gen. Sess. (2026) (eff. May 6, 2026) (to be codified at Utah Code § 13-2-1 *et seq.*). This law builds on Utah's existing age-verification mandate, and further provides that "[a]n individual is considered to be accessing the website from this state if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location to make it appear that the individual is accessing a website from a location outside this state." *Id.* § 14 (to be codified at Utah Code § 78B-3-1002(3)) (hereafter the "Deemed-Location Provision"). In other words, under this Deemed-Location Provision, adult-entertainment providers are liable for failing to perform age-verification for Utah-based users *even if* the user appears to be accessing a website from a location outside of Utah and the company had no way of knowing otherwise.

6.      There is no feasible way for a private company like Aylo to reliably verify whether any particular individual is using a virtual private network (VPN), proxy server, or other location-masking technology—and therefore no way to determine whether a user who appears to be located outside Utah is, in fact, located inside Utah. This is not a temporary technological limitation awaiting a solution; it is an inherent feature of how VPNs and proxy servers work, which is precisely why individuals and businesses around the world rely on them for privacy and security. Indeed, Utah officials responsible for enacting and enforcing S.B. 73 have admitted that they do not know how a private company is supposed to comply with the law. For example, S.B. 73's chief legislative sponsor, when asked how providers could identify the true location of individuals using VPNs, responded: "That's a fair question.  I've talked with Consumer Protection about that, and I don't know the answer to that.  I don't."[2]

---

[2] *Hearings on Online Age Verification Amendments*, Utah Senate Revenue and Taxation Committee at 1:14:30–1:15:01 (Utah Feb. 5, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/294399.

3

7.     Because there is no reliable way for a company like Aylo to verify whether a user who appears to be located outside Utah is, in fact, located inside Utah, the only way for Aylo to eliminate the risk of liability is to implement Utah's age-verification requirements for every user of its adult content platforms, worldwide. The Deemed-Location Provision thus transforms what is nominally a Utah regulation into a de facto global mandate: either age-verify every adult on the Internet in compliance with Utah law, or face significant civil penalties and potential criminal liability every time a user located in Utah accesses Aylo's platforms through a VPN or other tool that masks their true location, whether or not the user intended to disguise their whereabouts.

8.     No single state has constitutional authority to set the terms under which a global company may operate on the global Internet. The Deemed-Location Provision is an unconstitutional overreach, which Utah lacks authority to enact for three independent reasons.

9.     First, the Supreme Court has long confirmed that no state may "impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996). Indeed, "principles of state sovereignty and comity" prohibit a state from "impos[ing] economic sanctions . . . with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* These principles are rooted both in the Due Process Clause and structural principles inherent in the Constitution's design, such as horizontal separation of powers and interstate federalism. "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders. . . ." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). The Deemed-Location Provision violates these principles because it threatens Aylo with liability unless Aylo agrees to perform age-verification for all users of its adult-content websites worldwide, even for users that have no meaningful connection to Utah and reside in states that have chosen not to require age-verification.

10.     Second, the Deemed-Location Provision impermissibly burdens interstate commerce in violation of the Constitution's dormant Commerce Clause. A "statute that directly

4

controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

11.   Third, the Deemed-Location Provision is contrary to the Foreign Commerce Clause, because it purports to regulate wholly international transactions—foreign activities between a foreign company and foreign nationals with no plausible effect on the United States— and also creates barriers to federal uniformity in the international economic arena. "Foreign commerce is pre-eminently a matter of national concern," and not one that may be dominated by the competing legislative priorities of the fifty states. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979). The Supreme Court has warned repeatedly and unmistakably against excessive state regulation of "the instrumentalities of foreign commerce," which "may impair federal uniformity in an area where federal uniformity is essential." *Id.*; *see also Buttfield v. Stranahan*, 192 U.S. 470, 492-493 (1904) (Congress holds "exclusive and absolute" power over foreign commerce). The Deemed-Location Provision violates these principles by regulating wholly foreign transactions, impairing federal uniformity, and threatening to disrupt international trade relationships.

12.   Unless Aylo obtains relief, the Deemed-Location Provision will cause significant irreparable harm. Aylo faces the immediate prospect of substantial civil penalties; it would be forced to incur substantial and unrecoverable compliance costs to implement a global age-verification system that Utah alone has demanded; and it would suffer severe reputational and competitive harm from being compelled to impose privacy-invasive data collection on every user of its platforms worldwide, regardless of where those users live or what their own governments require.  Aylo is therefore entitled to a declaration that the Deemed-Location Provision is unlawful, as well as preliminary and permanent injunctive relief prohibiting its enforcement.

**PARTIES**

### I.   Plaintiffs

13.   Plaintiff Aylo Freesites Ltd is a technology and media company incorporated under the laws of Cyprus and its principal place of business is in Cyprus. Aylo operates free adult-entertainment video-sharing platforms, including popular brands like Pornhub, Redtube, and YouPorn. Aylo is a wholly owned subsidiary of Aylo Group Ltd. Aylo does not have any employees located in the United States, and does not maintain any office or other physical presence in the United States.

14.   Plaintiff Aylo Group Ltd is a company incorporated in Cyprus and its principal place of business is in Cyprus. In addition to Aylo Freesites Ltd, Aylo Group Ltd also owns several other companies, including Aylo Premium Ltd, which offers adult content to paying subscribers, and includes brands like Brazzers and Reality Kings; and Nutaku Entertainment Ltd, which operates a gaming platform that includes some adult entertainment. Aylo Group Ltd has approximately 340 employees, none of whom are located in the United States, and also does not maintain any office or other physical presence in the United States.

### II.   Defendants

15.   Defendant Utah Division of Consumer Protection is a division within the Utah Department of Commerce tasked with administering and enforcing state consumer protection laws. *See generally* Utah Code § 13-2-1. Pursuant to S.B. 73, that includes enforcing Utah's age-verification provisions, including the Deemed-Location Provision. *See* S.B. 73 § 1 (to be codified at Utah Code § 13-2-1). The Division is located at 160 East 300 South, 2nd Floor, Salt Lake City, UT 84111, and conducts a substantial amount of official business in and relating to this District.

16.   Defendant Katie Hass serves as the Director of the Utah Division of Consumer Protection.  In that role, she oversees the administrative and enforcement work of the Division, including with respect to the provisions of S.B. 73 at issue in this suit.

6

17.     Defendant Utah Department of Commerce is an executive agency of the Utah state government and oversees the Utah Division of Consumer Protection. Among other things, pursuant to S.B. 73, the Department is responsible for approving the Division's use of resources to execute its responsibilities for enforcing Utah's age-verification laws, including the Deemed-Location Provision. *See* S.B. 73 § 19 (to be codified at Utah Code § 78B-3-1007(5)). The Department is headquartered at 160 East 300 South, 2nd Floor, Salt Lake City, UT 84111, and conducts a substantial amount of official business in and relating to this District.

18.     Defendant Margaret Busse serves as the Executive Director of the Utah Department of Commerce. In that role, she oversees the regulatory and enforcement work of that Department and its divisions, including its responsibilities under S.B. 73.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), because this action arises under and seeks equitable relief to secure rights provided by the Constitution of the United States.

20.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, 28 U.S.C. § 1651, 42 U.S.C. § 1983, and the Court's inherent equitable powers.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are headquartered and reside in this District, and because a substantial part of the events or omissions giving rise to the action occurred in this District. This action is properly brought in this District's Central Division because that Division covers Salt Lake City, where Defendants are headquartered and reside and where S.B. 73 was enacted.

**FACTUAL ALLEGATIONS**

I.    **Aylo and Its Operations in Utah**

22.    Aylo and its affiliated companies operate a portfolio of adult entertainment platforms and services, including video-sharing platforms, premium pay sites, creator-focused platforms, gaming services, and advertising networks. The full portfolio of Aylo-affiliated brands includes Pornhub, Brazzers, Redtube, Reality Kings, YouPorn, Men.com, and the Nutaku gaming marketplace.

23.    As relevant here, Aylo operates several free video-sharing platforms, which are available worldwide and offer adult content in every country except Australia, France (where only some platforms are restricted), and the United Kingdom (where only certain verified users can access Aylo's free platforms). These platforms attract over 200 million active visitors per month, over 95% of whom are transient visitors who do not have a registered account. For these transient users, Aylo receives certain limited technical information from the device or server that the visitor is using to access the Aylo platform, including the visitor's Internet Protocol ("IP") address. Based on the IP addresses associated with its users' connections, Aylo estimates that approximately 86% of the visitors appear to be accessing the platform from countries outside the United States.

24.    After Utah enacted its age-verification law in 2023, Aylo determined that the law was insufficiently protective of users' privacy interests and decided to comply by exiting the Utah free adult-content market. Aylo did so by blocking access to adult content on its free platforms for users who appear to be located in Utah. Aylo receives information from a third-party service to identify users who appear to be located in Utah by reference to the IP address associated with the user's connection. Currently, when a user's IP address is associated with a Utah-based location, Aylo blocks that user's access to adult content and instead presents a version of the relevant platform that does not contain material subject to Utah's age-verification requirement (also known as "safe for work" or non-explicit content).

8

25.     With respect to paid platforms, those sites are operated by Aylo-affiliated companies such as Aylo Premium Ltd, Nutaku Entertainment Ltd., and Aylo Social Ltd. For those paid platforms that continue to offer adult content to known users in Utah and are required to age-verify those users, those companies comply with age verification through a text message (SMS)-based verification service, which constitutes a "reasonable age verification method" within the meaning of Utah Code § 78B-3-1001(9)(b)-(c). This SMS-based service matches a user's phone number with carrier and consumer data sources to verify a user's age. The current provider that Aylo affiliates use for this service does not offer the service globally.

## II.     S.B. 73 and the Deemed-Location Provision

26.     Under Utah's existing age-verification law, any "commercial entity that knowingly and intentionally publishes or distributes" material defined by the legislature as "harmful to minors"—which includes certain sexual or adult material—from a "website that contains a substantial portion" of such material must "perform reasonable age verification methods to verify the age of an individual attempting to access the material." Utah Code § 78B-3-1002(1).

27.     Providers may satisfy this requirement "through a state-approved application" that verifies the information on an individual's license or identification card; through "an independent, third-party age verification service" that relies on age-verification databases; or through another "commercially reasonable method that relies on public or private transactional data to verify the age of the person." *Id.* § 78B-3-1001(2), (9).

28.     Currently, this age-verification requirement is enforceable only through a private right of action, not through any Utah state agency. *See id.* § 78B-3-1002(3); *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 738-39 (10th Cir. 2024).

29.     S.B. 73 expands on Utah's age-verification framework in several ways relevant to this case. First, in addition to continuing to rely on private damages actions, S.B. 73 also grants the Division of Consumer Protection authority to investigate and enforce age-verification

requirements. *See* S.B. 73 §§ 1–2, 9, 16 (to be codified at Utah Code §§ 78B-3-1004(3), 13-2-6(1)-(2)). In particular, S.B. 73 subjects covered entities to a $2,500 administrative fine for each violation, *see id.* § 16 (to be codified at Utah Code § 78B-3-1004(3)(a)(i)); potential civil penalties, injunctions, and disgorgement, *see id.* (to be codified at § 78B-3-1004(3)(b)); and cease-and-desist orders followed by potential criminal penalties for noncompliance, *see id.* § 4 (to be codified at Utah Code § 13-2-6(1)–(2)).

30.     Additionally, S.B. 73 includes the Deemed-Location Provision which provides:

> An individual is considered to be accessing the website from this state if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location to make it appear that the individual is accessing a website from a location outside this state.

*Id.* § 14 (to be codified at Utah Code § 78B-3-1002(3)).

31.     The Deemed-Location Provision will expand the scope of Utah's age-verification requirements far beyond the state's jurisdiction, and therefore beyond the constitutional limits on the state's power, precisely because it is not possible for private companies to verify in all circumstances whether an individual is using a VPN, proxy server, or other tool to disguise their location, let alone to verify a user's true geographic location. Because of that, the Deemed-Location Provision places companies in an impossible position—they must either age-verify everyone regardless of their apparent location, or they must risk significant civil penalties and the potential for criminal liability if a user (unbeknownst to the company) is located in Utah and is using a VPN, proxy server, or other means to disguise from the company the fact that they are accessing content from Utah.

32.     No state has ever before enacted this type of Deemed-Location Provision. Nor has any state attempted to give its age-verification framework such sweeping global coverage. Indeed, New Hampshire, New Mexico, and West Virginia have all considered and rejected age-verification

legislation. *See, e.g.*, N.H. H.B. 1256, 2024 Leg., Reg. Sess. (2024) (voted Inexpedient to Legislate, Feb. 15, 2024); N.M. H.B. 313, 52d Leg., Reg. Sess. (2025) (action postponed indefinitely); W.Va. H.B. 2689, 87th Leg., Reg. Sess. (2025) (died in committee). And other states, such as Wisconsin and Colorado, have considered but rejected analogous measures restricting VPNs or imposing heightened geolocation verification requirements. *See, e.g.*, Wis. A.B. 105, 2025–2026 Leg., Reg. Sess. (2025) (VPN-blocking provision affirmatively stripped by amendment on Feb. 19, 2026); Colo. S.B. 25-201, 2025 Reg. Sess. (2025) (bill requiring platforms to apply "extensive due diligence" beyond IP address geolocation died on Senate floor); *see also* Mich. H.B. 4938, 2025-2026 103d Leg. (2025) (bill restricting VPNs introduced but failed to advance). Utah's Deemed-Location Provision overrides these contrary policy choices by forcing companies to implement Utah's preferred regulatory approach on a global basis.

## III.   It Is Impossible for Private Companies to Verify Users' True Locations

33.   The Deemed-Location Provision imposes liability on companies for failing to do something that cannot be done. There is no technology that allows a private company to reliably determine in all circumstances whether an individual is using a VPN, proxy server, or other location-masking tool—and therefore no technology that allows a private company to verify a user's true geographic location.

34.   In general, every device that is connected to the Internet is assigned an IP address. IP addresses generally correspond to particular geographic areas, and thus can be used to infer a device's likely location. But there is no requirement that IP addresses correspond to specific geographic areas, and there is no guarantee that an IP-based geolocation is accurate for any particular user. Sometimes users' inferred locations may not be accurate even when users have not taken any steps to disguise or conceal their location, such as if a user is only briefly transiting through a state.

35. Additionally, VPNs and similar technologies can disguise users' IP addresses, so that a user's inferred location is different from their true geographic location. Such technologies work by routing a user's internet traffic through intermediary servers, which may be located anywhere in the world.

36. When a user connects through a VPN and then visits a website, the website sees only the IP address of the VPN server—not the user's actual IP address or actual geographic location. For example, a user located in Utah who connects to a website through a VPN server located in New York would likely register to the website simply as a connection from a New York IP address.

37. Sophisticated VPN services may daisy-chain multiple intermediate servers or devices together to give their users even greater anonymity. For example, a user in Utah might connect to a server in Switzerland, which then connects to a device in New York, which then connects to the destination website.

38. A proxy server operates in a similar fashion, acting as an intermediary between the user and the destination website, and likewise masks the user's true IP address and geographic location.

39. VPNs and proxy servers are widely used for a broad range of lawful purposes wholly unrelated to evading age-verification requirements. Journalists use VPNs to protect confidential sources. Employees use them to access corporate networks remotely. Travelers use them to secure communications on public WiFi. Activists and dissidents use them to circumvent censorship by authoritarian governments. The millions of individuals who rely on VPNs for these purposes have no interest in evading age-verification requirements, but under Utah's Deemed-Location Provision, they would nonetheless be treated as suspected Utah residents whose access to lawful adult content may be restricted or whose personal data may be subjected to verification requirements they never contemplated.

40.     Even the Utah state government relies on the use of VPNs on government systems "to ensure that only authorized users can access the network and no one can intercept data." *Support: Security*, Utah.gov (last visited Apr. 15, 2026), https://www.uii.utah.gov/support/security.html. For example, the Utah Department of Government Operations' Division of Technology Services operates a "Global Protect VPN" service that was upgraded in 2024. Div. of Tech. Servs, Utah Dep't of Gov. Ops., *State of Utah VPN Upgrade* (July 2, 2024), https://dts.utah.gov/oursuccesses/state-of-utah-vpn-upgrade.

41.     The federal judiciary, too, is "pursuing implementation of a cloud VPN service," which "will provide enhanced security and consistent access management for employees remotely accessing all Judiciary assets, irrespective of their location." Admin. Office of the U.S. Courts, *Long Range Plan for Information Technology in the Federal Judiciary: Fiscal Year 2026 Update* at 18 (Oct. 1, 2025), https://www.uscourts.gov/sites/default/files/document/it_long_range_plan_fy2026.pdf. In other words, the very tools that S.B. 73 purports to treat as evasion mechanisms are tools that Utah's own government and the federal judiciary rely on for basic security operations.

42.     There is no reliable way for a website to verify in all circumstances whether an individual is using a VPN, proxy server, or other technology that might mask their location. VPN providers operate thousands of servers worldwide and regularly cycle through IP addresses. Additionally, there is no comprehensive, centralized registry of VPN or proxy-server IP addresses. And not all VPN traffic originates from commercial VPN providers with known IP ranges.

43.     Even if a website operator could determine that a particular user was connecting through a VPN or proxy server, there is no reliable method for the operator to verify the user's true geographic location. Additional location-verification tools beyond IP addresses—such as requesting GPS coordinates, analyzing WiFi positioning data, or conducting cell-tower triangulation—may increase accuracy, but these tools are also susceptible to manipulation, and

still do not allow for verification of a user's true location. Such additional methods can also come at significant costs in terms of user experience, privacy interests, and/or operational feasibility at scale across a website's millions of users.

44. Due to limits on existing technology, any attempt to verify users' true geographic location would necessarily be both under-inclusive (by failing to capture all Utah users, thereby exposing Aylo to liability under the statute) and over-inclusive (by incorrectly identifying some individuals as being located in Utah even when they are not, and thus changing their user experience without justification).

45. Moreover, technology is continually evolving at an increasingly rapid pace. Thus, even if VPNs, proxy servers, or other tools were to become obsolete, there will likely be new tools available in the future that will also prevent accurate detection of users' locations.

46. Because it is not possible to verify a user's true location, the Deemed-Location Provision leaves covered websites with only two options: impose age verification on every user of their platforms, everywhere in the world, regardless of whether those users have any connection to Utah, or accept the permanent risk of significant civil penalties (and, potentially, criminal liability) each time a Utah resident uses a VPN. The Deemed-Location Provision does not create a workable compliance standard; it requires covered entities to impose age verification on every user worldwide or accept permanent liability exposure.

47. Nor can a company avoid this dilemma by simply blocking all users who appear to be accessing its platforms through a VPN or proxy server. As explained above, there is no reliable way to identify all VPN traffic—meaning blanket VPN blocking would still leave the company exposed to liability from VPN users it failed to detect. Additionally, blocking all apparent VPN traffic would itself cause severe and irreparable harm given that VPNs are used by hundreds of millions of people worldwide for entirely legitimate reasons having nothing to do with evading age-verification requirements, including by users who are not located in Utah and have no

14

obligation to comply with Utah law. Blocking these users would impose significant harms on companies. And because there is no way to identify only Utah-based users who are using VPNs, the Deemed-Location Provision would still operate as a global regulation requiring companies to cut off all VPN traffic worldwide. In short, blocking all VPN traffic is neither technically sufficient to achieve compliance nor commercially viable—it would impose much of the same harm as worldwide age verification while still leaving companies exposed to liability.

48.     NordVPN, a global VPN provider that counts millions of users, has warned that Utah's law will create an "unresolvable compliance paradox." Chiara Castro, *"A Liability Trap" — NordVPN Slams Utah Age Verification Law Targeting VPN Users*, TechRadar (Mar. 5, 2026), https://www.techradar.com/vpn/vpn-privacy-security/a-liability-trap-nordvpn-slams-utah-age-verification-law-targeting-vpn-users. The firm has emphasized that blocking all VPN and proxy server IP addresses in Utah is "technically impossible," as providers constantly add new addresses and no comprehensive list exists; and the result is a "technically unenforceable law" that will fail to protect minors and instead "simply punish lawful users who care about their privacy, globally." *Id.*

49.     Utah officials, including Defendants, are aware that the Deemed-Location Provision will have these effects. In particular, Utah officials, including Defendants, are aware that there is no reliable method for accurately verifying a user's true location.

50.     For example, in discussing the challenges that VPNs pose for compliance with age-verification laws, Defendant Busse recently described S.B. 73 as "putting the onus on the company to figure this out." Brigham Tomco, *How Utah Plans to Turn the Tide on Porn*, Deseret News (Mar. 20, 2026), https://www.deseret.com/politics/2026/03/20/utah-law-targets-porn-websites-with-new-tax-and-hefty-fines-here-is-why-parents-say-it-is-necessary. Busse continued that "[t]he law simply says you can't have minors on your platform.  And so the companies are going to have to figure out the VPN problem."  *Id.*

51.     Similarly, in a February 5, 2026 Senate Revenue and Taxation Committee hearing regarding S.B. 73, the legislation's chief sponsor, Senator Calvin R. Musselman, was asked how providers could identify the true location of individuals using VPNs. Senator Musselman responded: "That's a fair question.  I've talked with Consumer Protection about that, and I don't know the answer to that.  I don't." *Hearings on Online Age Verification Amendments*, Utah Senate Revenue and Taxation Committee at 1:14:39–1:15:01 (Utah Feb. 5, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/294399.

52.     Utah officials thus recognize that, under the Deemed-Location Provision, there is no way for companies to avoid the risk of liability unless they perform age-verification for all users regardless of their apparent location.

## IV.     The Deemed-Location Provision Will Cause Irreparable Harm to Aylo's Business

53.     Because Aylo cannot reliably determine whether any particular user is employing a VPN or similar technology to mask a Utah location, the only way for Aylo to ensure compliance with the Deemed-Location Provision and avoid significant civil penalties and potential criminal liability would be to implement age-verification measures for every user of every Aylo adult-content platform worldwide, regardless of where the user appears to be located.

54.     To implement universal age verification across all of Aylo's adult-content platforms for all users globally would impose substantial irreparable harms on Aylo. Universal age verification would effectively require Aylo to fundamentally transform its business operations worldwide, deploying age-verification infrastructure in dozens of jurisdictions that have made the affirmative legislative choice not to require it, at untold cost, on an impossible timeline dictated by a single state's enforcement deadline. The unquantifiable and irreversible harms associated with this transformation of Aylo's business are in addition to the immense financial costs and operational burdens of deploying age-verification infrastructure for users in jurisdictions that do not require it.

16

55.     Aylo does not presently implement a single, worldwide age-verification system, and does not believe that any currently available age-verification method appears capable of operating at global scale without introducing significant trade-offs between reliability, accuracy, privacy, data minimization, and compliance with the diverse and often conflicting legal frameworks that apply across jurisdictions. Thus, Aylo would likely need to implement multiple new systems across different regions, which would take months or years—far longer than S.B. 73's May 6, 2026 enforcement date allows. This would further compound the cost and complexity of compliance. Each age-verification system imposes substantial costs on Aylo, both in terms of designing the system, building or contracting for the system, integrating the system into Aylo's platforms, and maintaining the system. Each of those steps would require significant engineering time and resources, as well as legal costs to ensure compliance with each country's information privacy laws.

56.     Universal age verification would be existentially threatening to Aylo's core business. Aylo's adult-content platforms depend on the ability of users to access content without friction—anonymously, without submitting sensitive personal information to third-party verification services. The overwhelming majority of Aylo's worldwide users have no connection to Utah, are not subject to Utah's age-verification requirements, and have not consented to providing identification before accessing Aylo's platforms. In Aylo's experience, when faced with an age-verification requirement, the vast majority of users do not verify or give up—they simply leave, migrating to unregulated platforms that impose no such requirements. Forcing age verification on Aylo's entire worldwide user base to satisfy Utah's Deemed-Location Provision is likely to drive a significant portion of that traffic away permanently. The revenue loss would be immediate and compound over time. It would also be ultimately unrecoverable. Universal age verification would degrade the user experience for the overwhelming majority of Aylo's adult users

17

who are not located in Utah and who are not subject to Utah's age-verification requirements. This would result in lost traffic, lost revenue, and competitive harm to Aylo.

57.    Aylo's past experience with age-verification laws confirms the tremendous harms that Aylo would face if forced to implement age-verification on a global basis. For example, when Louisiana began requiring age verification, one of Aylo's platforms suffered an over 80% drop in Internet traffic from within the state.

58.    Similarly, when the United Kingdom implemented its age-verification regime, Aylo's platforms experienced an approximately 75% decline in traffic from UK-based users. Aylo's experience across jurisdictions has been consistent: when faced with an age-verification requirement, the vast majority of users do not verify and instead leave the platform.

59.    Based on Aylo's experience implementing age verification in jurisdictions that require it, Aylo estimates that if it were forced to implement age-verification across all of its worldwide platforms, it would lose almost 80% of its revenue. Those consequences would be devastating to Aylo's business. Lost revenue from users who refuse to submit to age verification cannot be recovered after the fact through damages. Aylo's business model depends on the free flow of anonymous traffic; once that traffic is driven to other platforms, a significant portion is unlikely to come back. The harm is immediate, massive, and longstanding. That extreme loss would be unrecoverable and would have a severe impact on Aylo, its affiliated companies, and their employees.

60.    Aylo would also suffer severe and unrecoverable reputational harm with its consumers and users. Aylo has built its user relationships on a commitment to protecting user privacy—a commitment that is central to its brand, its competitive position, and its public advocacy on age-verification policy globally. Being forced by a single state to impose privacy-invasive data collection on millions of users worldwide would fundamentally and irreparably damage that relationship. Reputational harm of this kind cannot be undone by a damages award

18

after the fact. Aylo has long taken steps to protect user privacy, and being forced to implement Utah's age-verification system worldwide—requiring users to submit potentially sensitive personal information before accessing adult content—would fundamentally undermine Aylo's reputation among its customers and users.

## V.    Compliance Could Expose Aylo to Liability Risks Under Other Jurisdictions' Laws.

61.    Compliance with the Deemed-Location Provision would also create risks for Aylo in connection with the laws of other jurisdictions, or at least expose Aylo to a risk of allegations of noncompliance. A growing number of states have enacted comprehensive consumer privacy statutes that restrict the collection, retention, and processing of personal identifying information— including information about individuals' sexual habits and/or geolocation. For example, Maryland's Online Data Privacy Act restricts the collection, processing, or sharing of such data to what is "strictly necessary" to provide a specific product or service requested by the consumer. Md. Code, Com. Law §§ 14-4701(gg), 14-4707(a)(1). It is far from clear that Maryland would consider age-verification of users located in Maryland "strictly necessary" simply because Utah has enacted the Deemed-Location Provision.

62.    Moreover, several states require users to provide affirmative consent before processing sensitive data like geolocation, and also prohibit companies from discriminating against users that exercise their rights not to consent to certain data collection. *See, e.g.*, Cal. Civ. Code § 1798.140(ae)(1)(C) (defining "sensitive personal information" to include "[p]recise geolocation"); *id.* § 1798.121(a) (right to limit use and disclosure of sensitive personal information); Va. Code § 59.1-575 (defining "sensitive data" to include "[p]recise geolocation data"); *id.* § 59.1-578(A)(5) (requiring opt-in consent for processing sensitive data); Tex. Bus. & Com. Code § 541.001(29)(D) (defining sensitive data to include precise geolocation); *id.* § 541.101(b)(4) (requiring consent for processing sensitive data). To the extent Utah contends that Aylo should require more detailed geolocation data from users and deny access

19

to anyone that refuses to provide such information, that could stand in tension with these other states' privacy laws.

63.     This tension is not limited only to domestic law.  Aylo operates worldwide, including in the European Union, and thus is subject to the European Union's General Data Protection Regulation ("GDPR"). Regulation (EU) 2016/679, 2016 O.J. (L 119) 33.

64.     The GDPR classifies location data as "personal data" subject to its full regulatory framework.  Regulation (EU) 2016/679, art. 4(1). Any processing of location data must satisfy one of the GDPR's six enumerated lawful bases for processing and must comply with the GDPR's data-minimization principle, which requires that personal data be "adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed." *Id.* art. 5(1)(c); *see also id.* art. 6(1). Again, European regulators may not view compliance with Utah's Deemed-Location Provision as sufficiently "necessary" to justify collecting location data or other identifying information from European residents.

65.     If Utah's Deemed-Location Provision is permitted to stand, other states may enact similar provisions, each purporting to regulate worldwide age verification based on the possibility that VPN users within their borders might access covered websites. The result would be a patchwork of overlapping and potentially conflicting state-enacted worldwide regulatory regimes. Such regimes would exponentially increase the complexity and cost of compliance for Internet-based businesses including Aylo.

66.     Aylo is thus put in an impossible position: either risk significant civil penalties and potential criminal liability for conduct that Aylo has no way to detect or prevent, or implement Utah's preferred age-verification system across its worldwide platforms. Either choice entails significant irreparable harm, which warrants injunctive relief against enforcement of S.B. 73's Deemed-Location Provision.

20

**COUNT I**

**UNLAWFUL STATE EXTRATERRITORIAL REGULATION**

67.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

68.   Federal courts possess the authority to enjoin the enforcement of state laws that are contrary to the federal Constitution.  U.S. Const., art. VI, cl. 2 (Supremacy Clause); *Ex parte Young*, 209 U.S. 123 (1908).

69.   For the reasons explained in the foregoing paragraphs, S.B. 73's Deemed-Location Provision exceeds the authority permitted to the Utah state government under the Constitution.

70.   Each state's authority to regulate conduct "must be assessed in the context of our federal system of government" and must "remain faithful to the principles of interstate federalism embodied in the Constitution." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980) (quotation marks omitted).

71.   Our federal system functions only if the states' legislative powers are constrained by respect for each other's "equal sovereignty." *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013). The "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* (quotation marks omitted). "[I]t would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State," and encroach on the jurisdiction of another, "without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

72.   The Deemed-Location Provision is contrary to those constitutional principles and invades other states' orbit of lawful authority. Because it is effectively impossible for Aylo to determine users' true locations, the only way for Aylo to avoid liability under the Deemed-Location Provision is to implement age verification for all users of its adult-content platforms worldwide.

The Deemed-Location Provision thus projects Utah's policy preference onto all fifty states and onto foreign nations, compelling Aylo to change its lawful conduct everywhere in order to satisfy a single state's regulatory mandate.

73.     This extraterritorial command exceeds the limits of Utah's sovereign authority. Utah has no legitimate interest in regulating how Aylo interacts with users in California, New York, or Germany who are not and have never been located in Utah. Yet the Deemed-Location Provision's practical effect is to do exactly that.

74.     It follows from "principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing [their] lawful conduct in other States." *BMW of N. Am.*, 517 U.S at 572. The Deemed-Location Provision crosses that constitutional line because it threatens Aylo with civil penalties and potential criminal liability if it fails to implement burdensome age-verification measures in all fifty states.

75.     The Deemed-Location Provision is thus unconstitutional extraterritorial state legislation, contrary to the Due Process Clause and principles of horizontal federalism embodied in the structure of the Constitution.

## COUNT II

## VIOLATION OF THE DORMANT COMMERCE CLAUSE

76.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

77.     The Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, grants Congress the power to regulate commerce "among the several States."

78.     This grant of power has long been understood to contain a negative or "dormant" component that limits the authority of individual states to regulate interstate commerce, even in the absence of congressional action. A state statute that "directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's

22

authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336.

79. That is precisely what the Deemed-Location Provision does. Aylo's free sites have exited the Utah adult-content market, yet Utah's Deemed-Location Provision would effectively require Aylo to implement age verification for all users worldwide—including users engaged in wholly out-of-state transactions that have no connection to Utah whatsoever. Yet the Supreme Court has recognized that states may not enact laws that "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023).

80. Additionally, a state law violates the dormant Commerce Clause if "the burden [it] impose[s] on interstate commerce is clearly excessive in relation to the putative local benefits." *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1209 (10th Cir. 2025) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). And S.B. 73's burdens significantly outweigh its purported local benefits. Since Utah's existing age-verification laws already purport to protect most minors from viewing potentially harmful material without the Deemed-Location Provision, S.B. 73 protects only the small population of Utah minors who are able to evade age-verification requirements through VPNs or other tools. But to achieve that narrow benefit, S.B. 73 mandates that adult-content providers nationwide (indeed, worldwide) must age-verify each user on their platforms. The burden of age-verifying every user on every platform in every state eclipses the benefit of preventing a small number of minors from evading age gates. And Utah could address the purported problem with far fewer burdens on interstate commerce. *See Dorrance v. McCarthy*, 957 F.2d 761, 764 (10th Cir. 1992) ("The Court has continued to consider the availability of less burdensome alternatives in analyzing Commerce Clause challenges[.]"). If Utah is concerned about VPNs and other tools being used to disguise users' locations, Utah can regulate those tools directly. Indeed, Utah's overreach is particularly egregious because the problem it seeks to solve—

23

the inability to detect users' true locations—is not one of Aylo's making. The Constitution does not permit Utah to place the burden on Aylo to figure out where users are located, and, in so doing, force every other state to suffer the externalities of Utah's regulation.

81. The Deemed-Location Provision also discriminates against out-of-state entities in practical effect, by forcing them to surrender "the advantages they enjoy[] against their in-state rivals." *Pork Producers*, 598 U.S. at 372. Aylo exited Utah's adult-content market as a competitive choice that allowed it to offer users stronger privacy protections than competitors who remained. The Deemed-Location Provision strips away that advantage by forcing Aylo to implement Utah's age-verification system regardless of whether it serves Utah users at all, placing it on the same competitive footing as companies that never left.

82. The Deemed-Location Provision accordingly violates the dormant Commerce Clause of the United States Constitution and must be enjoined.

## COUNT III

### VIOLATION OF THE FOREIGN COMMERCE CLAUSE

83. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

84. The Constitution vests in the federal government exclusive authority over foreign affairs and commerce with foreign nations. U.S. Const. art. I, § 8, cl. 3. The Commerce Clause's limitations on state authority are therefore even more stringent with respect to foreign commerce. "In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) (quotation marks omitted); *see also Japan Line*, 441 U.S. at 446.

85. The Deemed-Location Provision unconstitutionally burdens foreign commerce in at least two respects.

86. First, the Deemed-Location Provision in effect requires Aylo to implement age-verification measures worldwide, including for users who are foreign nationals, located abroad,

seeking to access websites hosted and operated abroad by a foreign company. As alleged above, approximately 86% of visitors to Aylo's platforms are located outside the United States. For those users, the transaction is wholly foreign: a foreign individual accessing a foreign company's website from a foreign location. The connection to any United States interest, let alone to Utah specifically, is nonexistent. A single state lacks authority to regulate such wholly foreign transactions.

87.     Second, even assuming Utah could reach such commerce, the Deemed-Location Provision usurps the federal government's proper authority over foreign commercial relations, and does so without regard to existing international trade agreements or foreign regulatory frameworks. As alleged above, the GDPR classifies location data as personal data and requires that any processing of such data satisfy the GDPR's data-minimization principle, limiting collection to what is "necessary in relation to the purposes for which [the data is] processed." Regulation (EU) 2016/679, art. 5(1)(c). European regulators may not view compliance with Utah's Deemed-Location Provision as a sufficient basis to justify collecting location data or other identifying information from European residents, placing Aylo in the position of choosing which sovereign's requirements to violate. And to the extent Aylo is unable to quickly implement age-verification solutions for certain foreign users, the Deemed-Location Provision would effectively operate as a trade barrier, cutting off some foreign commerce entirely. The Deemed-Location Provision thus disrupts the federal government's ability to "speak with one voice when regulating commercial relations with foreign governments," *Japan Line*, 441 U.S. at 449, and impedes the carefully calibrated balance of international obligations that is constitutionally committed to the federal political branches.

88.     The Deemed-Location Provision accordingly violates the Foreign Commerce Clause of the United States Constitution.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

a.  declaring that the Deemed-Location Provision is unlawful;

b.  preliminarily and permanently enjoining Defendants and their agents from enforcing the Deemed-Location Provision;

c.  preliminarily and permanently enjoining Defendants and their agents from enforcing Utah Code § 78B-3-1002(1)(a) against Plaintiffs and their affiliates in connection with any individual whose location appeared to Plaintiffs and their affiliates to be outside the State of Utah;

d.  entering judgment in favor of Plaintiffs; and

e.  issuing any and all other such relief as the Court deems just and proper.

Dated: April 22, 2026                           Respectfully Submitted,

                                                */s/ Annika L. Jones*
                                                Annika L. Jones (16483)
                                                Brandon S. Fuller (17215)
                                                SNELL & WILMER L.L.P.
                                                15 West South Temple, Suite 1200
                                                Salt Lake City, Utah 84101-1004
                                                Telephone: (801) 257-1900
                                                Facsimile: (801) 257-1800
                                                aljones@swlaw.com
                                                bfuller@swlaw.com

                                                Lindsay C. Harrison *(pro hac vice forthcoming)*
                                                Jessica Ring Amunson *(pro hac vice forthcoming)*
                                                Daniel Schwei *(pro hac vice forthcoming)*
                                                JENNER & BLOCK LLP
                                                1099 New York Ave. NW
                                                Suite 900
                                                Washington, DC 20001
                                                Telephone: (202) 639-6000
                                                lharrison@jenner.com
                                                jamunson@jenner.com
                                                dschwei@jenner.com

                                                *Attorneys for Plaintiffs*

26