Annika L. Jones (16483)
Brandon S. Fuller (17215)
**SNELL & WILMER L.L.P.**
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
aljones@swlaw.com
bfuller@swlaw.com

Lindsay C. Harrison *(pro hac vice forthcoming)*
Jessica Ring Amunson *(pro hac vice forthcoming)*
Daniel Schwei *(pro hac vice forthcoming)*
**JENNER & BLOCK LLP**
1099 New York Ave. NW
Suite 900
Washington, DC, 20001
Telephone: (202) 639-6000
lharrison@jenner.com
jamunson@jenner.com
dschwei@jenner.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| AYLO FREESITES LTD, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UTAH DIVISION OF CONSUMER PROTECTION, *et al.*,<br><br>*Defendants*. | **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:26-cv-00340 |

4913-5907-5492

# TABLE OF CONTENTS

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 4

A. Aylo and Its Operations in Utah .......... 4

B. S.B. 73 and the Deemed-Location Provision .......... 5

C. Private Companies Cannot Verify Users' True Locations .......... 6

D. The Deemed-Location Provision Will Cause Significant Irreparable Harm .......... 8

ARGUMENT .......... 9

I. Aylo Is Likely to Succeed on the Merits. .......... 10

A. Utah's Deemed-Location Provision Is Impermissible Extraterritorial Regulation in Violation of the Due Process Clause and Federalism Principles Because It Demands Worldwide Compliance with Utah Law. .......... 10

B. The Dormant Commerce Clause Prohibits the Deemed-Location Provision's Significant Burdens on Out-of-State Commerce. .......... 15

C. The Deemed-Location Provision Impermissibly Interferes with Foreign Commerce .......... 19

II. Aylo Will Be Irreparably Harmed If S.B. 73 Goes Into Effect. .......... 21

III. The Balance of the Equities and Public Interest Favor Aylo's Requested Injunction. .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

### Cases

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) .......... 16-17

*American Insurance Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......... 21

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) .......... 25

*Barclays Bank PLC v. Franchise Tax Board of California*,
512 U.S. 298 (1994) .......... 20

*Baston v. United States*,
137 S. Ct. 850 (2017) .......... 19

*Board of Trustees of University of Illinois v. United States*,
289 U.S. 48 (1933) .......... 20

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996) .......... 11-14

*Bristol-Myers Squibb Co. v. Superior Court of California*,
582 U.S. 255 (2017) .......... 11

*Chamber of Commerce v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .......... 24

*Container Corp. of America v. Franchise Tax Board*,
463 U.S. 159 (1983) .......... 21

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) .......... 23

*Dorrance v. McCarthy*,
957 F.2d 761 (10th Cir. 1992) .......... 18

*DTC Energy Group, Inc. v. Hirschfeld*,
912 F.3d 1263 (10th Cir. 2018) .......... 23

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 16

*Franchise Tax Board v. Hyatt*,
587 U.S. 230 (2019) ..........10

*Free Speech Coalition, Inc. v. Anderson*,
119 F.4th 732 (10th Cir. 2024) ..........5

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ..........10

*Great Salt Lake Minerals & Chemicals Corp. v. Marsh*,
596 F. Supp. 548 (D. Utah 1984) ..........23

*Green Room LLC v. Wyoming*,
157 F.4th 1196 (10th Cir. 2025) .......... 16-17

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ..........19

*Husky Ventures, Inc. v. B55 Investments, Ltd.*,
911 F.3d 1000 (10th Cir. 2018) ..........23

*Japan Line, Ltd. v. Los Angeles County*,
441 U.S. 434 (1979) .......... 20-21

*Kleinsmith v. Shurtleff*,
571 F.3d 1033 (10th Cir. 2009) ..........19

*Limitless Worldwide, LLC v. AdvoCare International, LP*,
926 F. Supp. 2d 1248 (D. Utah 2013) ..........23

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ..........24

*National Foreign Trade Council v. Natsios*,
181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ..........21

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ..........16, 18

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) .......... 22, 24-25

*New York Life Insurance Co. v. Head*,
234 U.S. 149 (1914) .......... 12-13

*Nken v. Holder*,
556 U.S. 418 (2009).....25

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970).....18

*Quik Payday, Inc. v. Stork*,
549 F.3d 1302 (10th Cir. 2008).....16

*In re Sealed Case*,
936 F.3d 582 (D.C. Cir. 2019).....19

*Shafer v. Farmers' Grain Co. of Embden*,
268 U.S. 189 (1925).....16

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408 (2003).....11-13

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994).....22

*United States v. Davila-Mendoza*,
972 F.3d 1264 (11th Cir. 2020).....19

*United States v. Durham*,
902 F.3d 1180 (10th Cir. 2018).....19

*Wardair Canada, Inc. v. Florida Department of Revenue*,
477 U.S. 1 (1986).....20

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980).....11

**Statutes and Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3.....16, 19

Cal. Civ. Code § 1798.100(c).....15

Cal. Civ. Code § 1798.121(a).....14

Cal. Civ. Code § 1798.140(ae)(1)(C).....14

Md. Code Com. Law § 14-4707(b)(1).....15

Tex. Bus. & Com. Code § 541.001(29)(D).....15

Tex. Bus. & Com. Code § 541.101(b)(4) ....................15

Utah Code § 13-2-6(1) ....................5

Utah Code § 13-2-6(2) ....................5, 22

Utah Code § 76-5c-205 ....................18, 25

Utah Code § 78B-3-1001(2) ....................4

Utah Code § 78B-3-1001(9) ....................4

Utah Code § 78B-3-1002(3) .................... *passim*

Va. Code § 59.1-575 ....................14

Va. Code § 59.1-578(A)(1) ....................15

Va. Code § 59.1-578(A)(5) ....................15

**Legislative Materials**

Colo. S.B. 25-201, Reg. Sess. (2025) (introduced Mar. 20, 2025) ....................6, 14

*Hearings on Online Age Verification Amendments*, Utah Senate Revenue and Taxation Committee (Utah Feb. 5, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/294399 ....................2

*Hearings on Online Age Verification Amendments*, Utah House Revenue and Taxation Committee (Utah Feb. 25, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/300609 ....................17

Mich. H.B. 4938, 2025-2026 103d Leg. (2025) ....................6, 14

N.H. H.B. 1256, 2024 Leg., Reg. Sess. (2024) ....................14

N.M. H.B. 313, 52d Leg., Reg. Sess. (2025) ....................14

Utah S.B. 287, 65th Leg., Gen. Sess. (2023) (codified at Utah Code § 78B-3-1002) ....................4

Utah S.B. 73, 66th Leg., Gen. Sess. (2026) (effective May 6, 2026) (to be codified at Utah Code § 78B-3-1002(3)) .................... *passim*

W. Va. H.B. 2689, 87th Leg., Reg. Sess. (2025) ....................14

Wis. A.B. 105, 2025-2026 Leg., Reg. Sess. (Wis. 2025) ....................6, 14

**Other Authorities**

26 States' Br. *Amici Curiae* in Support of Pet'rs', *Suncor Energy (U.S.A.) Inc. et al. v. County Commissioners of Boulder County*, No. 25-170 (U.S. Sept. 26, 2025) ....................11, 15

GDPR art. 4(1) ....................24

GDPR art. 5(1)(c) ....................21

GDPR art. 6(1) ....................21

Jack Goldsmith & Eugene Volokh, *State Regulation of Online Behavior: The Dormant Commerce Clause and Geolocation*, 101 Tex. L. Rev. 1083 (2023) ....................17

Leif LeMahieu, *Trump Admin Launches Global Crackdown To Shield Kids From Pornography, Online Abuse*, Daily Wire (Apr. 14, 2026), https://www.dailywire.com/news/trump-admin-launches-global-crackdown-to-shield-kids-from-pornography-online-abuse .................... 20-21

Restatement (Third) of Foreign Relations Law § 402 (1987).................... 19-20

Brigham Tomco, *How Utah Plans to Turn the Tide on Porn*, Deseret News (Mar. 20, 2026), https://www.deseret.com/politics/2026/03/20/utah-law-targets-porn-websites-with-new-tax-and-hefty-fines-here-is-why-parents-say-it-is-necessary/. ....................6

Ernesto Van der Sar, *Netflix Intensifies 'VPN Ban' and Targets Residential IP-Addresses Too (Updated)*, Torrent Freak (Aug. 11, 2021), https://torrentfreak.com/netflix-intensifies-vpn-ban-and-targets-residential-ip-addresses-too-210811/. ....................7

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs, Aylo Freesites Ltd and Aylo Group Ltd, respectfully move the Court to issue a preliminary injunction barring Defendants from enforcing Utah Code § 78B-3-1002(3), scheduled to become effective on May 6, 2026, on the grounds that the statute constitutes impermissible extraterritorial regulation, violates the Dormant Commerce Clause, and is contrary to the Foreign Commerce Clause.

Absent a preliminary injunction enjoining the statute prior to its May 6 effective date, Plaintiffs will be placed in an impossible position: either risk massive liability in the form of civil and possibly even criminal penalties, or undertake significant and unrecoverable costs that will devastate their business and damage their reputations. Plaintiffs are therefore entitled to immediate relief, as demonstrated by the below memorandum and supporting declarations from Andreas Alkiviades Andreou (Ex. A), Graham Collie (Ex. B), and Dr. Gregory J. Rattray (Ex. C).

## INTRODUCTION

Plaintiffs, Aylo Freesites Ltd and its parent company Aylo Group Ltd, are international technology and media companies operating several adult-entertainment platforms.[1] In 2023, Utah enacted an age-verification mandate for adult-content providers. Aylo does not object in principle to limiting access to adult content to only age-verified users, but any government-mandated age-verification system must be technically feasible, practicably and equitably enforced across the industry, and sufficiently protective of user privacy. Aylo determined that Utah's law failed to meet those core principles, and in particular failed to sufficiently protect user privacy. Accordingly, Aylo chose to comply with the new law by withdrawing from the Utah adult-entertainment market.

The legality of Utah's existing age-verification law is not at issue in this suit. Instead, Aylo challenges a new Utah law that goes significantly—and unconstitutionally—beyond age verification. On March 19, 2026, Utah enacted Senate Bill 73 ("S.B. 73" or "the Act"), which

[1] For purposes of this case, the shorthand "Aylo" is intended to refer only to Aylo Freesites Ltd, except where otherwise indicated.

extends Utah's age-verification mandate further than any state has previously attempted. The provision declares that a user is legally "located in" Utah—and therefore subject to Utah's age-verification requirements—even if the user appears to be accessing content from outside Utah through a virtual private network ("VPN"), proxy server, or other location-masking technology. S.B. 73, 66th Leg., 2026 Gen. Sess. § 14 (Utah 2026) (effective May 6, 2026) (to be codified at Utah Code § 78B-3-1002(3)) (the "Deemed-Location Provision"). Under this Deemed-Location Provision, adult-content providers face civil penalties and potential criminal liability for failing to age-verify users they have no way of knowing are accessing their sites from within Utah.

This provision is a *de facto* worldwide mandate to age-verify all users. There is no technology, commercially available or otherwise, that allows a private company to reliably determine whether a user is employing a VPN, proxy server, or other location-masking technology, let alone to verify that user's true location. This is not a temporary technological gap. It is an inherent feature of how VPNs work: they are designed to prevent third parties from identifying a user's true location. Indeed, the Utah officials responsible for enacting and enforcing S.B. 73 have admitted that they do not know how private companies are supposed to comply. The chief sponsor of S.B. 73, when asked directly how providers could identify the location of users employing VPNs, responded: "That's a fair question. I've talked with Consumer Protection about that, and I don't know the answer to that. I don't."[2]

Because no technology can solve this problem, the Deemed-Location Provision leaves Aylo with only two choices. It can implement age verification for every user of every Aylo adult-content platform, worldwide, regardless of where those users are located, whether their own governments require such data collection, and what privacy laws in their own jurisdictions may forbid. Or Aylo can accept permanent exposure to civil penalties and potential criminal liability

[2] *Hearings on Online Age Verification Amendments*, Utah Senate Revenue and Taxation Committee at 1:14:30-1:15:01 (Utah Feb. 5, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/294399.

every time a Utah resident uses a VPN. Neither choice is lawful. No single state has constitutional authority to dictate the terms on which a global company may operate on the global Internet.

This attempt to project Utah's age-verification law onto the entire world is unconstitutional for three independent reasons. First, the Deemed-Location Provision violates the Constitution's prohibition on extraterritorial state legislation by effectively requiring adult-content providers to age-verify all worldwide users in order to comply with Utah law. Second, the Deemed-Location Provision violates the dormant Commerce Clause by directly regulating commercial conduct occurring wholly outside of Utah and imposing burdens on interstate commerce that are grossly disproportionate to any conceivable local benefit. Third, the Deemed-Location Provision violates the Foreign Commerce Clause by purporting to regulate wholly international transactions between a foreign company and foreign nationals conducted on foreign servers, and by usurping the federal government's exclusive authority to speak with one voice in regulating foreign commerce.

S.B. 73's Deemed-Location Provision takes effect May 6, 2026. If the Act is not enjoined, the consequences for Aylo will be immediate, severe, and irreparable. The company will no longer be able to comply with Utah law simply by blocking access to adult content in Utah. Instead, Aylo must choose between (1) risking civil and potential criminal liability if an individual disguises their location but in fact is located in Utah, or (2) implementing Utah's age-verification mandate for all users worldwide, regardless of their apparent location. The latter would require massive unrecoverable compliance costs, drive the overwhelming majority of Aylo's global users to competitors who do not share Aylo's commitment to compliance, and irreparably damage the user-privacy reputation on which Aylo's business depends—all to satisfy the demands of a single state acting far beyond its constitutional authority. These harms cannot be remedied through damages after the fact. Aylo thus seeks emergency relief and respectfully requests that this Court issue a preliminary injunction prohibiting enforcement of the Deemed-Location Provision before May 6.

## FACTUAL BACKGROUND

### A. Aylo and Its Operations in Utah

Aylo Freesites Ltd is a technology company that operates free adult-entertainment platforms, including well-known sites like Pornhub, Youporn, and Redtube. Andreou Decl. ¶ 5. Aylo is a foreign company, incorporated in Cyprus and with its principal place of business in Cyprus. *Id.* It is a wholly owned subsidiary of Aylo Group Ltd and does not have any employees or offices in the United States. *Id.* Aylo's free platforms with adult content are available worldwide in every country except Australia, France (where only some platforms are restricted), and the United Kingdom (where only certain verified users can access Aylo's free platforms). Collie Decl. ¶ 6. Across the world, Aylo's sites receive over 200 million active visitors each month, and approximately 86% of those visitors are believed to be outside the United States. *Id.* ¶ 12.

Aylo believes an age-appropriate Internet experience should be presented to every user who accesses the Internet. *Id.* ¶ 4. Aylo has engaged at length with governments and technology companies to promote effective age-verification solutions. *Id.* In Aylo's experience, when jurisdictions enact unworkable age-verification laws, users depart sites like Aylo's that implement content-moderation and trust-and-safety protocols, and instead visit sites where they are more likely to be exposed to illegal, obscene, or harmful material. *Id.* ¶ 28.

Since 2023, Utah has required certain adult-content providers to verify the age of all Utah-based users. *See* S.B. 287, 65th Leg., 2023 Gen. Sess. (Utah 2023) (codified at Utah Code § 78B-3-1002). Providers can do this "through a state-approved application" that verifies the information on an individual's license or identification card; through "an independent, third-party age verification service" that relies on age-verification databases; or through another "commercially reasonable method" that uses transaction data. Utah Code § 78B-3-1001(2), (9).

Following this law's enactment, Aylo concluded that Utah's regime did not adequately protect user privacy and thus Aylo exited the Utah market for free adult content. *Id.* ¶ 8. Aylo did this initially by blocking Utah-based Internet Protocol (IP) addresses on its sites, but later made

the sites accessible to Utah users without offering any adult content on them. *Id.*

Some Aylo-affiliated platforms (also owned by Aylo Group Ltd) continue to distribute adult content to users located in Utah in connection with paid accounts. Unlike users of free sites, who access content anonymously and have not consented to providing sensitive personal information, users with paid accounts have already voluntarily provided payment and identity information to Aylo as part of creating an account. For those users, the incremental privacy burden of age verification is limited. *Id.* ¶ 10. The paid platforms that are required to verify Utah users' ages do so through a text message (SMS)-based verification system, which the current third-party provider makes available for some countries but not globally. *Id.* ¶ 11.

**B. S.B. 73 and the Deemed-Location Provision**

On March 19, 2026, Utah expanded its age-verification law by enacting S.B. 73, the relevant provisions of which are scheduled to become effective May 6, 2026. S.B. 73 significantly escalates the enforcement consequences for age-verification violations. Currently, Utah's age-verification law is enforceable only through a private right of action. *See* Utah Code § 78B-3-1002(3); *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 738-39 (10th Cir. 2024). S.B. 73 adds government enforcement: the Division of Consumer Protection may impose a $2,500 administrative fine per violation; bring civil actions for penalties, injunctive relief, and disgorgement; and issue cease-and-desist orders backed by criminal penalties for noncompliance. *See* S.B. 73 §§ 1-2, 4, 9, 16 (to be codified at Utah Code §§ 78B-3-1004(3), 13-2-6(1)-(2)).

Additionally, S.B. 73 effectively transforms Utah's age-verification mandate into a global one. The relevant provision, the Deemed-Location Provision, provides that:

> An individual is considered to be accessing the website from this state if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location to make it appear that the individual is accessing a website from a location outside this state.

S.B. 73 § 14 (to be codified at Utah Code § 78B-3-1002(3)). Because it is impossible for

companies to verify an individual's VPN usage or true location, a company must age-verify all users worldwide, regardless of apparent location, to guard against the risk that some users might (unbeknownst to the company) be located in Utah.

Utah officials are well aware of companies' inability to detect VPN usage or users' true locations. In a hearing prior to S.B. 73's passage, the Act's chief sponsor, Senator Musselman, was asked how providers could identify VPN users' locations. He responded: "That's a fair question. I've talked with Consumer Protection about that, and I don't know the answer to that. I don't." *See supra* n. 2. More recently, the Executive Director of the Utah Department of Commerce, Margaret Busse, who oversees the Division of Consumer Protection, likewise did not know how companies could comply: "The law is putting the onus on the company to figure this out."[3]

The Deemed-Location Provision is the first law of its kind enacted anywhere in the country. Other states have considered and either rejected or failed to advance similar legislation targeting the use of VPNs. *See, e.g.*, Wis. A.B. 105, 2025–2026 Leg., Reg. Sess. (2025) (VPN-blocking provision affirmatively stripped by amendment on Feb. 19, 2026); Mich. H.B. 4938, 2025–2026 103d Leg. (2025) (introduced Sept. 11, 2025); Colo. S.B. 25-201, 2025 Reg. Sess. (2025) (introduced Mar. 20, 2025).

**C. Private Companies Cannot Verify Users' True Locations.**

As Utah officials have acknowledged, no reliable method exists to verify whether a user who appears to be located outside Utah is, in fact, located there. As explained in Dr. Rattray's expert declaration, this impossibility has two dimensions. *See* Rattray Decl. ¶¶ 15-20.

First, companies cannot reliably detect VPN usage. Internet traffic is routed through IP addresses that correspond approximately to geographic locations; VPNs, proxy servers, and similar tools allow users to route their traffic through servers located elsewhere, masking their true IP

[3] Ex. D, Brigham Tomco, *How Utah Plans to Turn the Tide on Porn,* Deseret News (Mar. 20, 2026), https://www.deseret.com/politics/2026/03/20/utah-law-targets-porn-websites-with-new-tax-and-hefty-fines-here-is-why-parents-say-it-is-necessary/.

address entirely. *Id.* ¶¶ 18, 42-48. There is no comprehensive registry of VPN services or proxy server IP addresses, VPN providers operate thousands of servers and regularly cycle through IP addresses, and VPN providers have developed techniques specifically designed to prevent websites from identifying that traffic is routed through a VPN. *Id.* ¶¶ 38-39, 44-45. Attempting to block known VPN traffic is thus a permanent moving target—and one that will always be incomplete. *Id.* ¶ 38-39, 44-45, 47. Other companies' attempts to block VPN traffic have proven to be full of pitfalls, as VPN providers have managed to circumvent the blocking measures and those measures have inadvertently blocked non-VPN users from accessing websites.[4]

Second, even if a company could identify that a particular user was employing a VPN, proxy server, or similar tool, it still could not determine that user's true geographic location. Knowing that someone is using a VPN reveals only that their apparent IP address is not their real one—it says nothing about where they actually are. Rattray Decl. ¶¶ 42, 46. Additional tools can marginally increase the likelihood of identifying a user's true location, but they remain unreliable and come at significant cost to user privacy and a website's efficient operation. *Id.* ¶¶ 49-66. This inability to verify location is not a temporary technological gap awaiting a solution; it is an inherent feature of these technological systems. *Id.* ¶¶ 20, 39.

Finally, even if a company could identify VPN usage, that would not signal an attempt by individuals in Utah to disguise their location. *Id.* ¶¶ 35, 46. Users throughout the world rely on VPNs for entirely legitimate purposes—*e.g.*, securing communications on public networks, preventing websites from harvesting personal data, and circumventing censorship by oppressive governments. *Id.* ¶ 35. So even if Aylo could identify which users access its platforms through VPNs (it cannot), that still would not justify treating those users as presumptively Utah-based.

---

[4] *See* Ex. E, Ernesto Van der Sar, *Netflix Intensifies 'VPN Ban' and Targets Residential IP-Addresses Too (Updated)*, Torrent Freak (Aug. 11, 2021), https://torrentfreak.com/netflix-intensifies-vpn-ban-and-targets-residential-ip-addresses-too-210811/.

**D. The Deemed-Location Provision Will Cause Significant Irreparable Harm**

S.B. 73's Deemed-Location Provision is set to become effective May 6, 2026. As of that date, even though Aylo has already taken steps to block *known* Utah users from accessing adult content on its platforms, Aylo will face liability even for *unknown* users located within Utah—*i.e.*, those who are using technologies to disguise their true location.

Because Aylo has no way to verify whether someone is using a VPN, proxy, or similar tool or is truly located outside Utah, the only way for Aylo to avoid liability under the Deemed-Location Provision is to implement age-verification measures across all Aylo platforms worldwide. To do so would impose substantial irreparable harm. Aylo would need to fundamentally transform its business operations worldwide, deploying age-verification infrastructure in dozens of jurisdictions that have made the affirmative legislative choice not to require it. *See* Collie Decl. ¶¶ 21-23. Aylo does not presently implement a single, worldwide age-verification system, and no currently available age-verification method appears capable of operating at global scale without introducing significant trade-offs. *Id.* ¶¶ 22-23. Aylo would thus need to implement multiple new systems across different regions, which would take months or years and would be incredibly costly. *Id.*

More fundamentally, universal age verification would devastate Aylo's core business. Aylo's adult-content platforms depend on the ability of users to access content without friction—anonymously, and without submitting sensitive personal information to third-party verification services. Industry data and Aylo's own experience demonstrate that when faced with an age-verification requirement, the vast majority of users do not verify—they simply leave, migrating to other platforms that impose no such requirements. *Id.* ¶¶ 25-28. Based on past experience with state and country age-verification restrictions, Aylo estimates that if it were forced to implement age verification across all of its worldwide platforms, it would lose almost 80% of its revenue. *Id.* ¶ 27. This revenue loss would be immediate and unrecoverable. *Id.*

Aylo would also suffer severe and unrecoverable reputational harm. Aylo has built its user

relationships on a commitment to protecting user privacy—a commitment that is central to its brand, its competitive position, and its public advocacy on age-verification globally. Being forced by a single state to impose privacy-invasive data collection on millions of users worldwide would fundamentally and irreparably damage that reputation. *Id.* ¶¶ 29, 35.

Finally, Aylo cannot avoid this dilemma by simply blocking or age-verifying all users who appear to be accessing its platforms through a VPN or proxy server. As explained above, there is no reliable way to identify all VPN traffic—meaning Aylo would still be exposed to liability from VPN users it failed to detect. *See* Rattray Decl. ¶¶ 18, 42-47. But even setting aside that technical limitation, blocking or age-verifying all apparent VPN traffic would itself cause severe and irreparable harm. VPNs are used by hundreds of millions of people worldwide for entirely legitimate reasons having nothing to do with evading age-verification requirements, including by users who are not located in Utah and have no obligation to comply with Utah law. *Id.* ¶¶ 35, 48. Wholesale blocking or age-verifying those users would likewise cause substantial and unrecoverable loss of traffic and revenue. Collie Decl. ¶¶ 24-28. It would also place Aylo at a significant competitive disadvantage relative to non-compliant platforms that impose no such restrictions, accelerating the migration of users to sites that do not share Aylo's commitment to compliance, including Aylo's commitment to ensure sites that are free of non-consensual or child sex abuse material. *Id.* ¶¶ 28, 35. In short, blocking or age-verifying all VPN traffic is neither technically sufficient to achieve compliance nor commercially viable—it would impose much of the same harm as worldwide age verification while still leaving Aylo exposed to liability.

Accordingly, Aylo would suffer severe irreparable harm if the Deemed-Location Provision were to go into effect.

## ARGUMENT

A preliminary injunction against enforcement of the Deemed-Location Provision is warranted. As set forth below, (1) Aylo is "substantially likely to succeed on the merits"; (2) it will

"suffer irreparable injury if the court denies the injunction"; (3) the "threatened injury (without the injunction) outweighs the opposing party's under the injunction"; and (4) the injunction "isn't adverse to the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

## I. Aylo Is Likely to Succeed on the Merits.

No state has authority to dictate the worldwide operations of a company on the global Internet. But that is exactly what the Deemed-Location Provision does by threatening adult-content platforms with liability unless they age-verify all users worldwide. That is impermissible extraterritorial legislation, violates the dormant Commerce Clause, and is contrary to the Foreign Commerce Clause.

### A. Utah's Deemed-Location Provision Is Impermissible Extraterritorial Regulation in Violation of the Due Process Clause and Federalism Principles Because It Demands Worldwide Compliance with Utah Law.

The Constitution prohibits any state from enacting legislation that compels companies to change their conduct in other states or foreign nations to avoid liability. That rule derives from the structural limits that the Constitution places on each state's sovereign authority, and it applies with full force here: because no company can reliably identify VPN-masked Utah users without implementing age verification globally, the Deemed-Location Provision's only practical compliance path runs through every jurisdiction in the world. Utah lacks constitutional authority to dictate those terms.

The constitutional foundation of these limits is the equal sovereignty of the states and the due process limits that flow from it. The Constitution transformed the states from independent sovereigns into "a perpetual Union based on the 'fundamental principle of *equal* sovereignty among the States.'" *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246 (2019) (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013)). That equal sovereignty carries with it structural limits on state authority: "[e]ach State's equal dignity and sovereignty under the Constitution implies certain

constitutional 'limitations on the sovereignty of all of its sister States.'" *Id.* at 245 (citation omitted). Thus, a "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 422 (2003). And the Fourteenth Amendment's Due Process Clause likewise "act[s] as an instrument of interstate federalism" to ensure states "do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 294 (1980); *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 263 (2017) (explaining that even when a state "has a strong interest in applying its law," the "Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power" (quotations omitted)).

The rule that follows from these constitutional foundations is well-settled: a state may regulate conduct occurring within its own borders, but it may not impose its regulatory preferences on lawful conduct occurring in sister states or foreign nations. Indeed, as Utah recently explained in a different case, the Constitution precludes one state from "enforc[ing] its own policy upon the others." *See* 26 States' Br. *Amici Curiae* in Support of Pet'rs at 3-4, 10-12, *Suncor Energy (U.S.A.) Inc. et al. v. County Commissioners of Boulder County*, No. 25-170 (U.S. Sept. 26, 2025) (quoting *Kansas v. Colorado*, 206 U.S. 46, 95 (1907)) (Ex. F, "Utah Climate Br."). For over a century, the Supreme Court has applied this rule to invalidate extraterritorial assertions of state authority.

For example, in *BMW of North America, Inc. v. Gore*, the Court invalidated a state punitive-damages award because it sought to control lawful conduct occurring in other states. 517 U.S. 559, 585-86 (1996). In that case, Alabama law required certain pre-sale disclosures, but other states did not "provide such protection in a uniform manner" and in fact there was "a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States." *Id.* at 569-70. There was no question that Alabama could apply its law to the plaintiff's own purchase of a BMW within Alabama, but Alabama could not use its punitive-damages law to regulate BMW's lawful conduct

occurring in other states or "impose its own policy choice on neighboring States." *Id.* at 571-72. The Court applied this same rule in *State Farm* in reversing a Utah court's punitive damages award that again sought to change the defendant insurance company's conduct throughout the country:

> A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.

538 U.S. at 422.

Almost a century earlier, these same limits on state regulatory authority animated the Court's decision in *New York Life Insurance Co. v. Head*, where Missouri sought to apply its laws to a contract made in a different state, between citizens of different states, on the ground that the new contract modified a prior contract executed in Missouri. 234 U.S. 149, 160-61 (1914). Even accepting the premise that the new contract was also a Missouri contract, the Court held that Missouri's laws could not apply: "[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends." *Id.* at 161.

In each of these cases, the Court limited the state's assertion of power to only those actions taken within the individual state. Even when the state had some lawful in-state basis for regulating the defendant's conduct—*i.e.*, an unlawful sale that warranted an award of damages, an in-state insurance dispute, or a prior contract executed within the state—the Court still enforced limits on the states' authority "to deter conduct . . . lawful in other jurisdictions." *Gore*, 517 U.S. at 573.

Here, Utah's Deemed-Location Provision exceeds these limits. Because no company can reliably determine whether an individual is using a VPN or is "actually located" in Utah, the Deemed-Location Provision functionally requires every covered provider to implement Utah's age-verification for all users. That is true even for providers like Aylo that have exited the Utah adult-entertainment market. Utah has thus projected its policy preferences throughout the entire

nation—indeed, throughout the entire world—contrary to these well-settled constitutional principles. *See Gore*, 517 U.S. at 570-71 (no state may "enact . . . a policy for the entire Nation" or "impose its own policy choice on neighboring States").

It is irrelevant that the Deemed-Location Provision formally imposes liability only if a company fails to age-verify someone located within Utah. That is not a meaningful territorial limit because, as Utah officials have essentially acknowledged, there is no reliable way for companies to identify that universe of individuals—*i.e.*, individuals actually located within Utah notwithstanding their apparent location elsewhere. *See* Rattray Decl. ¶¶ 21-47. As a matter of basic logic, a rule that is contingent on an unknowable fact is *de facto* a universal rule. If Utah had enacted a law requiring universal age verification for all users regardless of location, there is no question that law would run afoul of the Constitution's structural limits on state authority; the Deemed-Location Provision operates no differently.

Indeed, the Deemed-Location Provision is no different than the punitive-damages awards in *Gore* and *State Farm*, or the assertion of jurisdiction in *Head*. In those cases, the state's formal assertion of jurisdiction was only over in-state conduct—*i.e.*, an automobile sale, an insurance dispute, and a prior contract. But the Court nonetheless invalidated those state assertions of power precisely because they sought to "chang[e] the tortfeasors' lawful conduct in other States." *Gore*, 517 U.S. at 572. Formally, the judgment in *Gore* simply required BMW to pay $2 million in punitive damages; but functionally, the judgment operated to "deter conduct that is lawful in other jurisdictions." *Id.* at 573. The same was true in *State Farm*, 538 U.S. at 415. And in *Head*, Missouri was formally claiming authority only to regulate a Missouri contract; but functionally, Missouri was controlling out-of-state-conduct by out-of-state actors. 234 U.S. at 160-61. Equally here, the Deemed-Location Provision may formally impose liability only for users actually located in Utah, but functionally, the provision requires worldwide compliance. That command violates constitutional limits on state authority by allowing Utah to control Aylo's conduct worldwide.

Moreover, the Deemed-Location Provision's impermissibly extraterritorial scope is highlighted by the degree to which it "infring[es] on the policy choices of other States," *Gore*, 517 U.S. at 572, particularly those states that have adopted different frameworks for regulating adult-content providers. For example, New Hampshire, New Mexico, and West Virginia have all considered and explicitly rejected age-verification bills. *See, e.g.*, N.H. H.B. 1256, 2024 Leg., Reg. Sess. (2024) (voted Inexpedient to Legislate, Feb. 15, 2024); N.M. H.B. 313, 52d Leg., Reg. Sess. (2025) (action postponed indefinitely); W. Va. H.B. 2689, 87th Leg., Reg. Sess. (2025) (died in committee). And Wisconsin, Michigan, and Colorado have declined to enact bills with analogous VPN provisions. *See, e.g.*, Wis. A.B. 105; Mich. H.B. 4938; Colo. S.B. 25-201. The Deemed-Location Provision overrides all these decisions and imposes Utah's law as the national standard.

Proving the point, Aylo's free sites have exited the Utah adult-content market and are pursuing that business elsewhere, in jurisdictions with laws that Aylo believes are more appropriately protective of user privacy. Despite those platforms' withdrawal from the Utah adult-content marketplace, the Deemed-Location Provision *still* imposes obligations on Aylo—reaching beyond Utah's borders and imposing Utah's age-verification laws on Aylo's adult-content operations in other states. A state law that regulates an entity's out-of-state conduct, even after the entity has exited that state's market, is a hallmark sign of impermissible extraterritorial legislation.

This conflict is not limited only to other states' approaches to adult content; the Deemed-Location Provision also creates potential compliance issues with other states' data privacy laws. For example, several states require users to provide affirmative consent before processing sensitive data like geolocation, and also prohibit companies from discriminating against users that exercise their rights not to consent to data collection.[5] Additionally, several states contain "data

[5] *See, e.g.*, Cal. Civ. Code § 1798.140(ae)(1)(C) (defining "sensitive personal information" to include "precise geolocation"); *id.* § 1798.121(a) (right to limit use and disclosure of sensitive personal information); Va. Code § 59.1-575 (defining "sensitive data" to include "[p]recise geolocation data"); *id.* § 59.1-578(A)(5) (requiring opt-in consent for processing sensitive data);

minimization" requirements limiting websites' collection of user data to only that which is reasonably necessary.[6] It is far from clear whether these states would view collecting their citizens' sensitive data, solely for purposes of complying with Utah law, to be a valid purpose.

Finally, allowing Utah to regulate global conduct through the artifice of this VPN provision would open the door for states to regulate extraterritorially on any number of topics. As just one example, Oregon might impose a carbon offset fee on all digital transactions involving Oregon users, along with a provision imposing penalties if a company fails to charge the fee to someone in Oregon masking their location. Because a company cannot verify whether any particular user is in Oregon, to avoid liability the company would have to collect the fee on all digital transactions globally—allowing Oregon to significantly expand its regulatory reach well beyond its borders. Of course, this type of global regulation by a single state is precisely what Utah recently opposed in arguing that Colorado law cannot "govern the global atmosphere" through climate regulation, reiterating that "our federal system allows States to pursue their own divergent policies." Utah Climate Br. at 10. The same principles apply here to foreclose the Deemed-Location Provision.

In short, the Deemed-Location Provision operates as a universal command requiring even those adult-content providers who have exited the Utah market and operate in jurisdictions that do not impose age-verification mandates to nonetheless comply with Utah's age-verification mandate. That command exceeds Utah's lawful authority and is unconstitutional extraterritorial legislation.

### B. The Dormant Commerce Clause Prohibits the Deemed-Location Provision's Significant Burdens on Out-of-State Commerce.

The Deemed-Location Provision also runs afoul of the dormant Commerce Clause. The

---

Tex. Bus. & Com. Code § 541.001(29)(D) (defining sensitive data to include precise geolocation); *id.* § 541.101(b)(4) (requiring consent for processing sensitive data).

[6] *See, e.g.*, Md. Code, Com. Law § 14-4707(b)(1) (requiring companies to "[l]imit the collection of personal data to what is reasonably necessary and proportionate to provide or maintain a specific product or service requested by the consumer to whom the data pertains"); *see also* Va. Code § 59.1-578(A)(1); Cal. Civ. Code § 1798.100(c).

Constitution vests Congress with the power to "regulate Commerce . . . among the several States," art. I, § 8, cl. 3, which "impliedly confines the states' power to burden interstate commerce." *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1209 (10th Cir. 2025) (citations omitted). This "further, negative command," referred to as the dormant Commerce Clause, "forbid[s] the enforcement of 'certain state economic regulations even when Congress has failed to legislate on the subject,'" to prevent one state from directly controlling commerce elsewhere. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368-69 (2023) (citations and alterations omitted). The dormant Commerce Clause precludes the Deemed-Location Provision for three reasons.

First, the Deemed-Location Provision directly regulates interstate activity with no connection to Utah. The Commerce Clause permits some "*incidental* regulation of interstate commerce[,]" but "direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality op.); *see also Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 199 (1925) ("[A] state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid[.]"). States may not enact laws that "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Pork Producers*, 598 U.S. at 376 n.1. But that is exactly what the Deemed-Location Provision does. By requiring Aylo to verify all users' ages regardless of location, the Act regulates transactions involving hundreds of millions of users who live outside Utah and have "no connection" to the state. *Id.*

As the Tenth Circuit has recognized, this concern can be particularly acute for laws regulating conduct on the Internet. *See ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999). In *Johnson*, the court invalidated a state internet regulation because it governed websites "which can be accessed by virtually anyone, anywhere," making state-specific compliance impossible. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1312 (10th Cir. 2008) (citing *Johnson*, 194 F.3d at 1157). Courts have since recognized that advances in geolocation technology have reduced—though not eliminated—those concerns, because companies can now often identify and segment users by

geography. *See* Jack Goldsmith & Eugene Volokh, *State Regulation of Online Behavior: The Dormant Commerce Clause and Geolocation*, 101 Tex. L. Rev. 1083, 1086 (2023). Indeed, Aylo is currently able to comply with Utah's age-verification mandate because geo-blocking allows it to restrict access to adult content for users who appear to be located in Utah. But by imposing liability based on users' true physical locations—which VPN technology conceals and which no geolocation system can reliably determine—the Deemed-Location Provision takes us back to the Internet of the *Johnson* era. Because the Deemed-Location Provision demands "perfection" well beyond "reasonable attempts at geolocation," it has produced precisely the burdens that the dormant Commerce Clause forbids. *Id.* at 1086, 1109-10. *Johnson*'s holding thus applies with full force to this law.

Second, the Deemed-Location Provision's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." *Green Room*, 157 F.4th at 1209 (citing *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142, (1970)). The Deemed-Location Provision offers limited local benefit because Utah's existing age-verification laws already purport to protect most minors from viewing adult content. S.B. 73's sponsor, Senator Musselman, claimed the passage of the 2023 age-verification law has already led to "significant improvements" in mental health for the state's youth.[7] The Deemed-Location Provision thus is meant to benefit only the subset of Utah minors who are able to evade age-verification requirements through VPNs or other tools. But, in order to achieve that narrow benefit, Utah has enacted a law with massive burdens.

Even the "importance of the state's interest in protecting minors from sexually oriented materials" cannot justify the "excessive[] burden [on] interstate commerce compared to the local benefits the statute actually confers." *Johnson*, 194 F.3d at 1161. The Deemed-Location Provision mandates that adult-content providers transform their businesses and begin age-verifying all users

[7] *Hearings on Online Age Verification Amendments*, Utah House Revenue and Taxation Committee at 1:08:50-1:09 (Utah Feb. 25, 2026) (statement of Sen. Musselman), https://www.utleg.gov/event-streaming/committee/timeline/300609.

on their platforms, regardless of whether the company has sought to exit the Utah adult-entertainment market. *Cf. Pork Producers*, 598 U.S. at 400 (Roberts, C.J, concurring in part and dissenting in part) (four Justices concluding that the California law excessively burdened interstate commerce because its restrictions "carry implications for producers as far flung as Indiana and North Carolina, whether or not they sell in California"); *id.* at 394 (Barrett, J., concurring in part and dissenting in part) (also concluding that the law constitutes a substantial burden on interstate commerce). The burden of age-verifying every user on every platform eclipses any marginal benefit of preventing a small number of Utah minors from accessing adult content.

Moreover, Utah could address the purported problem with far fewer burdens on interstate commerce. *See Pike*, 397 U.S. at 142 ("[T]he extent of the burden that will be tolerated" depends on whether the local interest "could be promoted . . . with a lesser impact on interstate activities."); *Dorrance v. McCarthy*, 957 F.2d 761, 764 (10th Cir. 1992) ("The Court has continued to consider the availability of less burdensome alternatives in analyzing Commerce Clause challenges[.]"). Utah already prohibits knowingly exposing minors to adult content, and Utah is free to enforce that law. *See* Utah Code § 76-5c-205. And if Utah is concerned about VPNs and other tools, Utah can regulate the sale or distribution of those tools, including by age-gating the sale of such technologies to minors. But Utah has instead chosen a particularly burdensome approach, forcing a third-party company to solve a problem that it did not create. The Constitution does not permit Utah to place the burden on Aylo—an entity that has exited the Utah adult-content market—to figure out where individuals are located, and, in so doing, force the citizens of 49 other states to likewise be bound by Utah's judgments about what age-verification is appropriate.

Third, the Deemed-Location Provision discriminates against out-of-state entities in practical effect. A state may not enact laws that force out-of-state companies to surrender "the advantages they enjoy[] against their in-state rivals," *Pork Producers*, 598 U.S. at 372, or that "alter[] the competitive balance between in-state and out-of-state firms," *Kleinsmith v. Shurtleff*,

571 F.3d 1033, 1041 (10th Cir. 2009) (citations omitted); *see also Hughes v. Oklahoma*, 441 U.S. 322, 336-37 (1979). The Deemed-Location Provision does both. Aylo exited Utah's adult-content market as a competitive choice that allowed it to offer users stronger privacy protections than competitors who remained. The Deemed-Location Provision strips away that advantage by forcing Aylo to implement Utah's age-verification system regardless of whether it serves Utah users at all, placing it on the same competitive footing as companies that never left. A state law that reaches beyond its borders to eliminate the competitive advantages that out-of-state companies have earned by choosing not to operate in that state's market discriminates against interstate commerce in precisely the way the dormant Commerce Clause forbids.

### C. The Deemed-Location Provision Impermissibly Interferes with Foreign Commerce.

The Constitution provides that "Congress shall have the Power . . . To regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Like the Interstate Commerce Clause, the Foreign Commerce Clause has a corresponding negative power known as the dormant Foreign Commerce Clause. *See United States v. Durham*, 902 F.3d 1180, 1204 (10th Cir. 2018). The Deemed-Location Provision is contrary to this constitutional provision as well.

For starters, it is doubtful that the Constitution authorizes even Congress to regulate wholly foreign transactions, *i.e.*, transactions occurring between a foreign adult-content provider and foreign users whose activities are occurring wholly outside the United States. *Cf. Baston v. United States,* 137 S. Ct. 850, 851 (2017) (Thomas, J. dissenting from denial of cert.) (expressing doubt that Congress has power under the Foreign Commerce Clause "to regulate conduct occurring entirely within the jurisdiction of a foreign sovereign"); *In re Sealed Case*, 936 F.3d 582, 590 (D.C. Cir. 2019) ("Doubt certainly exists as to Congress's ability under the Foreign Commerce Clause to criminalize conduct with no effect on the United States."); *United States v. Davila-Mendoza*, 972 F.3d 1264, 1276 (11th Cir. 2020); *see also* Restatement (Third) of Foreign Relations Law § 402 (1987) (discussing limits on territorial jurisdiction). Of course, that is exactly what the

Deemed-Location Provision does—it forces Aylo (a foreign company) to implement age-verification even with respect to foreign users accessing the site wholly from abroad.

Even if Congress has such power, Utah certainly does not. Congress's Foreign Commerce Clause power is "exclusive and plenary" and "may not be limited, qualified, or impeded to any extent by state action." *Bd. of Trs. of Univ. of Ill. v. United States,* 289 U.S. 48, 56-57 (1933). Time and again, the Supreme Court has explained that in "the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) (quotations omitted); *see Wardair Canada, Inc. v. Fla. Dep't of Rev.*, 477 U.S. 1, 7-8 (1986) (similar). "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Barclays Bank*, 512 U.S. at 311 (quotations omitted); *see also Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 446 (1979). Thus, the dormant Foreign Commerce Clause prohibits states from enacting regulations that "impair federal uniformity" and "prevent[] the Federal Government from speaking with one voice in international trade." *Barclays Bank*, 512 U.S. at 320 (quotations omitted).

The Deemed-Location Provision violates these principles in two ways. First, if Utah is able to enact a law determining the worldwide standard for age-verification, then so too is every other state, and the Federal Government is no longer able to speak "with one voice" in encouraging other countries to adopt the Federal Government's preferred approach on age verification. Indeed, the Federal Government is actively engaging with other countries on this issue, and Utah's law—imposing obligations on international companies to perform age-verification for their international users—now stands in the way of such diplomatic efforts. Ex. G, Leif LeMahieu, *Trump Admin Launches Global Crackdown To Shield Kids From Pornography, Online Abuse*, Daily Wire (Apr. 14, 2026), https://www.dailywire.com/news/trump-admin-launches-global-crackdown-to-shield-kids-from-pornography-online-abuse (quoting State Department memo shared with other

countries as stating that "[t]he United States favors regulatory approaches that empower parents to prescribe access limitations for devices used by their child, rather than mandating one-size-fits-all access limitations imposed by the government"); *cf. Container Corp. of Am. v. Franchise Tax. Bd.*, 463 U.S. 159, 194 (1983) ("[A] state tax at variance with federal policy will violate the 'one voice' standard if it *either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive."); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003).

Second, Utah's law presents a threat of "offending our foreign trading partners" and potentially "leading them to retaliate against the nation as a whole." *Container Corp.*, 463 U.S. at 194; *Japan Line*, 441 U.S. at 450 ("If a novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged by the levy may retaliate against American-owned instrumentalities present in their jurisdictions."). Utah's law is at a minimum in tension with the European Union's General Data Protection Regulation (GDPR), which contains a data minimization requirement similar to those mentioned above. *See* GDPR art. 5(1)(c).

Moreover, Utah's law could well be perceived as erecting trade barriers, given that Aylo does not currently have a worldwide age-verification system in place. *See* Collie Decl. ¶¶ 22-23. Thus, to the extent Utah's law required Aylo to shut down its international platforms for international users, that could be construed as a trade barrier. *Cf. Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir. 1999) ("the Foreign Commerce Clause . . . restrains the states from excessive interference in foreign affairs"), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). The Deemed-Location Provision is thus unlawful under the Foreign Commerce Clause because it improperly interferes with matters of foreign trade and diplomacy.

## II. Aylo Will Be Irreparably Harmed If S.B. 73 Goes Into Effect.

Without a preliminary injunction, Aylo faces an impossible choice: either risk massive liability in the form of civil and possibly even criminal penalties by continuing to operate without implementing universal age-verification, or undertake the significant and unrecoverable costs of

implementing a worldwide age-verification system that will devastate Aylo's core business. Either path causes severe and irreparable injury.

If Aylo fails to comply with the Deemed-Location Provision, it risks substantial administrative fines, civil penalties, and potential criminal sanctions. Under S.B. 73, the Division of Consumer Protection can impose a $2,500 administrative fine for "each violation" of the Act. S.B. 73 § 16(3)(a)(i). The Division can also bring civil actions against alleged violators for additional civil penalties and other relief. *Id.* § 16(3)(a)(ii). And the Division can also issue a cease-and-desist order, the violation of which is a criminal offense. Utah Code § 13-2-6(2). For a company with millions of visits per day, an unknown number of which may be by users in Utah, Aylo would face substantial liability as soon as the Deemed-Location Provision goes into effect.

Alternatively, if Aylo were to comply with the Deemed-Location Provision, it would suffer irreparable harm in at least four different ways. First, Aylo would have to institute age-verification for all users worldwide, and implementing this system would require a lengthy amount of time and would be incredibly costly. Collie Decl. ¶¶ 21-23. Because Utah is immune to suit for monetary damages, however, Aylo will have no way to recoup these costs even if the law is deemed unconstitutional. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J. concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1130-31 (D. Utah 2024), *appeal docketed*, No. 24-4100 (10th Cir. 2024).

Second, age verification will cause tremendous and unrecoverable harm to Aylo's business. As noted above, Aylo does not object to age verification in principle and has instituted age-verification measures in some jurisdictions where it believes the measures are sufficiently protective of users' privacy. Based on Aylo's past experience in other jurisdictions, however, Aylo estimates that if it were forced to implement age verification across all of its worldwide platforms, it would lose almost 80% of its revenue, as users who refuse to submit to age verification migrate

to non-compliant platforms. Collie Decl. ¶¶ 25-28. Users who abandon Aylo's platforms for competitors frequently do not return; the revenue loss would be immediate and unrecoverable. Collie Decl. ¶ 28 This loss constitutes irreparable harm. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1271 (10th Cir. 2018) (district courts should consider "loss of customers," especially where difficult to calculate in monetary terms, "when deciding whether a plaintiff has shown a sufficient probability of irreparable harm"); *Limitless Worldwide, LLC v. AdvoCare Int'l, LP*, 926 F. Supp. 2d 1248, 1254 (D. Utah 2013) ("Loss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm."). Indeed, if 80% of Aylo's customers desert its platforms, that would be existentially threatening for the business itself, which likewise constitutes grave, irreparable harm. *Great Salt Lake Mins. & Chems. Corp. v. Marsh*, 596 F. Supp. 548, 557 (D. Utah 1984) (a company suffers irreparable injury where it faces "a substantial risk of being put out of business"); *see also Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1012–13 (10th Cir. 2018) ("[T]he destruction of a business could amount to irreparable harm.").

Third, if forced to implement Utah's age-verification regime worldwide, Aylo would also suffer reputational harm. Aylo has built its user relationships on a commitment to protecting user privacy—a commitment that is central to its brand, its competitive position, and its public advocacy on age-verification policy globally. Collie Decl. ¶¶ 29, 35. Being forced by a single state to impose privacy-invasive data collection on hundreds of millions of users worldwide would fundamentally damage that reputation. The resulting loss of Aylo's reputation as a business that safeguards users' personal information is irreparable. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156-57 (10th Cir. 2001) (damage to brand "reputation and credibility" is irreparable).

Fourth, compliance with the Deemed-Location Provision would risk placing Aylo in conflict with the laws of other jurisdictions, compounding the irreparable nature of the harm. As noted above, a growing number of states have enacted comprehensive consumer privacy statutes

that restrict the collection, retention, and processing of personal identifying information—including information about individuals' sexual habits and geolocation. *See supra* at 14-15. Moreover, several states require users to provide affirmative consent before processing sensitive data like geolocation, and also prohibit companies from discriminating against users that exercise their rights not to consent to certain data collection. *See supra* at 14.

This tension between the Deemed-Location Provision and other privacy regulations extends beyond domestic law. Aylo operates worldwide, including in the European Union, where it is subject to the GDPR. The GDPR classifies location data as "personal data" subject to its full regulatory framework, GDPR art. 4(1), and requires that personal data be "adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed," *id.* art. 5(1)(c); *see also id.* art. 6(1). European regulators may not view compliance with Utah's Deemed-Location Provision as sufficiently "necessary" to justify collecting location data or other identifying information from European residents. Compliance with the Deemed-Location Provision thus would place Aylo in an impossible regulatory crossfire—forced by Utah to collect data that other sovereigns may have concerns about Aylo collecting—a conflict that cannot be remedied through after-the-fact damages.

This no-win situation is itself sufficient to establish irreparable harm. *NetChoice*, 748 F. Supp. 3d at 1130-31 (organization suffered irreparable harm where its "members st[ood] to incur substantial unrecoverable expenses in the form of either civil penalties or compliance costs"); *see also Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010). Aylo need not expose itself to either form of harm before seeking relief. *Cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("Our analysis must begin with the recognition that, where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat[.]").

### III. The Balance of the Equities and Public Interest Favor Aylo's Requested Injunction.

Finally, the balance of the equities and the public interest both favor granting a preliminary injunction. These two factors "merge" when the government is the opposing party. *Nken v. Holde*r, 556 U.S. 418, 435 (2009). Both favor Aylo. As the Tenth Circuit has recognized, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (citations omitted). Because Aylo has demonstrated a substantial likelihood of success on its constitutional claims, "it follows that the balance of equities and the public interest lean in [its] favor." *NetChoice*, 748 F. Supp. 3d at 1131.

The public interest also weighs in favor of enjoining the Deemed-Location Provision because Utah has other, less burdensome means of addressing its stated concerns. Utah's existing age-verification laws already require adult-content providers to verify the age of users identified as being located in Utah, and S.B. 73's own sponsor has touted the "significant improvements" those laws have produced. Utah also has criminal laws prohibiting the knowing exposure of minors to pornography. *See* Utah Code § 76-5c-205. These tools are specifically tailored to Utah's legitimate interest in protecting minors without imposing burdens beyond the state's borders. By contrast, the Deemed-Location Provision would affect millions of users worldwide who have no connection to Utah, subjecting them to privacy-invasive data collection. *See* Rattray Decl. ¶¶ 15-20, 49-66. The public interest is not served by allowing a single state to conscript the global Internet into its regulatory regime when less restrictive alternatives are already available and, by the state's own account, already working.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin Defendants from enforcing the Deemed-Location Provision, as set forth in the attached proposed order.

Dated: April 22, 2026

Respectfully submitted,

/s/ *Annika L. Jones*
Annika L. Jones (16483)
Brandon S. Fuller (17215)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
aljones@swlaw.com
bfuller@swlaw.com

Lindsay C. Harrison *(pro hac vice forthcoming)*
Jessica Ring Amunson *(pro hac vice forthcoming)*
Daniel Schwei *(pro hac vice forthcoming)*
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
lharrison@jenner.com
jamunson@jenner.com
dschwei@jenner.com

*Attorneys for Plaintiffs*