Derek Brown
Utah Attorney General

Lance Sorenson (10684)
David N. Wolf (6688)
Jorden Truman (19718)
Anikka Hoidal (16489)
Assistant Utah Attorneys General
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (385) 584-6509
lancesorenson@agutah.gov
dnwolf@agutah.gov
jwtruman@agutah.gov
ahoidal@agutah.gov

Counsel for Defendants

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| AYLO FREESITES LTD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UTAH DIVISION OF CONSUMER PROTECTION, Katie Hass in her official capacity as Director of the Utah Division of Consumer Protection, UTAH DEPARTMENT OF COMMERCE, Margaret Busse in her official capacity as Executive Director of the Utah Department of Commerce. <br><br> Defendants. | **Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction** <br><br> Case No. 2:26-cv-00340-DBB-JCB <br><br> Judge David Barlow <br> Magistrate Judge Jared C. Bennett |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 5

DEFENDANTS' STATEMENT OF FACTS ............................................................................. 6

    THE PUBLIC'S INTEREST IN PROTECTING CHILDREN FROM PORNOGRAPHY ............................. 6

        The Explosion of Internet-Based Pornography......................................................... 6

        The Accessibility of Internet-Based Pornography to Children.......................... 8

        The Harmful Effects of Pornography on Children.............................................. 9

    PLAINTIFF AYLO IS THE LARGEST PROVIDER OF ONLINE PORNOGRAPHY ................................. 13

    LOCATION OBFUSCATION DETECTION TECHNOLOGY .............................................................. 13

        What is location obfuscation?.................................................................................. 13

        How location obfuscation tools have been used to evade application of age-
            verification and other legal requirements.................................................. 15

        Ubiquity of VPN-detection technology and prevalence in other industries; cost and
            feasibility.................................................................................................... 16

    GEOLOCATION TECHNOLOGY.................................................................................................... 19

    COMPLIANCE WITH UTAH LAW IS FEASIBLE AND STRAIGHT-FORWARD ................................. 23

        Narrowing the field of users to whom Geolocation technology is applied....................... 24

        Options to Comply with Utah law ............................................................................ 25

        Option 1 — Request Device Geolocation................................................................. 25

        Option 2 — Voluntary Age Assurance without Geolocation.......................................... 26

        Option 3 — User disables the VPN ......................................................................... 26

Burden of Compliance with Utah's Law .......................................................... 26

STANDARD OF REVIEW ............................................................................... 27

ARGUMENT ................................................................................................... 28

    I.   Aylo is unlikely to succeed on the merits ........................................... 28

    A.   Aylo is unlikely to succeed on the merits of its extraterritoriality claim.............. 28

      (1)  The Act does not directly regulate out-of-state transactions with no connection to Utah.................................................................................................... 29

      (2)  None of the cases Aylo cites support its extraterritoriality theory.................... 32

    B.   Aylo is unlikely to succeed on the merits for its dormant Commerce Clause claim **Error! Bookmark not defined.**

      (1)  A dormant Commerce Clause challenge requires discrimination against out-of-state interests................................................................................................... 36

      (2)  The Actual-Location Provision does not discriminate against interstate commerce facially or in effect ................................................................................... 37

      (3)  The Actual-Location does not fail what remains of the *Pike* balancing test..... 39

        a.   Utah has a substantial interest in protecting Utah minors from accessing online pornography ........................................................................................... 41

        b.   Aylo has failed to show that the Actual-Location Provision clearly causes a discriminatory burden on interstate commerce.................................................... 42

    C.   Aylo has not demonstrated a strong likelihood of success on the merits for its foreign Commerce Clause claim...................................................................... 43

      (1)  The one voice standard requires Aylo to make a showing that a foreign policy exists and is seriously threatened by the Actual-Location Provision ...................... 43

      (2)  Aylo has failed to identify a foreign policy and even if so, has failed to show the policy is seriously threatened ........................................................................ 45

    II.   Aylo has not met its burden to establish irreparable harm................................. 46

III. The Balance of Equities and Public Interest weigh in favor of denying the request for injunction .......................................................................................... 51

CONCLUSION .................................................................................................................. 53

# TABLE OF AUTHORITIES

Page(s)

Cases

*AbbVie, Inc. v. Brown,*
809 F. Supp. 3d 1341 (D. Utah 2025).................................................................................. 30

*Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n,*
545 U.S. 429 (2005)............................................................................................................ 41

*Barclays Bank PLC v. Franchise Tax Bd.,*
512 U.S. 298 (1994)................................................................................... 44, 45, 46, 47

*Container Corp. of Am. v. Franchise Tax Bd.,*
463 U.S. 159 (1983).................................................................................................. 44, 45

*Dep't of Revenue v. Davis,*
553 U.S. 328 (2008)............................................................................................................ 36

*Direct Mktg. Ass'n v. Brohl,*
814 F.3d 1129 (10th Cir. 2016)........................................................................................... 37

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
356 F.3d 1256 .................................................................................................................... 48

*DTC Energy Grp., Inc. v. Hirschfeld,*
912 F.3d 1263 (10th Cir. 2018)........................................................................................... 48

*Energy & Env't Legal Inst. v. Epel,*
793 F.3d 1169 (10th Cir. 2015)........................................................................................... 31

*Exxon Corp. v. Governor of Maryland,*
437 U.S. 117 (1978)...................................................................................................passim

*First W. Capital Mgmt. Co. v. Malamed,*
874 F.3d 1136 (10th Cir. 2017)........................................................................................... 48

*Flynt v. Bonta,*
131 F.4th 918 (9th Cir. 2025) ............................................................................................. 29

*Free Speech Coalition v. Paxton,*
606 U.S. 461 (2025)................................................................................................ 5, 7, 8, 41

*Free Speech Coalition, Inc. v. Anderson,*
119 F.4th 732 (10th Cir. 2024) ....................................................................................... 5

*Ginsberg v. State of N. Y.,*
390 U.S. 629 (1968).................................................................................................... 41

*Granholm v. Heald,*
544 U.S. 460 (2005).................................................................................................... 37

*Green Room LLC v. Wyoming,*
157 F.4th 1196 (10th Cir. 2025) ............................................................................. 36, 37

*Heideman v. South Salt Lake City,*
348 F.3d 1182 (10th Cir. 2003)............................................................................... 28, 51

*Japan Line, Ltd. v. County of Los Angeles,*
441 U.S. 434 (1979).................................................................................................... 44

*Kassel v. Consol. Freightways Corp. of,*
*Del.,* 450 U.S. 662 (1981)....................................................................................... 40, 42

*Kearney v. Salomon Smith Barney, Inc.,*
137 P.3d 914 (Cal. 2006)............................................................................................. 41

*Kleinsmith v. Shurtleff,*
571 F.3d 1033 (10th Cir. 2009)................................................................................... 37

*Lewis v. BT Inv. Managers, Inc.,*
447 U.S. 27 (1980)...................................................................................................... 29

*Mallory v. Norfolk S. Ry. Co.,*
600 U.S. 122 (2023).................................................................................................... 33

*Maryland v. King,*
567 U.S. 1301 (2012)......................................................................................... 4, 51, 52

*Mazurek v. Armstrong,*
520 U.S. 968 (1997).................................................................................................... 28

*National Pork Producers Council v. Ross,*
  598 U.S. 356 ..............................................................................................................passim

*Nevares v. M.L.S.,*
  2015 UT 34, 345 P.3d 719 .............................................................................................. 3

*New Mexico Dep't of Game & Fish v. United States Dep't of the Interior,*
  854 F.3d 1236 (10th Cir. 2017)...................................................................................... 51

*Online Merchants Guild v. Cameron,*
  995 F.3d 540 (6th Cir. 2021)............................................................................... 30, 31, 32

*Pharm. Res. & Mfrs. of Am. v. Concannon,*
  249 F.3d 66 (1st Cir.2001).............................................................................................. 40

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970)............................................................................................... 3, 39, 40

*Reuters Ltd. v. United Press Int'l, Inc.,*
  903 F.2d 904 (2d Cir. 1990)............................................................................................ 48

*SCFC ILC, Inc. v. Visa USA, Inc.,*
  936 F.2d 1096 (10th Cir. 1991)....................................................................................... 48

*Schrier v. Univ. of Co.,*
  427 F.3d 1253 (10th Cir.2005)........................................................................................ 47

*Truesdell v. Friedlander,*
  80 F.4th 762 (6th Cir. 2023) ..................................................................................... 38, 39

*Wardair Canada, Inc. v. Fla. Dep't of Revenue,*
  477 U.S. 1 (1986).................................................................................... 44, 47, 48, 49

*Woos LLC v. Mustafa,*
  2:25-cv-00212-DBB-DBP, 2025 WL 2939247 (D. Utah July 23, 2025)........................... 47, 51

Statutes

Utah Code §78B-3-1002 .................................................................................................. 23

Utah Code §78B-3-1002(3) .............................................................................................. 1

Utah Code §78B-3-1002(1) & (3)...................................................................................... 1

vii

Utah Code § 76-5c-205 ............................................................................................ 5

Utah Code § 78B-3-1006 ........................................................................................ 24

Utah Code § 78B-3-1002(1)(a) ............................................................................... 5

Rules

Fed. R. Civ. P. 65(d)(1) .......................................................................................... 28

Other Authorities

Utah Senate Bill (S.B.) 73 ............................................................................ 1, 17, 48

## **INTRODUCTION**

Plaintiffs Aylo Freesites Ltd and Aylo Group Ltd (collectively "Aylo") allege that Utah has attempted to enact a "de facto global mandate"[1] by requiring pornographic websites to take reasonable efforts to ensure that Utah users of their platforms are not minors, even if those Utah users are using a Virtual Private Network (VPN), proxy server, or other location obfuscation technology that masks their geographic location. Aylo thus seeks to enjoin the enforceability of recently enacted S.B. 73, codified at Utah Code §78B-3-1002(3) (the "Actual-Location Provision").

The Actual-Location Provision states that pornographic websites "shall perform reasonable age verification  methods to verify the age of an individual attempting to access the [website's] material" and an "individual is considered to be accessing the website from this state (Utah) if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location[.]"[2]

In raising extraterritoriality, dormant Commerce Clause, and foreign Commerce Clause arguments, Aylo makes two fatal misrepresentations, one factual and one legal. First, the factual misrepresentation: on almost every page of its Complaint and its Motion for Preliminary

---

[1] *See* Pls.' Compl., ECF No. 1, ¶ 7.

[2] Utah Code §78B-3-1002(1) & (3). Aylo's reference to this provision as the "Deemed-Location Provision" is misleading; the statute does not "deem" anyone outside of Utah to be subject to Utah's laws. Rather, it states that if an individual is *actually* located in the State of Utah, then the age assurance provisions apply.

Injunction, Aylo asserts that it is technologically impossible to ascertain whether any particular individual is using a VPN, let alone ascertain the location of someone using a VPN.[3] The premise of Aylo's entire argument is that Utah's law requires it to age-gate the entire world of VPN users on its sites in order to comply with the Actual-Location Provision. This is false (as Aylo should know).[4] The technology to detect VPN usage and other location obfuscation is ubiquitous, inexpensive, and widely used in a variety of industries, including regulated industries. Likewise with geolocation technology, which allows a company like Aylo to know where its users are, even if they are using VPNs or other location obfuscation. The online gaming industry, for example, uses location obfuscation detection and geolocation technology to comply with varying jurisdictional regulations. Aylo's pretensions of ignorance regarding these commonplace tools is disingenuous. Anyone who has used Google Maps or Uber knows how easy it is for an online platform to require user-enabled device location. And from there, age assurance can occur for the subset of users in jurisdictions, like Utah, that require age assurance.

---

[3] *See, e.g.*, Pls.' Compl., ECF No. 1, p. 3, ¶ 6 ("There is no feasible way for a private company like Aylo to reliably verify whether any particular individual is using a virtual private network (VPN), proxy server, or other location-masking technology – and therefore no way to determine whether a user who appears to be located outside Utah is, in fact, located inside Utah"); *see also* Pls.' Mot. for Prelim. Inj., ECF No. 3, p. 2 ("There is no technology, commercially available or otherwise, that allows a private company to reliably determine whether a user is employing a VPN, proxy server, or other location-masking technology, let alone to verify that user's true location").

[4] Aylo's pretensions of ignorance regarding commonplace tools for VPN detection and geolocation rise to the level of highly improbable for one of the largest tech companies in the world. It has the eighth most global internet traffic. *See* "Most Visited Websites in the World, Updated March 2026," https://www.semrush.com/trending-websites/global/all. In addition to its many pornographic websites, Aylo operates gaming sites as well under the name Nutaku.

Because Aylo builds its entire case on a faulty factual foundation, its Motion for Preliminary Injunction crumbles on all four prongs.

As to its legal misrepresentation, Aylo asserts that the Court should continue to apply *Pike* balancing as if *National Pork Producers v. Ross* never happened.[5] But *National Pork Producers*, while not overruling *Pike*, drastically re-calibrated the way to conduct a dormant Commerce Clause and extraterritoriality analysis. The core of the dormant Commerce Clause is the principle of anti-discrimination. That is, states may not discriminate against out-of-state commercial interests to the benefit of in-state commercial interests. Here, the Actual-Location Provision applies with equal force to in-state providers of adult content as it does to out-of-state ones. There is no discrimination. *Pike* balancing may be conducted to help uncover discrimination, but there is none here. Additionally, Utah has a "well-settled presumption against extraterritorial application of statutory provisions."[6] For these reasons, the Utah District Court recently rejected a similar dormant Commerce Clause challenge to a separate Utah law based on the lack of discrimination, not even reaching *Pike* balancing.[7] *National Pork Producers* governs the first two claims of the Complaint, and dictates that those claims be rejected. Certainly, for purposes of this Motion, Aylo falls far short of meeting its burden that it is likely to succeed on those two claims.

---

[5] *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); *National Pork Producers Council v. Ross*, 598 U.S. 356, 2023); *see also* Pls.' Mot. for Prelim. Inj., ECF No. 3, pp. 17-18.
[6] *Nevares v. M.L.S.*, 2015 UT 34, ¶ 29, 345 P.3d 719.
[7] *See Abbvie et al v. Brown et al*, Case No. 2:25-cv-00271-RJS-DAO, pp. 27-29. A copy of the *Abbvie* decision is attached hereto as Exhibit A.

As for its third claim under the foreign Commerce Clause, Aylo again does not come near to clearing the high bar set for preliminary injunctions. Aylo cannot demonstrate that the federal government has spoken with "one voice" against the type of law Utah (and many other states and countries) have enacted to protect children from online pornography. This claim, too, is unlikely to succeed on the merits.

Aylo will not suffer irreparable harm when the law goes into effect. The "impossible choice"[8] Aylo purports to face does not exist. Aylo may comply with Utah law without age-gating the entire world. Aylo will not suffer irreparable harm in complying with Utah law during the pendency of this lawsuit. Utah, however, will suffer a "form of irreparable injury" if its law is enjoined.[9] And the detrimental effects of Aylo's products on minors is well-known, as even Aylo admits.[10] The balance of harms and public interest weigh heavily against granting injunctive relief.

---

[8] *See* Pls.' Mot. for Prelim. Inj., ECF No. 3, pp. 21–22.

[9] *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted).

[10] *See* Pls.' Mot. for Prelim. Inj., ECF No. 3, p. 1 ("Aylo does not object in principle to limiting access to adult content to only age-verified users[]").

## **BACKGROUND**

Utah enacted a law in 2023 that, like the laws of many states and countries,[11] requires pornographic websites to take reasonable steps to ascertain the ages of their users. [12] As initially written, this law – the Age Assurance Act – provided only a private right of action. For this reason, a First Amendment challenge to the Age Assurance Act brought by a trade association for pornographers failed in Utah due to the State's lack of enforcement power.[13] In response to the Age Assurance Act, Aylo's "geo-fenced" Utah; that is, they blocked users with Utah IP addresses from accessing their free, adult-content sites. However, Aylo does not age assure users from Utah who are using location obfuscation tools, by its own admission, even though many online industries use VPN detection technology, geolocation technology, and age assurance methods to comply with varying governmental laws. In the meantime, the United States Supreme Court issued an important ruling that age assurance laws for online pornography do not run afoul of the First Amendment under intermediate scrutiny because they are only an incidental burden on the free speech of users.[14]

---

[11] Twenty-five U.S. states require age assurance for websites that contain material harmful to minors. *See* FSC Action Center, "Age Verification Bill Tracker," https://action.freespeechcoalition.com/age-verification-bills/. Additionally, numerous countries require age assurance and other requirements for pornographic websites including Australia, Canada, Spain, Portugal, France, the United Kingdom, Italy, Turkey, Brazil, Argentina, Chile, and many more. *See* AVPA tracker, https://avpassociation.com/map/.

[12] *See* Utah Code § 78B-3-1002(1)(a). Utah law also prohibits the distribution of pornography to minors. *See* Utah Code § 76-5c-205.

[13] *See Free Speech Coalition, Inc. v. Anderson*, 119 F.4th 732 (10th Cir. 2024).

[14] *See Free Speech Coalition v. Paxton*, 606 U.S. 461 (2025).

Some states, like Indiana, interpret their age assurance laws to include a requirement to age-assure users who mask their location.[15] Utah made that requirement explicit with the passage of the Actual-Location Provision in 2026. Following enactment of that law, Aylo brought this suit. Unlike *Paxton*, this lawsuit is not about free speech or privacy, as Aylo has not brought any First Amendment claims; rather, it is about whether Utah can take reasonable, effective steps to protect its minors from pornographic websites which extend their reach into Utah's borders.

## **DEFENDANTS' STATEMENT OF FACTS**

### ***The Public's Interest in Protecting Children from Pornography***

### *The Explosion of Internet-Based Pornography*

1. The number of users in the United States who accessed one of the top five pornography websites for the entire month of April 1998 was estimated to be nine million people, only 15% of the then 57 million American online population.[16]

2. The top three pornography websites in the United States each reportedly had more than 2.4 billion visits for the month of May 2023 alone worldwide, with over 500 million visits originating in the United States. Visits to these pornography websites exceeded visits to Internet giants such as Amazon and TikTok.[17]

---

[15] *See State of Indiana v. Aylo Freesites Ltd et al*, Case No. 49D05-2523-057061 (Marion Superior Court, Ind.).

[16] Alvin Cooper, Coralie R. Scherer, Barry L. Gordon, and Sylvain C. Boies, "Sexuality on the Internet: From Sexual Exploration to Pathological Expression," *Professional Psychology: Research and Practice* 30, no. 2 (1999): 154–64.

[17] Similar Web, "Top Websites Ranking," June 7, 2023, https://www.similarweb.com/top-websites/ (accessed June 7, 2023).

3.   The 2019 "Year in Review" report for popular porn website Pornhub, a licensed website of Aylo, reported 42 billion visits to its site for just that year alone, an increase of 8.5 billion compared to the prior year.[18]

4.   In 2018, Pornhub transferred 4,403 petabytes of data, which is more than the *entire internet* consumed just 16 years earlier in 2002.[19]  In 2019, Pornhub transferred 6,597 petabytes of data, a near 50% increase from 2018.[20]

5.   Roughly 84% of visitors to Pornhub access the site from a smartphone or tablet.[21]

6.   Today's advances in technology that did not exist or were nascent in the early 2000s, such as high-definition streaming videos, webcams, and virtual reality, have not only revolutionized pornography accessibility, but made it increasingly vivid, interactive, and immersive.[22]

7.   The growing popularity of sexually explicit equivalents to YouTube (such as Aylo brand "YouPorn"), which are free and, absent government regulation, require no credit card or age assurance, along with technological developments that increase the range and mobility of the

---

[18] *Compare* PORNHUB, *2019 Review*, *supra* note 23 (showing 42 billion visits in 2019), *with 2018 Year in Review*, PORNHUB (Dec. 11, 2018), https://www.pornhub.com/insights/2018-year-in-review (showing 33.5 billion visits in 2018).

[19] *Id. See also* Byrin Romney, "Screens, Teens, and Porn Scenes, Legislative Approaches to Protecting Youth from Exposure to Pornography," 45 *Vermont L. Rev.* 43, 50 (2020).

[20] *Id.*

[21] *Id.*

[22] Sofia C. Simon and Tobias Greitemeyer, "The Impact of Immersion on the Perception of Pornography: A Virtual Reality Study," *Computers in Human Behavior* 93 (2019): 141–148.

means used to access such websites, have led to a historic shift in the availability of pornographic materials.[23]

*The Accessibility of Internet-Based Pornography to Children*

8.  More than half of children in the United States now own smart phones by age 11.[24]

9.  The average time kids spend on digital devices is 4 to 7 hours per day.[25] Forty-five percent of teenagers use the internet almost constantly, while another 44% go online several times a day.[26] Tweens report nearly 5 hours of screen use per day, not including school or homework.[27] For teens, the number jumps to nearly seven and a half hours of screen use per day.[28]

10. A large majority of both boys and girls report having watched pornography online during adolescence.[29] The average age of first exposure to pornographic content material is 11 years

---

[23] Eran Shor, "Age, Aggression, and Pleasure in Popular Online Pornography Videos," *Violence Against Women* (2018): 1–19, p. 1-2; https://doi.org/10.1177/1077801218804101.

[24] Victoria Rideout and Michael B. Robb, *The Common Sense Census: Media Use by Tweens and Teens*, 2019 (San Francisco, CA: Commonsense Media, 2019), https://www.commonsensemedia.org /sites/default/files/research/report/2019-census-8-to-18-full-report-updated.pdf.

[25] *Id.*

[26] Monica Anderson et al., Pew Res. Ctr*., Teens, Social Media, and Technology*, 2018 at 8 (2018), https://www.pewresearch.org/internet/wpcontent/uploads/sites/9/2018/05/PI_2018.05.31_TeensTechFINAL.pdf.

[27] Victoria Rideout & Michael B. Robb, *The Common Sense Census: Media Use by Tween and Teens* (Jenny Pritchett ed. 2019).

[28] *Id.*

[29] Chiara Sabina, Janis Wolak, and David Finkelhor, "*The Nature and Dynamics of Internet Pornography Exposure for Youth*," *CyberPsychology & Behavior* 11, no. 6 (2008): 691–693, http://unh.edu/ccrc/pdf/CV169.pdf.

old.[30] A 2022 study of more than 1300 teens aged 13 to 17 reported that nearly 3 in 4 teens had viewed pornography.[31] Of those exposed, 54% first saw online pornography at age 13 or younger and 15% were exposed at the age of 10 or younger.[32]

11. One study has shown that children who view clips of Sesame Street and Peppa Pig on YouTube are on average just three clicks away from explicit adult material, including nudity and violence.[33]

*The Harmful Effects of Pornography on Children*

12. Mainstream online pornography is a key social institution contributing to the formation of norms of sexual conduct.[34] Adolescents are more susceptible than adults to addictions and to developmental effects on the brain.[35] Adolescents are also more sensitive than adults to the addicting properties of drugs and natural stimuli due to immature brain development in the regions of the brain associated with addiction.[36]

---

[30] Khadijah Watkins, *Impact of Pornography on Youth*, 57 J. Am. Acad. Child & Adolescent Psychiatry 89 (2018).

[31] Michael B. Robb and Supreet Mann, *Teens and Pornography*, Common Sense, (2022), https://www.commonsensemedia.org/research/teens-and-pornography.

[32] *Id.*

[33] Josh Halliday, "YouTube study shows children are three clicks away from explicit material," https://www.theguardian.com/technology/2013/feb/05/youtube-study-explicit-material.

[34] Fiona Vera-Gray et al., *The British Journal of Criminology* (2021): 1-18, doi:10.1093/bjc/azab035.

[35] Tamara L. Doremus-Fitzwater, Elena I. Varlinskaya, and Linda P. Spear, "Motivational Systems in Adolescence: Possible Implications for Age Differences in Substance Abuse and Other Risk-Taking Behaviors," *Brain and Cognition* 71, no. 1 (2010):114– 123; Frances E. Jensen with Amy Ellis Nutt, *The Teenage Brain: A Neuroscientist's Survival Guild to Raising Adolescents and Young Adults*, (New York: Harper Collins, 2015).

[36] *Id.*

13. Major pornography sites are socializing their users (including children) to view abusive and violent sex as normal.[37] In 2021, one in eight video titles presented to first-time viewers of three mainstream pornography websites described sexual violence involving incest, physical aggression and sexual assault, non-consent, and teens.[38] As much as 88% of pornography's most popular scenes contain physical aggression.[39]

14. In a 2022 study, 52% of teens exposed to pornography reported seeing violent forms of pornography such as choking (36%), someone in pain (37%), or depictions of what appears to be rape (19%).[40]

15. A meta-analysis of 59 studies reported that male adolescents who sexually offended were more likely to have early exposure to pornography, higher rates of pornography use, and to have interest in sex with animals, incest, and pedophilia than non-offending youth.[41]

---

[37] Debby Herbenick et al., "Diverse Sexual Behaviors and Pornography Use: Findings from a Nationally Representative Probability Survey of Americans Aged 18 to 60 Years Old," *The Journal of Sexual Medicine* (2020): 1–11, doi: 10.1016/j.jsxm.2020.01.013; Robb and Mann, ibid.

[38] Fiona Vera-Gray et al., *The British Journal of Criminology* (2021): 1-18, doi:10.1093/bjc/azab035.

[39] Ana J. Bridges et al., Aggression and Sexual Behavior in Best-Selling Pornography Videos: A *Content Analysis Update,* 16 VIOLENCE AGAINST WOMEN 1065, 1075 (2010).

[40] Robb and Mann, supra note 44.

[41] Michael C. Seto and Martin L. Lalumiere, "What is So Special about Male Adolescent Sexual Offending? A Review and Test of Explanations through Meta-Analysis," *Psychological Bulletin* 136, no. 4 (2010): 526-575; Ybarra et al., "X-Rated Material and Perpetration of Sexually Aggressive Behavior among Children and Adolescents: Is There a Link?" *Aggressive Behavior* 37, (2011).

16. Longitudinal research shows that childhood exposure to violent pornography predicts a nearly six-fold increase in self-reported sexually aggressive behavior later in life.[42]

17. A meta-analysis of 37 studies found that exposure to violent or rape pornography increased a child's odds of experiencing sexual exploitation by nearly three times.[43]

18. The more adolescent boys view pornography online, the poorer their grades are.[44] Low academic performance among adolescents is linked with poor social skills, aggressive behavior, and earlier sexual intercourse.[45]

19. Adolescents who use pornography are more likely to have depressive symptoms and less emotional bonding to caregivers, such as their parents.[46]

---

[42] Michele L. Ybarra et al., "X-Rated Material and Perpetration of Sexually Aggressive Behavior among Children and Adolescents: Is There a Link?" *Aggressive Behavior* 37, no. 1 (2011): 1–18.

[43] Jessica Laird et al., "Demographic and Psychological Factors Associated with Child Sexual Exploitation. A Systematic Review and Meta-analysis," *JAMA Network Open* 3, no. 9 (2020):1–17.

[44] Ine Beyens, Laura Vandenbosch, and Steven Eggermont, "Early Adolescent Boys' Exposure to Internet Pornography: Relationships to Pubertal Timing, Sensation Seeking, and Academic Performance," *The Journal of Early Adolescence* 35, no. 8 (2015): 1045-1068.

[45] *Id.*

[46] Eric W. Owens et al., The Impact of Internet Pornography on Adolescents: A Review of the *Research*, 19 Sexual Addiction and Compulsivity 99, 101 (2012).

20. Use of hardcore pornography is linked to harmful outcomes such as mental health problems,[47] child-on-child harmful sexual behaviors,[48] risky sexual behaviors,[49] and physical and sexual victimization.[50]

21. Among males, a younger age of first exposure to pornography has been linked to higher rates of pornography use later in life,[51] as well as the viewing of animal and child sexual abuse material as adults.[52]

22. Studies show that adolescents' pornography use is related to a higher likelihood of engaging in sexual aggression as well as experiencing it.[53]

---

[47] Megan S. C. Lim, Paul A. Aguis, Elise R. Carroette, et al., "Young Australians Use of Pornography and Associations with Sexual Risk Behaviors," *Australian and New Zealand Journal of PublicHealth* 41, no. 4 (2017).

[48] Michael C. Seto and Martin L. Lalumiere, "What is So Special about Male Adolescent Sexual Offending? A Review and Test of Explanations through Meta-Analysis," *Psychological Bulletin* 136, no. 4 (2010): 526-575; *see also* Ybarra et al., "X-Rated Material and Perpetration of Sexually Aggressive Behavior among Children and Adolescents: Is There a Link?" *Aggressive Behavior* 37, no. 1 (2011).

[49] Meghan Donevan and Magdalena Mattebo, "The Relationship between Frequent Pornography Consumption, Behaviours, and Sexual Preoccupancy among Male Adolescents in Sweden," *Sexual & Reproductive Health* 12 (2017): 82–87.

[50] Michele L. Ybarra and Kimberly Mitchell, "Exposure to Internet Pornography among Children and Adolescents: A National Survey," *CyberPsychology & Behavior* 8, no. 5 (2005): 473–486.

[51] Chyng Sun, Ana Bridges, Jennifer Johnson, and Matt Ezzell, "Pornography and the Male Sexual Script: An Analysis of Consumption and Sexual Relations," *Archives of Sexual Behavior* 45, no. 4 (2016): 983-994.

[52] Kathryn Seigfried-Spellar and Marcus K. Rogers, "Does Deviant Pornography Use Follow a Guttman-Like Progression?" *Computers in Human Behavior* 29, no. 5 (2013): 1997-2003; Kathryn Seigfried-Spellar, "Deviant Pornography Use: The Role of Early-Onset Adult Pornography Use and Individual Differences," *International Journal of Cyber Behavior, Psychology and Learning* 6, no. 3 (Jul.2016).

[53] Jochen Peter et al., Adolescents and Pornography: A Review of 20 Years of Research, 53 J. SEX RES. 509, 524 (2016).

23. Longitudinal studies found that pornography use is associated with both in-person and online sexual harassment and sexual assault by adolescent boys.[54]

24. Adolescents who consume pornography are more likely to engage in prostitution.[55]

### *Plaintiff Aylo is the largest provider of online pornography*

25. Plaintiff Aylo is the largest provider of online pornography, operating the world's most trafficked adult sites, such as Pornhub, RedTube, and YouPorn.[56]

26. Aylo's flagship site Pornhub is the eighth most visited website in the world, ahead of X (formerly Twitter) and Amazon.[57]

27. For its subscription-based platforms, Aylo conducts age verification of its users in Utah.[58]

28. Aylo chooses not to age-verify any of its users on its free sites.[59]

### *Location Obfuscation Detection Technology*

#### *What is location obfuscation?*

29. An Internet Protocol (IP) address is a unique identifying number assigned to every device connected to the Internet. Every device with an internet connection has an IP address, whether

---

[54] *Id.*

[55] Zachary D. Bloom et al., Male Adolescents and Contemporary Pornography: Implications *for Marriage and Family Counselors*, 23 Fam. J.: Counseling & Therapy for Couples and Fam. 82, 85 (2014).

[56] *See* Lieberman, Hallie, "Can Pornhub be Ethical?" Washington Post, April 20, 2024, https://www.washingtonpost.com/style/of-interest/2024/04/20/pornhub-solomon-friedman/.

[57] *See* "Top Websites in the World," www.semrush.com/trending-websites/global/all.

[58] *See* Pls.' Compl., ECF No. 1, ¶ 25.

[59] *Id*. at ¶ 23-24.

it's a computer, laptop, or even toys. The IP addresses allow for the efficient transfer of data between two connected devices, allowing machines on different networks to talk to each other.[60]

30. Over time, commercial providers have developed extensive databases linking IP address ranges to countries, states, cities, internet service providers, mobile carriers, hosting providers and other network characteristics. These databases enable online services to estimate the likely location of a user based on the IP address from which they are connecting.[61]

31. A Virtual Private Network (VPN) is a service that secures an individual's internet connection, creating a "private tunnel" between the device and the internet. It encrypts data—making it virtually unreadable to hackers. A VPN also hides the user's real IP address, making it appear as though the user is connecting from a different device.[62]

32. VPNs and similar technologies can disguise users' IP addresses, so that a user's inferred location is different from their true geographic location. Such technologies work by routing a user's internet traffic through intermediary servers, which may be located anywhere in the world.[63]

33. When a user connects through a VPN and then visits a website, the website "sees" the IP address of the VPN server—not the user's actual IP address or actual geographic location.[64]

---

[60] *See* Declaration of Chad Kornett ("Kornett Dec."), ¶ 12. The Kornett Dec. is attached hereto as Exhibit B; *see also* Declaration of Expert Witness Tony Allen ("Allen Dec."), ¶ 65. The Allen Dec. is attached hereto as Exhibit C.

[61] Kornett Dec., ¶ 12, and Allen Dec., ¶ 65.

[62] Allen Dec., ¶ 81.

[63] *Id*.; *see also* Kornett Dec., ¶ 13.

[64] *Id*.

34. A proxy server or other location obfuscation tool operates in a similar fashion, acting as an intermediary between the user and the destination website, and likewise masks the user's true IP address and geographic location.[65]

*How location obfuscation tools have been used to evade application of age-verification and other legal requirements*

35. In addition to their legitimate uses, VPNs and other location-masking technologies may also be used by individuals seeking to circumvent geographic restrictions, territorial licensing controls, jurisdiction-specific legal requirements, or other location-based access controls. This use of VPN technology is well known throughout the technology sector and has been recognized by regulators, service providers, content owners and online platforms for many years.[66]

36. One common example arises in connection with digital content licensing. Streaming services routinely license content on a territory-by-territory basis and consequently utilize geolocation technologies to determine which content may be made available within particular jurisdictions. It is similarly well known that some users attempt to utilize VPNs or proxy services in order to access content libraries intended for other countries or regions.[67]

37. The most common workaround in states, like Utah, which require age assurance for access to pornography websites, is use of a VPN to access the internet and the website. Similarly, where websites, like those of Plaintiff, have blocked access to their sites for users with Utah IP addresses, the use of a VPN to access the internet has increased.[68]

---

[65] Allen Dec. at ¶ 84.
[66] *Id*. at ¶ 82; *see also* Kornett Dec., ¶ 13.
[67] *Id*. at ¶ 85.
[68] *Id*. at ¶ 89.

38. Over twenty percent of children aged 8-17 report that they know how to operate a VPN, with a significant portion of them using VPNs to access restricted content.[69]

39. Although Aylo geo-fenced its pornography websites in Utah after enactment of the Age Assurance Act (that is, it blocked users with Utah IP addresses from accessing its sites), Aylo has encouraged its users to use VPNs to access its sites. In 2018, Aylo's website Pornhub launched its own VPN product called "VPNhub" so that users could access its site without IP address verification, allowing a workaround for age assurance requirements.[70]

40. Pornhub terminated VPNhub in 2022, but began referring customers to a "partner provider" called IPVanish. Pornhub continues to refer users to IPVanish as a means to avoid state laws requiring age assurance.[71]

*Ubiquity of VPN-detection technology and prevalence in other industries; cost and feasibility*

41. Contrary to Aylo's claims, it is not difficult to detect the use of a VPN or other location obfuscation tool. And, having done so, it is not difficult to comply with Utah's law by age-assuring users located in Utah, without having to age-assure all users employing location obfuscation.[72]

42. Reliable means of location obfuscation detection is not only technically feasible; it is commercially deployed at scale across multiple industries today. It is cost-effective, widely available, and already in use by companies of various sizes and sophistications operating under

---

[69] *See* Childnet, "Young people's use of VPNs," https://www.childnet.com/wp-content/uploads/2025/12/Young-peoples-use-of-VPNs.pdf.
[70] *See* vpnhub.com.
[71] *Id*.
[72] *See* Allen Dec., Exhibit B, ¶¶ 90-91; *see also* Kornett Dec., ¶¶ 10, 14, and 20.

frameworks comparable to S.B. 73, such as regulated iGaming, online sports betting, global media streaming, and international age verification.[73]

43. The existence of VPN-based circumvention and other location masking is widely recognized by online service providers themselves. Organizations operating streaming platforms, online gambling services, financial services, content distribution platforms and other regulated services routinely acknowledge the possibility that some users may seek to utilize VPNs or similar technologies in an attempt to circumvent location-based restrictions.[74]

44. The existence of users who may seek to circumvent location-based restrictions is therefore not unique to Aylo or to age-restricted content services. It is a problem that has been encountered across numerous regulated industries and online services, many of which continue to operate successfully using location-related compliance controls despite the existence of VPNs and other location-masking technologies.[75]

45. Location obfuscation detection technology can determine whether an IP address is legitimate or has been anonymized, and therefore likely associated with a VPN, proxy server or other location masking device.[76]

46. The identification and management of VPN usage, proxy services and related location-masking technologies is not a novel technical problem. Rather, it is an established area of

---

[73] Kornett Dec., ¶ 20.
[74] Allen Dec., ¶ 90.
[75] *Id.* at ¶ 91; *see also* Kornett Dec., ¶ 22.
[76] Kornett Dec., ¶ 14; *see also* Allen Dec., ¶¶ 92-95.

commercial activity supported by specialist vendors, technology providers and compliance services.[77]

47. The existence of location obfuscation does not render geolocation technologies ineffective or unusable. Rather, VPNs and other location obfuscation represent one of a number of factors that geolocation systems may need to evaluate when evaluating the likely location of a user.[78]

48. Websites use location obfuscation detection technology to prevent fraud and account abuse, protect copyrighted content, enforce internal pricing policies, and comply with distinct laws and regulations worldwide. These websites include Amazon Prime, YouTube TV, and Disney+.[79]

49. Location obfuscation detection works by analyzing multiple layers of network traffic, along with location and device data. It combines various tools and techniques to determine whether a connection is coming from a masked location or a regular network.[80]

50. Many online services such as gambling, streaming, ticketing, and finance regularly deploy VPN/proxy-detection and then geolocation technology.[81]

51. There are a number of providers of, and robust market for, location detection technology.[82]

---

[77] Allen Dec., at ¶ 92; *see also* Kornett Dec., ¶ 20.
[78] Allen Dec. at ¶ 95.
[79] Kornett Dec., ¶ 22.
[80] *Id.*, ¶ 11(c).
[81] *Id.*, ¶ 26; *see also* Allen Dec., ¶ 90.
[82] Kornett Dec., ¶ 26; *see also* Allen Dec., ¶¶ 92-93.

52. Numerous providers offer IP geolocation services, VPN intelligence services, proxy detection services, device intelligence services, fraud prevention platforms and related technologies. These services are routinely made available through standard commercial integrations and are widely used by organizations of varying sizes. Such integrations are commonplace throughout the technology sector and are routinely undertaken as part of broader compliance, fraud prevention, cybersecurity and risk-management programs.[83]

53. As with many digital services, costs vary depending upon the scale of deployment, the volume of transactions processed, the level of functionality required and the contractual arrangement entered into by the organization concerned. However, geolocation services benefit from substantial economies of scale.[84]

54. Location obfuscation detection is a proven, reliable, and cost-effective first layer of broader geolocation services, with specific pricing information set forth in Exhibit B, attached.[85]

55. GeoGuard, a location obfuscation detection service, can effectively detect VPNs and other masking tools in 99.8% of test cases, according to an independent audit.[86]

### Geolocation technology

56. Geolocation technology is the process of identifying the real-world geographic location of an electronic device, like a smartphone or computer. It accomplishes this by combining several different data sources to pinpoint a device's location.[87]

---

[83] Allen Dec., ¶¶ 98-99.
[84] *Id*. at ¶ 100.
[85] Kornett Dec., ¶¶ 25, 62.
[86] *Id*., ¶ 23.
[87] Allen Dec., ¶¶ 55-56; Kornett Dec., ¶¶ 33-35.

57. The purpose of geolocation is generally to enable an organization to make location-related decisions, such as whether a user is located within a particular country, state, territory or region or whether a user is eligible to access a service that is restricted by geographic location.[88]

58. Modern multi-source geolocation systems operate independently of IP address data. To do this, they aggregate multiple independent data sources, none of which are routed through or affected by a VPN tunnel. A VPN encrypts and reroutes internet traffic, concealing a user's IP address from the destination server. It does not alter the GPS coordinates reported by a device's hardware, the Wi-Fi networks visible to that device, or the cell towers to which it is connected. These signals exist at the physical and operating system layer of a device, below the network layer at which VPNs operate. They reflect the device's actual physical location regardless of what the IP address shows.[89]

59. Geolocation is not a new technology. It has formed part of the operational infrastructure of the internet for many years and is routinely used by online service providers, payment processors, financial institutions, streaming platforms, telecommunications providers, retailers, gambling operators, fraud prevention services and government agencies.[90]

60. Apps like Google Maps and Uber use geolocation to help users move from Point A to Point B.[91]

---

[88] Allen Dec., ¶ 57.
[89] Kornett Dec., ¶ 35; *see also* Allen Dec., ¶ 66.
[90] Allen Dec., ¶ 58.
[91] *Id.*, ¶¶ 58-59.

61. Financial institutions use geolocation for fraud prevention, to verify that a transaction is made by their actual users.[92]

62. The online gaming industry uses geolocation to comply with varying state laws.[93]

63. Based upon publicly available information, Aylo and its affiliated services already utilize information relating to user location as part of their ordinary business operations. For example, Pornhub's privacy policy indicates that the platform collects and processes IP-address and location-related information for a variety of purposes including personalization, analytics, advertising, security and service improvement. Similarly, one of Aylo's advertising platforms, TrafficJunky, provides geographic targeting capabilities for advertisers. These examples demonstrate that geolocation technologies are already part of the Plaintiffs' existing technical infrastructure.[94]

64. When a VPN user enables device location for particular websites, the user does not typically reveal any other data encrypted by the VPN, such as their real IP address.[95]

65. Geolocation services are widely deployed, commercially available, operationally mature, and form part of the ordinary technical infrastructure relied upon by countless online services throughout the world.[96]

66. Large online platforms commonly operate numerous third-party integrations relating to payment processing, content delivery, fraud prevention, identity verification, cybersecurity,

---

[92] *Id.*
[93] *Id.*
[94] *Id.*, at ¶ 60.
[95] *Id.*, ¶¶ 103 – 113.
[96] Allen Dec., ¶ 78.

analytics, advertising technology, trust and safety systems and regulatory compliance. Geolocation services are typically deployed within this broader ecosystem of operational and compliance technologies.[97]

67. Online gambling is an example of the use, effectiveness, and reliability of geolocation. Every U.S. jurisdiction with regulated online sports betting has adopted multi-source geolocation as a legal requirement. Thirty-two independent state regulatory bodies have determined that these systems produce a sufficiently reliable determination of user location to uphold the integrity of their regulatory frameworks. That determination has been validated through mandatory independent certification, including regular penetration and subversion testing specifically designed to probe the system's limits.[98]

68. In every U.S. jurisdiction with regulated online gaming, the regulatory expectation is not absolute perfection. It is that "reasonable" technology, in the context of available tools and emerging location-spoofing techniques, produces a sufficiently reliable determination of the device and user locations to uphold the integrity of the state's regulatory framework. Location verification technologies have met that standard consistently, as confirmed by comprehensive licensing, testing, and auditing requirements across all 32 jurisdictions.[99]

69. The real-world data from Utah makes the case plainly. In 2025, geolocation provider GeoComply detected and blocked over 1.63 million attempted sports betting and iGaming transactions originating from Utah, all of which would have been illegal under state law. Of the

---

[97] *Id*., ¶ 101.
[98] Kornett Dec., ¶ 47.
[99] *Id*., ¶ 41.

1.63 million blocked transactions, 60.4% involved IP addresses that did not correspond to a Utah location. In other words, more than half of the users attempting to place illegal bets from Utah were already masking their true location through location obfuscation, including nearly 27,000 transactions linked directly to VPNs. Had these companies been blocking users based solely on IP address, the majority of these illegal transactions would never have been identified or blocked.[100]

### *Compliance with Utah Law is feasible and straight-forward*

70. Compliance with Utah's Age Assurance requirements does not require Aylo to verify the ages of all its VPN users, contrary to the allegations of the Complaint.[101]

71. Rather, Aylo needs only to follow the same process that is already used in a number of industries that face varying regulations, such as the gambling industry.[102]

72. Utah's law, either by its terms or in practice, does not require age assurance for anyone outside of Utah.[103]

73. Further, under Utah's "safe harbor" provision, a pornography website "is deemed in compliance with age verification requirements if the commercial entity uses an age verification method that meets the standards established by the [consumer protection] division by rule[.]"[104]

---

[100] *Id.*, ¶ 45.
[101] *Id.*, ¶ 19.
[102] *Id.*, ¶ 20.
[103] Utah Code §78B-3-1002.
[104] Utah Code § 78B-3-1006.

74. That is, online pornography websites do not face liability for any single minor who may succeed in accessing its websites, so long as those sites are following the age verification standards established by the division.[105]

75. Although the rules for the Actual-Location Provision have not yet been promulgated, they will allow websites that contain a substantial portion of material harmful to minors to comply with the age assurance requirements of the Act by using third party age assurance vendors who follow standards for location obfuscation detection and geolocation products, or by following those standards themselves.[106]

*Narrowing the field of users to whom Geolocation technology is applied*

76. After detecting use of a location obfuscation tool, websites like those operated by Aylo may narrow the field of users requiring any further action by assessing non-IP indicators such as device time zone, locale and language settings, currency preferences, browser Accept-Language headers, device region settings, and historical account activity to estimate likelihood of Utah presence, and then exclude from further actions those users who are not likely to be in Utah. This passive assessment requires no action from the user and creates no perceptible change to their experience. For the vast majority of users on any global platform, the compliance process would begin and end here without any user-facing interaction whatsoever.[107]

---

[105] *See* Declaration of Katherine Hass, attached hereto as Exhibit D, ¶¶ 4-8.
[106] *Id.*
[107] Kornett Dec., ¶¶ 36-37.

77. For example, unless purposefully trying to evade detection, a purported Utah user is unlikely to present a device time zone set to India, a browser language set to non-English with non–U.S. regional formats, and a transaction currency outside U.S. dollars simultaneously.[108]

*Options to Comply with Utah law*

78. Once Aylo narrows the field of VPN users who might plausibly be located in Utah, it can offer users at least three options for compliance with Utah law, which do not require global age assurance.

*Option 1 — Request Device Geolocation*

79. Connected devices can provide location data with user consent, which does not entail revealing any other encrypted information, the same type of prompt users encounter on ride-sharing, mapping, and banking applications.[109]

80. For mobile devices, this leverages GPS, Wi-Fi, and cell tower signals. For desktops, Wi-Fi is the primary data point. In both cases, approximately 350 data integrity checks are conducted to affirm the user's true location.[110]

81. The steps Aylo would take for this option are:

    i.    Detect VPN.

    ii.    Ask user to enable device location.

    iii.    If the user is outside Utah, no age assurance is necessary.

    iv.    If a user is in Utah, age assurance occurs.

---

[108] *Id.*
[109] *Id.*, ¶ 38.
[110] *Id.*

*Option 2 — Voluntary Age Assurance without Geolocation*

82. Aylo may also offer an option to users to voluntarily age-assure without revealing their location or disabling their VPNs.

83. Some users may choose to age-assure without enabling device location or disabling their VPN.

84. This voluntary action affects only a relatively small subset of users, i.e., those using VPNs, seeking access to pornography; while concealing location.

*Option 3 — User disables the VPN*

85. Aylo may comply with Utah's law by having the user disable the VPN, so that Aylo may ascertain the user's real IP address and location.

86. These steps entail:

    i.   Detect VPN usage.

    ii.   Prompt user to disable VPN to continue if the user does not choose another option.

    iii.   Once IP address is visible, determine geographic location.

    iv.   If user appears to be in Utah, conduct age assurance.

    v.   If not, no further action required.

*Burden of Compliance with Utah's Law*

87. Geolocation compliance is routine, inexpensive, and widely used.[111]

---

[111] Allen Dec., ¶¶ 72-79; *see also* Kornett Dec., ¶¶ 10(c), 14, 20, 22, 25, 31, and 41-47.

88. Online gaming operators already use sophisticated geolocation tools to comply with state laws.[112]

89. Alcohol and cannabis delivery services similarly verify geographic eligibility.[113]

90. Streaming platforms enforce regional licensing restrictions daily.[114]

91. Critically, the integration of location obfuscation detection and geolocation technology into an existing platform is neither technically demanding nor time-consuming. In practice, a full integration typically requires no more than a few days to a few weeks depending on the technical resources available.[115]

92. A more specific range of pricing for geolocation services is set forth in Exhibit B.[116]

## STANDARD OF REVIEW

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."[117] Before a preliminary injunction may be entered, the moving party must establish that (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of

---

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] Kornett Dec., ¶ 56.

[116] *Id.*, ¶ 63.

[117] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (internal quotation marks and citation omitted).

success on the merits.[118] To obtain a preliminary injunction, the movant must establish all four preliminary injunction factors.[119] "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[120]

## ARGUMENT

### I.   Aylo is unlikely to succeed on the merits

#### A.  Aylo is unlikely to succeed on the merits of its extraterritoriality claim

Constitutional limits on extraterritorial legislation stem from multiple provisions of the Constitution such as the dormant Commerce Clause, the Due Process Clause, and the Full Faith and Credit Clause. Aylo raises extraterritoriality arguments under both the Due Process Clause and dormant Commerce Clause, with appeals to structural principles such as equal sovereignty and federalism.[121] Thus, there is some overlap in the analysis of Aylo's stand-alone extraterritoriality cause of action (Claim I) and its dormant Commerce Clause cause of action (Claim II).

The seminal case that speaks to extraterritoriality is *National Pork Producers*,[122] in which the Supreme Court recalibrated the test that applies to claims of extraterritoriality. There, the Court recognized that the extraterritoriality doctrine has multiple constitutional roots, including

---

[118] *Id.*

[119] *Winter,* 555 U.S. at 20; *see also RoDa Drilling*, 552 F.3d at 1209 n.3.

[120] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation marks and citation omitted).

[121] Pls.' Mot., ECF No. 3, pp. 10-16.

[122] 598 U.S. 356 (2023)

Due Process and dormant Commerce Clauses.[123] Regardless of its origin, the Court observed the rule against extraterritorial effects is offended if the law "*directly* regulates out-of-state transactions by those with *no* connection to the state."[124] Thus, a state's out-of-state impacts, even when they are "massive," do not run afoul of limitations on extraterritoriality.[125] And that's because "[s]tates retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected."[126] The upshot is that while "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior,"[127] there is no "per se rule against extraterritorial effects."[128]

> (1) The Act does not directly regulate out-of-state transactions with no connection to Utah

Several principles guide in applying the extraterritoriality doctrine. First, if a state law is triggered by events in that state, it may not be considered to be directly regulating transactions that lack any connection to the state. For example, in *AbbVie Inc. v. Brown*, the plaintiff argued that a Utah law effectively allowed Utah to regulate manufacturers and pharmacies "across the country," including transactions with insufficient Utah nexus.[129] The court rejected that theory because the law was limited to Utah-related pharmacies and hospitals and clinics; it contained no

---

[123] *Nat'l Pork Producers*, 598 U.S. at 376.

[124] *Id.* at 376 n.1; *see also Flynt v. Bonta*, 131 F.4th 918, 924 (9th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 506 (Jan. 12, 2026) (describing *Pork Producer*'s extraterritoriality doctrine).

[125] *See Nat'l Pork Producers*, 598 U.S. at 382, 390-391 (finding no dormant Commerce Clause or extraterritoriality problem with California's law that significantly impacted out-of-state pork production).

[126] *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980).

[127] *Nat'l Pork Producers*, 598 U.S. at 374.

[128] *AbbVie, Inc. v. Brown*, 809 F. Supp. 3d 1341, 1365 (D. Utah 2025), attached as Exhibit A.

[129] 809 F. Supp. 3d 1341, 1365-66 (D. Utah 2025).

language indicating that it was intended to apply extraterritorially.[130] Here, the Actual-Location

Provision specifically and the Age Assurance Law generally apply only to users actually located

in Utah. It does not require age assurance for anyone outside of Utah.

Second, not every out-of-state effect from a state law is considered a direct regulation.

Direct regulation exists where the challenged law, by its "express terms" or "inevitable effect,"

controls commerce occurring wholly outside the regulating State.[131] The Sixth Circuit's decision

in *Online Merchants Guild* illustrates the point. There, a Kentucky law allegedly had the

practical effect of setting a national price ceiling for goods sold on Amazon.[132] Amazon thus

argued the law should be struck down for unlawful extraterritorial regulation.[133] After all,

Amazon argued, Kentucky's law had the practical effect of adjusting how Amazon did business

in every other state.[134] But the court rejected that argument. It held that Kentucky's law was not

a direct extraterritorial regulation because the nationwide effect depended on "Amazon's

independent decisions in how it structures its online marketplace" and not on Kentucky's law

itself.[135] Thus, where state law leads to an out-of-state effect that results from a company's own

business structure or compliance choices, the effect is indirect and does not trigger the

extraterritoriality doctrine.[136]

---

[130] *Id.* (employing the "presumption against extraterritorial application of statutory provisions"); *see* Exhibit A.

[131] *Online Merchants Guild v. Cameron*, 995 F.3d 540, 553 (6th Cir. 2021).

[132] *Id.* at 554.

[133] *Id.* at 544.

[134] *Id.* at 554

[135] *Id.* at 555.

[136] *See id.* at 558.

The Tenth Circuit agrees with the Sixth Circuit's reasoning. It recognized that in "today's interconnected market," state regulations will "often have ripple effects, including price effects, both in-state and elsewhere."[137] Thus, a law must "blatantly regulat[e] price and discriminate against out-of-state producers" before triggering the (now defunct) per se rule against extraterritorial effects.[138] That understanding is confirmed by *National Pork Producers* where the Supreme Court saw no extraterritorial problem over California's law affecting how out-of-state pork is produced.[139]

Following this controlling precedent, the Actual-Location Provision is not a direct regulation of out-of-state conduct with no connection to Utah. It asks that adult-content providers who make their online content available to Utahns reasonably attempt to ensure that Utah minors do not access it through VPNs or other location obscuring devices. Liability only attaches if the provider fails to reasonably age-verify a Utah user. Thus, the Actual-Location Provision regulates only conduct occurring in Utah; the Actual-Location Provision does not regulate conduct with no connection to Utah.

To the extent the Actual-Location Provision affects a change in Aylo's business structure, that effect is indirect and does not rise to the level of unconstitutional extraterritorial regulation. Indeed, the Actual-Location Provision's out-of-state effects are simply how Aylo chooses to respond to a potential Utah-based VPN user in order to determine and avoid in-state liability. And because widely available VPN-detection and geolocation tools allow Aylo to reasonably

---

[137] *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015).
[138] *Id.*
[139] *See Nat'l Pork Producers*, 598 U.S. at 371-376.

and feasibly attempt to age assure VPN-using Utahns, any decision by Aylo to instead age-verify all users would be a voluntary business choice, not an effect forced by Utah law. The out-of-state (and even nation-wide) effects from that choice would not violate the rule against extraterritorial regulation.[140]

In short, Aylo has failed to show a substantial likelihood of success that the Actual-Location Provision is an unconstitutional extraterritorial regulation.

(2) None of the cases Aylo cites support its extraterritoriality theory

For support of its extraterritorial argument, Aylo relies on three inapposite cases: each involved a state imposing punitive or regulatory burdens on conduct with no connection to the regulating state—which is not the case here.

First, in *BMW of North America, Inc. v. Gore*,[141] the Supreme Court observed it was improper for an Alabama law to base punitive damages against BMW "in large part on conduct that happened in other jurisdictions,"[142] which conduct was "lawful" in other states and "had no impact on Alabama or its residents."[143] In other words, the Court was primarily concerned about whether Alabama was punishing BMW for activity that had no connection to Alabama. And importantly, the Court never said Alabama could not attempt to alter BMW's nationwide policy by "insist[ing] that BMW adhere to a particular disclosure policy in that State."[144] Indeed, it

---

[140] *See Online Merchants Guild*, 999 F.3d at 555.
[141] 517 U.S. 559 (1996).
[142] *Id.* at 573-74.
[143] *Id.*
[144] *Id.*

indicated that any such attempts would be lawful as long as the law is "supported by the State's interest in protecting its own consumers and its own economy."[145]

Second, in *New York Life Insurance Co. v. Head*,[146] the constitutional defect in Missouri's law was that it attempted to invalidate a New York contract made between non-Missouri residents.[147] In other words, Missouri affirmatively "reach[ed] out and regulate[d] conduct that has little if any connection with the State's legitimate interests."[148]

And third, in *State Farm Mutual Auto. v. Ins. Co. v. Campbell*,[149] Utah awarded punitive damages against a nationwide insurance company for actions that had no connection to the Utah-based plaintiffs.[150] The Supreme Court vacated that award and remanded so the lower court could adjust the punitive damages award to relate to the insurance company's actions in Utah.[151] In doing so, the Court noted that while Utah went too far, a State may use a company's "lawful out-of-state conduct" to determine the "culpability of the [businesses'] action in the State where it is tortious."[152]

In none of those cases would the Actual-Location Provision be a problem. This is not a case where Utah is directly regulating behavior that has no connection to Utah. Indeed, liability only attaches for a Utah-based transaction where Aylo failed to reasonably age assure and

---

[145] *Id.* at 572.
[146] 234 U.S. 149 (1914).
[147] *Id.* at 161.
[148] *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito J., concurring in part).
[149] 538 U.S. 408, 422 (2003).
[150] *See id.* at 423.
[151] *Id.* at 429.
[152] *Id.* at 422.

prevent a Utah minor from accessing pornography. At most, the Actual-Location Provision's extraterritorial reach is limited to considering Aylo's out-of-state efforts to determine its in-state liability. States can do this.[153] Accordingly, Aylo's has failed to show a substantial likelihood of success on the merits for its extraterritoriality claim.

### B. Aylo is unlikely to succeed on the merits for its dormant Commerce Clause claim

The Supreme Court recently clarified how lower courts should analyze dormant Commerce Clause claims in *Nat'l Pork Producers*. There, the Supreme Court stated that "antidiscrimination . . . lies at the very core of our dormant Commerce Clause jurisprudence."[154]

The dormant Commerce Clause "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."[155] (internal citation omitted). In *Nat'l Pork Producers*, California enacted a law to prohibit the in-state sale of pork that came from pigs confined in a cruel manner. The law applied equally to in-state pork producers as well as those out-of-state. The petitioners challenged the law under the dormant Commerce Clause, and the Supreme Court rejected those arguments. For the same reasons that California may regulate the welfare of pigs destined for slaughter and sold within its state, Utah may regulate the welfare of its minors, and protect them from an onslaught of pornography streaming into the state from both out-of-state and in-state websites.

---

[153] *See State Farm Mut. Auto. Ins.*, 538 U.S. at 422.
[154] *Nat'l Pork Producers*, 598 U.S. at 369.
[155] *Id.* (internal citation omitted).

From Aylo's mistaken framing that it must age-verify every VPN user around the world, Aylo argues the Actual-Location Provision violates the dormant Commerce Clause in three ways. First, Aylo argues the Actual-Location Provision directly regulates interstate activity with no connection to Utah.[156] Second, Aylo argues the Actual-Location Provision discriminates against out-of-state entities in practical effect.[157] And third, Aylo argues the Actual-Location Provision's burdens on interstate commerce are excessive in relation to its local benefits.[158] Each argument fails.

First, Aylo already raised the extraterritoriality argument, which has been addressed above. The Actual-Location Provision is not directly regulating transactions with no connection to Utah. Also, the discrimination argument fails because Aylo has not identified any in-state adult-content provider that is benefiting from the Actual-Location Provision at the expense of an out-of-state provider, which is a necessary requirement for discrimination under the dormant Commerce Clause. Finally, the burden-to-benefit argument fails because, under *National Pork Producers*, the analysis only applies to help identify any discriminatory purpose. Here, the burden Aylo identifies, worldwide age-verifying, is illusory, while Utah retains an important interest in protecting its minors from accessing pornography. And to any extent the Actual-Location Provision poses a burden on Aylo, that burden is reasonable, feasible, and would also apply to in-state producers of adult content. Thus, Aylo cannot meet its burden to show a substantial likelihood of success for its dormant Commerce Clause arguments.

---

[156] *See* Pls.' Mot. for Prelim. Inj., ECF No. 3, p. 16.
[157] *Id*. at pp. 17-18.
[158] *Id*. at pp. 18-19.

>    (1) A successful dormant Commerce Clause challenge requires discrimination against out-of-state interests

The dormant Commerce Clause limits a state's power to enact laws that discriminate against out-of-state commercial interests.[159] It is aimed at preventing states from retreating "into economic isolation."[160] Thus, at its core, the dormant Commerce Clause prohibits "economic protectionism"— i.e., state measures designed to benefit in-state economic interests by disadvantaging out-of-state competitors.[161] But the doctrine is not a "roving license" for federal courts to police state policymaking.[162] The Supreme Court has repeatedly warned that courts must exercise "extreme caution" before using the dormant Commerce Clause to invalidate democratically enacted state laws.[163]

A plaintiff may prevail on a dormant Commerce Clause challenge by showing either "the challenged law affirmatively or clearly discriminates against interstate commerce on its face or in practical effect."[164] Although there is still a place to conduct a burden / benefit analysis, that analysis is limited to exploring the "core" of the purpose of the dormant Commerce Clause – the anti-discrimination principle.[165]

---

[159] *Nat'l Pork Producers*, 598 U.S. at 369.

[160] *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008).

[161] *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1209 (10th Cir. 2025).

[162] *Id.* at 380.

[163] *Nat'l Pork Producers*, 598 U.S. at 390.

[164] *Green Room LLC*, 157 F.4th at 1209 (quoting *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009)).

[165] *Nat'l Pork Producers*, 598 U.S. at 369.

(2) The Actual-Location Provision does not discriminate against interstate commerce facially or in effect

A law discriminates only if it "benefits local actors and burdens out-of-state actors" in a way that "alters the competitive balance between instate and out--of-state [companies]."[166] In other words, "state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."[167] And Aylo bears "[t]he burden to show discrimination."[168]

Importantly, discrimination does not occur if the law cannot favor an in-state business at the expense of an out-of-state business. For example, if there are "no local producers," "such claims of disparate treatment between interstate and local commerce would be meritless."[169] This distinction matters. As emphasized by the Sixth Circuit, a law's disparate impact on an out-of-state business "must not be confused" with a law that has "discriminatory effects on interstate commerce."[170]

Here, Aylo points to nothing in the Actual-Location Provision that works to benefit Utah-based adult content providers at the expense of out-of-state adult content providers. This is fatal to its discrimination theory. What's more, there's nothing in the Actual-Location Provision that is discriminatory; it regulates evenhandedly among all producers that make their adult-content available to Utahns, and it makes no distinction based on where the distributor is located. Thus,

---

[166] *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1142 (10th Cir. 2016) (quoting *Kleinsmith*, 571 F.3d at 1041)).

[167] *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citation omitted).

[168] *Kleinsmith*, 571 F.3d at 1040.

[169] *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978).

[170] *Truesdell v. Friedlander*, 80 F.4th 762, 771 (6th Cir. 2023).

even if there were a Utah-based adult-content distributor, it would have to reasonably adhere to the Actual-Location Provision's requirement just as any out-of-state distributor.

That problem for Aylo aside, Aylo's discrimination argument rests on the proposition that a state cannot force an out-of-state business to surrender its competitive advantages to instate rivals.[171] But Aylo names no in-state rival who benefits from the Actual-Location Provision. And the loss in competitive advantage Aylo identifies is illusory because the Actual-Location Provision does not "force[] Aylo to implement Utah's age-verification system, regardless of" who it serves.[172]

Aylo's real complaint is that it may have to adjust its business model in response to the Actual-Location Provision, which might lead to a drop in visitors. But a law cannot be discriminatory in effect if all adult content producers face the same requirement. And as *Exxon* made clear, compliance burdens on a business's preferred operating structure do not constitute discrimination.[173]

*Rousso v. State*[174] is also instructive. There, the Washington Supreme Court determined that Washington's ban on internet gambling did not violate the dormant Commerce Clause because its statute did not openly discriminate and applied evenhandedly to in-state and out-of-state entities. Same, too, with S.B. 73.

---

[171] Pls.' Mot. for Prelim. Inj., ECF No. 3, p. 18 (citing *Nat'l Pork Producers*, 598 U.S. at 372).
[172] *Id.* at p. 19.
[173] *Exxon*, 437 U.S. at 126.
[174] 239 P.3d 1084 (Wash. 2010).

(3) The Actual-Location does not fail what remains of the *Pike* balancing test

Under *Nat'l Pork Producers*, the Court emphasized that *Pike* is not a freewheeling cost-benefit review of state laws.[175] And that's because courts are ill-equipped to balance the moral benefits of a law versus its economic costs.[176] Rather, the purpose of *Pike* is to "smoke out" purposeful discrimination in state laws that appear facially neutral.[177] *Pike* balancing, then, considers if a state's law places a "clearly excessive" burden on interstate commerce in relation to its "putative local benefits."[178] "To put things in perspective, the Supreme Court has not invalidated a law under *Pike* in more than 30 years."[179]

To the extent *Pike* balancing is needed to "smoke out" discrimination, the first part of the analysis is to gauge the nature and strength of the State's interest. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."[180] And when that local interest involves matters of safety, "a State's power to regulate commerce is never greater."[181]

---

[175] *Nat'l Pork Producers*, 598 U.S. at 380.

[176] *Id.* at 381 ("How is a court supposed to compare or weigh economic costs (to some) against noneconomic benefits (to others)? No neutral legal rule guides the way.")

[177] *Id.* at 377-379.

[178] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

[179] *Truesdell*, 80 F.4th at 773; *accord Nat'l Pork Producers*, 598 U.S. at 380 (recognizing that only a small number of cases have been invalidated under that theory).

[180] *Pike*, 397 U.S. at 142.

[181] *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (Powell, J., plurality opinion for four Justices) (cleaned up). Indeed, the Supreme Court is "most reluctant" to invalidate state "regulations that touch upon safety." *Id.*; *see id.* at 686-87 (Brennan, J., joined by Marshall, J., concurring) (recognizing that "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce" (cleaned up)).

The second part of the *Pike* inquiry focuses on the burden on interstate commerce, and not on the burden a law poses on a particular business's preferred operations. Indeed, the Supreme Court refuses to protect "the particular structure or methods of operation in a retail market" under the dormant Commerce Clause.[182] So, even if a state law results in a shift in market share—where one business unwilling to comply with state law is replaced by another that is willing to comply with state law—that shift does not constitute a substantial burden on interstate commerce.[183] Notably, the dormant Commerce Clause does not shield companies from economic impacts such as higher compliance costs or reduced profits.[184]

To that point, it is widely accepted that, consistent with the dormant Commerce Clause, a multistate business must bear the cost of discovering and complying with state laws everywhere it does business.[185] Thus, the fact that, in response to California's law regulating the type of pork

---

[182] *Exxon*, 437 U.S. at 127.

[183] *See Nat'l Pork Producers*, 598 U.S. at 384-85 (observing that shifts in market share where non-compliant businesses are replaced by compliant businesses are not protected by the dormant Commerce Clause).

[184] *See Pharm. Res. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir.2001) ("Simply because the manufacturers' profits might be negatively affected ... does not necessarily mean that the Maine Act is regulating those profits."); *Exxon*, 437 U.S. at 127 (1978) ("We cannot ... accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.").

[185] *See, e.g.*, *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 920 (Cal. 2006) ("[A]s a general matter, a company that conducts business in numerous states ordinarily is required to make itself aware of and comply with the law of a state in which it chooses to do business."); *see also Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 438 (2005) (finding it acceptable under the dormant Commerce Clause for an interstate trucking firm to pay local fees everywhere that it does business).

sold in the state, some pork producers' preferred "methods of operation" would be burdened did not suffice to establish a cognizable injury to interstate commerce.[186]

      a.  Utah has a substantial interest in protecting Utah minors from accessing online pornography

Utah's interest in preventing minors from accessing harmful sexual content is highly important.[187] States have long had an interest in preventing minors from accessing harmful products like alcohol or pornography.[188] Indeed, society has a "transcendent interest" in protecting the "welfare of children," especially so when "parental control or guidance cannot always be provided."[189] And the situation here, a Utah minor's unprecedented and near-frictionless access to graphic, violent, video porn, only elevates Utah's interest further.

The effects of pornography on a young child's brain prove the point. Any Utah child's access to Aylo's panoply of pornography, including rape, father-daughter, and choking during sex, is of significant concern. That child's mind very likely takes on an unhealthy view of sex. And since typically sex requires other participants, that child's unhealthy view has downstream negative effects on others.[190]

In light of that concern, and despite agreeing that minors should not access pornography, Aylo calls any benefit stemming from the Actual-Location Provision "marginal."[191] Aylo states

---

[186] *Nat'l Pork Producers*, 598 U.S. at 386-87.

[187] *See Free Speech Coalition v. Paxton*, 606 U.S. 461, 473, 496 ("States have a specific interest in protecting *children* from sexually explicit speech") and ("[a state's] interest in shielding children from sexual content is important, even compelling") (citation omitted).

[188] *See Ginsberg v. State of N. Y.*, 390 U.S. 629, 640 (1968).

[189] *Id.*

[190] *See* Statement of Facts ¶¶ 12-24, supra.

[191] Pls. Mot. for Prelim. Inj., p. 17 (alleges only a "small number of Utah minors" are at issue).

that it does not "object in principle"[192] to age verification laws, but it is clear Aylo objects in practice. That cavalier view is precisely why Utah needs to have the Actual-Location Provision in the first place—to help narrow a common workaround a minor has in accessing pornography,[193] especially where feasible and reasonable methods exist to address that workaround. The short of it is Utah's interest here is far from "marginal" and should be one a court is "most reluctant" to invalidate.[194]

> b.  Aylo has failed to show that the Actual-Location Provision clearly causes a discriminatory burden on interstate commerce

The relevant question for the burden analysis is whether interstate commerce itself, not a particular business, is burdened.[195] Aylo identifies no such burden on interstate commerce. Instead, Aylo's alleged burdens are illusory and company-specific. Illusory because the Actual-Location Provision does not require Aylo—or any other adult-content provider—to age-gate globally.[196] Those providers may choose to do so, but that is not what the Actual-Location Provision requires. Further, the burdens Aylo identifies are changes it could make to its own age-verification process when facing a Utah-based VPN user. But the dormant Commerce Clause is not offended if a business changes its structure to comply with a state law.[197]

---

[192] *Id.* at 2.

[193] Even Aylo recognizes that detecting and age-verifying VPN-using Utah minors may help address a common workaround to its adult-content. *See* Mot. 17 (recognizing that minors are "able to evade age-verification requirements through VPN's or other tools").

[194] *Kassel*, 450 U.S. at 670.

[195] *Exxon*, 437 U.S. at 127-28.

[196] *See* Statement of Facts ¶¶ 41-80, supra.

[197] *See Nat'l Pork Producers*, 598 U.S. at 385 ("[T]he dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.' That goes for pigs no less than gas stations." (quoting *Exxon*, 437 U.S. at 127)).

To the extent the Actual-Location Provision burdens Aylo's business, that burden is reasonable and feasible. The Actual-Location Provision only asks that Aylo take reasonable, commercially available steps to ensure that a Utah-based VPN user is age-verified. Methods exist for doing so. In that way, the Actual-Location Provision works to ensure that Aylo does something reasonable (as opposed to nothing at all) when faced with the potential that it may distribute pornography to a minor who has masked their location through a VPN or other tool.

Thus, because Aylo identifies no burden on the interstate commerce, and because the only burdens it cites are operational burdens specific to itself, it cannot meet *Pike*'s requirement that the statute impose a burden on interstate commerce that is "clearly excessive" relative to Utah's substantial local benefits.

### C. Aylo has not demonstrated a strong likelihood of success on the merits for its foreign Commerce Clause claim

Aylo argues that the Actual-Location Provision conflicts with the foreign Commerce Clause's "one voice" standard.[198] The Supreme Court has recognized a "one voice" doctrine, which preempts state laws that "prevent the Federal Government from speaking with one voice in international trade."[199] But the doctrine does not operate as broadly as Aylo suggests.

> **(1)** The one voice standard requires Aylo to make a showing that a foreign policy exists and is seriously threatened by the Actual-Location Provision

The "one voice" doctrine is rarely triggered. It requires a state law to "either implicate foreign policy issues which must be left to the Federal Government or violates a clear federal

---

[198] Pls.' Mot. for Prelim. Inj., p. 20.
[199] *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 320 (1994) (quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 453 (1979) (cleaned up)).

directive."[200] Several principles guide in analyzing this issue: challengers have been required to establish that (1) a foreign policy is actually implicated by the state statute, (2) the identified federal foreign policy is sufficiently clear—typically reflected in congressional action—and (3) that the state law "seriously threatens" that federal policy. Each will be explained in turn.

First, the party bringing the one voice challenge bears the burden of establishing the foreign policy implicated by the state action.[201] Failing to bring sufficient evidence to make this showing is grounds to dismiss the claim.[202]

Second, for whatever foreign policy is identified, it needs to be sufficiently clear. To determine this, the Supreme Court has looked to Congress, because it is the "branch responsible for the regulation of foreign commerce."[203] So, if there exists "indicia" that Congress is willing to tolerate a state's laws impacting foreign companies, then there isn't a sufficiently clear foreign policy conflicting with states' ability to pass those laws.[204] And that remains true despite Executive Branch letters or pronouncements that prefer a different approach, which are simply "precatory" to that analysis.[205]

Third, the identified federal policy needs to be "seriously threatened" by the state law.[206] As a baseline, raising attenuated concerns that foreign countries may feel offended by

---

[200] *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983).

[201] *See Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9 (1986).

[202] *See id.* (observing that the challenging party's failure to establish a foreign policy supports rejecting their arguments).

[203] *See Barclays*, 512 U.S. at 325.

[204] *See id.* at 326-27; *see also id.* at 328-29 (treating congressional tolerance of the state practice as evidence that no clear conflicting federal policy existed).

[205] *Id.* 329-30.

[206] *Id.* at 327.

"unorthodox [State] treatment" is insufficient.[207]  The same goes for concerns of foreign retaliation in response to a state law. Indeed, the Supreme Court views itself as having little competence in deciding how to balance a particular risk of foreign retaliation.[208] Rather, the inquiry turns on whether the political branches have treated the state law as posing a genuine threat to federal foreign policy.[209]

**(2)** Aylo has failed to identify a foreign policy and even if so, has failed to show the policy is seriously threatened

Aylo's foreign Commerce Clause argument falters out of the gate. The only "policy" Aylo gestures toward is a single Executive Branch letter obtained from a news outlet.[210] If the Supreme Court in *Barclays* rejected multiple letters, press releases, and amicus briefs as insufficient to establish the foreign policy at issue, one Executive Branch letter would not be sufficient here.[211]

Even assuming that there is some foreign policy preferring an approach different than Utah's, Aylo has not demonstrated that policy is "seriously threatened." Aylo identifies no foreign country that has objected to Utah's law, no diplomatic communications, and no evidence that foreign governments are invested in protecting Aylo's privacy choices. Rather, Aylo points to one European law and argues that the Actual-Location Provision "presents a threat" of offense

---

[207] *Container Corp. of Am.*, 463 U.S. at 195.

[208] *Id.* at 194; *see also Barclays*, 512 U.S. at 328 (observing the judiciary "is not vested with power to decide" retaliation risks to the United States resulting from state taxes on foreign companies).

[209] *See Container Corp. of Am.*, 463 U.S. at 196 (observing lack of federal interest in a state law suggests the United States' foreign policy was "not seriously threatened").

[210] Pls.' Mot. for Prelim. Inj., p. 21.

[211] *Barclays*, 512 U.S., at 329-30.

by our trading partners and may "potentially lead" to retaliation.[212] But that risk is attenuated.[213] Regardless, courts have little competence in deciding risks of foreign retaliation. Accordingly, Aylo's retaliation argument is not sufficient to establish a foreign Commerce Clause violation.

And finally, Aylo argues that "Utah's law could well be perceived as erecting trade barriers, given that Aylo does not have a worldwide age-verification system in place."[214] This trade barrier argument doesn't work because Utah's law doesn't require Aylo to shut down any of its operations. And the Actual-Location Provision doesn't require Aylo to age-gate every user, even if they use a VPN.

Thus, Aylo has failed to demonstrate a substantial likelihood of success on the merits of its foreign Commerce Clause argument. The same goes for all its arguments. For that reason, the Motion must be denied.

## II.    Aylo has not met its burden to establish irreparable harm

Aylo cannot demonstrate irreparable harm because the "impossible choice"[215] Aylo purports to face does not exist. If the Actual-Location Provision goes into effect, Aylo does not "risk massive liability in the form of civil and possibly even criminal penalties" and there will be

---

[212] *Id.*

[213] Notably, it's been reported that the EU is just as concerned about VPN users bypassing age-gating requirements as Utah is. *European Parliament think-tank suggests VPN crackdown amid online age-verification push*, Anne-Laure Dufeal, BRUSSELSIGNAL.EU (May 8, 2026), https://brusselssignal.eu/2026/05/european-parliament-think-tank-suggests-vpn-crackdown-amid-online-age-verification-push/. The same for Australia. *See Chaitanya Kohli, How Will Platforms Monitor VPN Usage When Under-16 Social Media Ban Begins in Australia*, Medinama.com (Dec. 8, 2025), https://www.medianama.com/2025/12/223-vpn-detection-australia-esafety-guidelines-under-16-social-media-ban/.

[214] Pls.' Mot. for Prelim. Inj., p. 21.

[215] *Id*. at pp. 21–22.

no "significant and unrecoverable costs of implementing a worldwide age-verification system that will devastate Aylo's core business."[216]

"The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance."[217] "[C]ourts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"[218] "[B]ecause 'a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'"[219] "Demonstrating irreparable harm is 'not an easy burden to fulfill.'"[220] Aylo has not met this burden.

Aylo has not demonstrated it will suffer any irreparable harm that would warrant the Court granting the extraordinary remedy of enjoining Defendants from enforcing a statutory provision that seeks to prevent Utah's minors from accessing adult content (i.e., pornographic

---

[216] *Id.*

[217] *Woos LLC v. Mustafa*, 2:25-cv-00212-DBB-DBP, 2025 WL 2939247, *3 (D. Utah July 23, 2025) (alteration in original) (quoting *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir.2005)).

[218] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (second alteration in original) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

[219] *Id.* at 1261 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

[220] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).

material). Aylo argues that compliance[221] with the Actual-Location Provision would cause it irreparable harm in four ways: 1) "Aylo would have to institute age-verification for all users worldwide," which would "require a lengthy amount of time and . . . be incredibly costly";[222] 2) if Aylo were forced to "implement age verification across all of its worldwide platforms," that would "cause tremendous and unrecoverable harm to Aylo's business" because "users who refuse to submit to age verification migrate to non-compliant platforms" and those "who abandon Aylo's platforms for competitors frequently do not return" based on Aylo's own estimates and its own past experience;[223] 3) if Aylo was "forced to implement Utah's age-verification regime worldwide, Aylo would also suffer reputational harm" and damage to its "commitment to protecting user privacy";[224] and 4) Aylo's compliance with the Actual-Location Provision would conflict with other jurisdictions' laws.[225] Aylo cannot demonstrate irreparable harm in any of these ways.

---

[221] Pls.' Mot. for Prelim. Inj., pp. 21 – 24. Aylo also states that by not complying with the Actual-Location Provision it would risk administrative fines, civil penalties, and potential criminal sanctions. Defendants do not dispute the potential liability that S.B. 73 imposes on noncompliant entities, but also note that the imposition of administrative fines and civil actions are at the discretion of the Director of the Division of Consumer Protection who also controls the rulemaking authority connected with the enforcement powers of the Division of Consumer Protection. And, those rules have not yet been promulgated.

[222] *Id*. at p. 22 (citing Collie Decl. at ¶¶ 21–23).

[223] *Id*. at pp. 22–23 (citing Collie Decl. at ¶¶ 25–28).

[224] *Id*. at p. 23 (citing Collie Decl. at ¶¶ 29, 35).

[225] *Id*. at pp. 23–24.

All of this purported harm stems from Aylo's belief that it has to implement "worldwide" age-verification measures because it "has no way to verify whether someone is using a VPN, proxy, or similar tool or is truly located outside Utah."[226] Aylo is wrong.

Contrary to Aylo's assertions that "[t]here is no technology, commercially available or otherwise, that allows a private company to reliably determine whether a user is employing a VPN, proxy server, or other location-masking technology,"[227] such technology does exist. This technology has been used for a number of years, and is currently used by platforms such as BBC, Netflix, and Amazon Prime Video for streaming and copyright purposes. This technology is also used by regulated industries, such as the gambling industry, to enforce state-by-state requirements for online participation in the industry services.[228]

Not only is there widespread technology that can reasonably detect a VPN user, but there is also technology that, upon discovering a VPN user, can assess the likelihood that the user is located in Utah. This technology can assess a user's browser settings such as the time zone from which the device is operated, or the currency the device operator uses to purchase items or access content using the device. Time zone and currency are indicators of a user's geographical location.[229]

Even more, upon discovering a likely VPN user, a geolocation service may provide users with options that would allow them to access their desired platform including: turning off their

---

[226] *Id.* at p. 8.

[227] *Id.* at 2; *see also id.* at 8 ("Aylo has no way to verify whether someone is using a VPN, proxy, or similar tool or is truly located outside Utah . . . .").

[228] *See* Statement of Facts, ¶¶ 29-84, supra.

[229] *Id.*

49

VPN so their device's IP address is identifiable and their general location can be reasonably verified; verifying their age by submitting acceptable age-verification documents; verifying their location by allowing access to acceptable location-identifying information.[230] Given the widespread use of this technology across industries, the idea that "Aylo has no way to verify whether someone is using a VPN, proxy, or similar tool or is truly located outside Utah" and thus the only way to avoid liability under the Actual-Location Provision would require Aylo to "fundamentally transform its business operations worldwide" is farfetched, and certainly not a basis to establish irreparable harm.[231]

In sum, there is a way for Aylo to "reliably determine whether a user is employing a VPN, proxy server, or other location-masking technology,"[232] which is the crux of Aylo's argument about why compliance with the Actual-Location Provision will cause it irreparable harm.[233] The availability, efficacy, and mainstream use across industries of VPN-detection technology defeats Aylo's argument that it will suffer irreparable harm should the Actual-Location Provision be enforced.

---

[230] *Id.*

[231] Pls.' Mot. for Prelim. Inj., p. 8.

[232] *Id.* at p. 2.

[233] To the extent Aylo also argues that there will be "tremendous and unrecoverable harm to [its] business" or "reputational harm," those harms are "[b]ased on Aylo's past experience in other jurisdictions" and supported by a declaration from the Vice President of a company within a corporate organization that includes Plaintiffs. Mot. at 22–23; *see* Collie Decl. at ¶¶ 1, 25–28, 29, 35; *see also Woos*, 2025 WL 2939247, *5 (citing *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) for the proposition that preliminary injunctions "should not issue on the basis of affidavits alone"). And, to the extent that Aylo argues that there is any irreparable harm due to extraterritorial conflict, there is no extraterritorial conflict and thus no basis for irreparable harm. *See* Part I, supra.

### III.    The Balance of Equities and Public Interest weigh in favor of denying the request for injunction

The third and fourth factors—balance of harm and effect on the public interest—merge when the government is the opposing party, and these factors weigh in favor of denying Plaintiffs' Motion. *See Rocky Mountain Gun Owners*, 121 F.4th at 112. "[Th]e ability of a [government] to enact and enforce measures it deems to be in the public interest is . . . an equity to be considered in balancing hardships."[234] And, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[235]

Plaintiffs argue that these two factors favor Aylo because (1) they believe there is a substantial likelihood of success on the merits of their claims, and (2) there are laws in place to protect minors from exposure to pornography.[236] These factors do not favor Aylo.

First, as detailed above, Aylo is not likely to succeed on the merits of its claims.[237] And so, because there is no constitutional violation, the balance of equities and public interest do not tilt in Aylo's favor.

Second, while Plaintiffs appear to concede that there is a "legitimate interest in protecting minors," they say only that there are existing age-verification laws and criminal laws to address

---

[234] *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003).
[235] *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted).
[236] Pls.' Mot. for Prelim. Inj., p. 25.
[237] *See* Part I, supra.

Utah's concerns.[238] Plaintiffs argue that these "tools" adequately serve to protect Utah's interest in protecting minors.[239] But these tools are not enough.

While the current "tools" Plaintiffs refer to are in place, there is a glaring gap where Utah's youth are not protected – VPNs and other masking devices. Even with age assurance tools, VPNs are a workaround that allows Utah's youth access to pornography websites, including those, like Aylo's, that have blocked access to their sites based on a user's Utah IP address. And, over 20% of children aged 8-17 years old or younger report that they know how to use a VPN.[240] The bottom line is that VPNs let Utah's youth access harmful pornographic content from Aylo's websites.

Aylo is no stranger to VPNs. Pornhub, a "popular brand[]" that "Aylo operates," ran its own VPN company, "VPNhub," from approximately 2018 until 2022, providing a workaround for youth to access its websites pornographic content.[241] After terminating VPNhub in 2022, Pornhub referred customers to a "partner provider," which is a separate entity called IPVanish.[242] Pornhub continues to refer users there. This side of the scale tilts heavily in favor of Utah's youth.

On the other side of the scale is the public interest and equity of Aylo employing technology that is not burdensome to employ. Online services including gambling, streaming,

---

[238] Pls.' Mot. for Prelim. Inj., p. 25.
[239] *Id*.
[240] Statement of Facts ¶ 38, supra.
[241] *Id*. at ¶ 39.
[242] *Id*. at ¶ 40.

ticketing, and finance all already regularly use VPN detection and geolocation technology.[243] And the implementation costs are modest relative to Aylo's site operations.[244] That modest burden would go a long way to further limiting Utah's youth's access to pornography and thus experiencing its negative effects.

The balance here is not a close call. The balance tilts in favor of denying an injunction of a law that would impose a minimal burden on Plaintiffs—utilizing common technology—in order to further protect Utah's youth from the significant harms of viewing pornography. This factor weighs in Defendants' favor.

## CONCLUSION

As many states do in a variety of contexts, Utah seeks to regulate a product in the interest of its citizens who are susceptible to harms associated with that product. Utah does not distinguish between pornography that is produced outside its borders from that which is produced inside its borders; it regulates it all the same. Utah does not discriminate, which means Aylo cannot prevail on its first two claims. Further, Aylo cannot prevail on its third claim because the United States has not articulated a foreign policy with respect to pornography – certainly not one that would run counter to Utah's Age Assurance Act, including the Actual-Location Provision. Aylo is unlikely to succeed on the merits of its claims.

The people of Utah, through their representatives, have enacted a law in interest of the state's youth. An injunction is detrimental to the public's interest. Weighing that interest against

---

[243] *Id.* at ¶¶ 46-52.
[244] *Id.*

the costs of doing online business that many industries already bear, the Court should conclude that the interest of protecting youth far outweighs Aylo's compliance costs.

For these reasons, Defendants respectfully ask the Court to deny Aylo's request for a preliminary injunction.

DATED: June 8, 2026

OFFICE OF THE UTAH ATTORNEY GENERAL

*/s/ Lance Sorenson*
LANCE SORENSON
DAVID WOLF
JORDEN TRUMAN
ANIKKA HOIDAL
Assistant Utah Attorneys General
Counsel for Defendants

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 8, 2026, I electronically filed the foregoing, **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Daniel Schwei
JENNER & BLOCK LLP
1099 NEW YORK AVE NW STE 900
WASHINGTON, DC 20001
202-740-1679
Email: dschwei@jenner.com

Jessica Ring Amunson
JENNER & BLOCK LLP
1099 NEW YORK AV NW STE 900
WASHINGTON, DC 20001
202-639-6023
Email: jamunson@jenner.com

Lindsay C. Harrison
JENNER & BLOCK LLP
1099 NEW YORK AVE NW STE 900
WASHINGTON, DC 20001
202-639-6865
Email: lharrison@jenner.com

Annika L. Jones
SNELL & WILMER LLP
15 W SOUTH TEMPLE STE 1200
SALT LAKE CITY, UT 84101
801-257-1967
Email: aljones@swlaw.com

Brandon Scott Fuller
SNELL & WILMER LLP
15 W SOUTH TEMPLE STE 1200
SALT LAKE CITY, UT 84101
801-257-1868
Fax: 801-257-1800
Email: bfuller@swlaw.com

/s/ *Asia Reid*
ASIA REID
Paralegal