**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| AYLO FREESITES LTD and AYLO GROUP LTD<br><br>*Plaintiff,*<br><br>v.<br><br>UTAH DIVISION OF CONSUMER PROTECTION; KATIE HASS, in her official capacity as Director of the Utah Division of Consumer Protection, UTAH DEPARTMENT OF COMMERCE; and MARGARET BUSSE, in her official capacity as Executive Director of the Utah Department of Commerce,<br><br>*Defendant.* | Case 2:26-cv-00340 |

## EXPERT DECLARATION OF CHAD KORNETT

### TABLE OF CONTENTS

I.    Introduction

II.    Qualifications, Prior Testimony, and Compensation

III.    Scope and Background
- A. Overview
- B. Definitions
- C. Technical Concepts

IV.    Summary of Fact

V.    Factual Statements and Analysis
- A. Statement 1: Location Obfuscation Detection Is Reliable and Viable
  1. Location Obfuscation Detection Is Technically Feasible and Commercially Proven
  2. Location Obfuscation Tools Are Widely Available in a Competitive Marketplace
  3. Location Obfuscation Tools Are Already a Critical Standard Across Regulated and Non-Regulated Industries
- B. Statement 2: Location Verification Is Already Regulated, Enforced, and Proven at Scale
  1. Below the VPN: How Geolocation Uses Device-Level Signals to Reveal True Location
  2. Technical Certification Confirms Reasonable Geolocation Technologies Are Reliable
  3. Geolocation is Proven at Scale
- C. Statement 3: Location Obfuscation Detection and Geolocation Technologies Can Be Implemented at Reasonable Cost with Minimal Burden
  1. The Commercial Feasibility of Compliance

VI.    Conclusions

VII.    Appendix

# I.   INTRODUCTION

I, Chad Kornett, declare as follows:

1. I am over the age of 18 and am competent to testify.

2. I have personal knowledge of the facts stated herein.

3. I am an employee of GeoComply USA, Inc., a wholly owned operating subsidiary of GeoComply Solutions Inc. ("GeoComply"), holding the position of Senior Vice President, Geolocation.

4. I provide this information as an expert with respect to the various capabilities and reliability of virtual location verification technologies, and the relative costs and burdens of implementing such technologies into mass market online applications. I have reviewed Plaintiff's (sometimes referred herein as, "Aylo"') Complaint and Motion for Preliminary Injunction.

# II.   QUALIFICATIONS, PRIOR TESTIMONY, AND COMPENSATION

5. I hold a Bachelor of Science in Electrical and Computer Engineering from Rowan University and have completed executive education at Oxford University's Saïd Business School. I have spent more than two decades working at the intersection of geolocation technology and regulated industry compliance.

6. In 2013, I authored the original technical specifications for geolocation compliance in regulated online gaming at Gaming Laboratories International (GLI) and subsequently led their evolution through successive iterations of location technologies, which now service as the foundational compliance benchmark across all U.S. regulated online gaming jurisdictions. I have worked directly with Apple, Google, and Microsoft on location services and device integrity.

7. Since March 2021, I have been employed by GeoComply, a global provider of geolocation compliance and fraud prevention technologies that has been licensed by state gaming agencies and tribal nations to supply gaming operators in 32 jurisdictions in the United States, to lead its anti-spoofing program across mobile, desktop, and browser environments, driving location integrity across gaming, financial services, banking, media and entertainment, and digital identity. I drive GeoComply's regulatory strategy across all 32 U.S. regulated online gaming jurisdictions and international markets and I am responsible for ensuring that trustworthy location verification can be easily integrated and relied upon by customers globally. Geolocation is not a peripheral feature of these frameworks. It is a legal prerequisite; without verified location, no wager can lawfully be placed, no compliant transaction confirmed, and no age-restricted content reliably governed.

8. I have not previously testified as an expert witness.

9. I am compensated at the rate of $250 per hour.

### III.    SCOPE AND BACKGROUND

A. Overview

10. In this declaration I will provide factual clarity on three broad points regarding available geolocation technologies to explain location verification technologies within the context of applicable regulatory and contractual standards, namely:

(a) Location obfuscation technologies—such as a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location—can be readily and reliably detected at scale.

(b) Reasonably verifying the location of an end user employing such technologies is commercially and technically possible, and these verification methods are already utilized at scale for comparable compliance use cases throughout the United States and globally.

(c) Location obfuscation detection and compliance-grade geolocation technologies can be implemented at a reasonable cost while minimizing the burden on end users.

B. Definitions

11. For consistency, I will use the following terms to describe technical concepts, unless directly referring to alternative language in cited materials:

(a) Location Obfuscation: The use of technologies, tools and other means to conceal or misrepresent the geographic location of a device or user, including but not limited to virtual private networks (VPNs), proxy servers, Tor exit nodes, and smart domain name system (DNS) proxies. These tools are also referred to in S.B. 73 as "a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location".[1]

(b) Location Obfuscation Detection: The process of determining whether an Internet Protocol (IP) address is associated with a Location Obfuscation Tool, including VPN providers, proxy servers, or Tor exit nodes, through the use of continuously updated databases and real-time lookup services.

(c) Geolocation: The technical process of confirming that a device, and by extension its user, is physically located within a particular geographic jurisdiction. Location Verification encompasses a spectrum of methods, ranging from IP address-based geolocation (lower precision) to multi-source geolocation combining GPS, Wi-Fi, and cellular signals (higher precision).

(d) Digital Platform: An internet-accessible service or application operated by a digital service provider (such as a media, fintech, or online gaming company) and accessed by end users through web browsers or mobile applications.

---

[1] S.B. 73, 2026 Gen. Sess. (Utah 2026) (enacted).

<u>C. Technical Concepts</u>

12. IP addresses are a basic and widely used data point employed by digital platforms to identify the location of devices and, by extension, the users accessing the content or service available on the digital platform. Assigned by internet service providers, these addresses can be static, such as residential IP addresses, or dynamic, such as mobile IP addresses. IP addresses are, according to Aylo's request for a preliminary injunction, the primary data points used to exclude jurisdictions that Aylo chooses not to service.[2]

13. Because IP addresses are the primary and widely used data point most platforms rely on to restrict geographic access, location obfuscation tools, such as VPNs, are specifically designed to mask IP address geolocation. VPNs have many legitimate uses, such as personal privacy and cybersecurity. They can also be used by individuals for nefarious purposes, such as evading local laws and regulations, wrongfully accessing copyrighted material, or masking other criminal activity.

14. Many digital platforms use location obfuscation detection services, which can determine whether an IP address is legitimate or whether it has been anonymized, and therefore is likely associated with a VPN, proxy server, or Tor exit node. For example, streaming services and digital content platforms use such services to help protect content rights across jurisdictions.

15. While location obfuscation detection services can determine which users are associated with VPNs, they cannot on their own determine the true end location of a VPN user. However, the technology to do so does exist. To determine the location of a user employing location obfuscation tools, one must use geolocation techniques and technologies to aggregate and analyze additional data points beyond an IP address. These more accurate alternatives to IP address-based geolocation include, but are not limited to:

(a) GSM (mobile network data): Provides approximate location using cell towers.

(b) Wi-Fi signals: Offers greater precision by triangulating proximity to Wi-Fi networks.

(c) GPS (satellite data): The most accurate method, pinpointing a device's location via satellite positioning.

16. Beyond these primary location-positioning signals, a range of passive device signals provide additional network and device context (e.g., network latency, time zone settings, etc.). While these signals are not used as standalone location determinants, they provide meaningful corroborating context that, when aggregated, can reliably indicate the probable jurisdiction of a device. Importantly, these signals are passively available from the device environment itself and are not affected by VPN usage.

17. Geolocation systems are not binary. On one end of the geolocation spectrum is IP address geolocation, which is prone to manipulation. At the other end is multi-source geolocation, which is the most technologically sophisticated and precise. There exists a spectrum of possible geolocation processes that lie between these two options.

---

[2] Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support, *Aylo Freesites Ltd. v. Utah Division of Consumer Protection*, No. 2:26-cv-00340 (D. Utah Apr. 22, 2026).

18. Combining various geolocation methodologies and data points creates a more reliable multi-source geolocation system, with reduced risk of signal manipulation. Critically, these data points can be aggregated and analyzed even when a user is employing a VPN or other location obfuscation tool. When multi-source geolocation serves as the basis of compliance programs, the effectiveness of country or state-level online regulations strengthens.

## IV.    SUMMARY OF FACTS

19. Aylo claims on page 2 of its Motion for Preliminary Injunction that "[t]here is no technology, commercially available or otherwise, that allows a private company to reliably determine whether a user is employing a VPN, proxy server, or other location-masking technology, let alone to verify that user's true location." That claim is factually false.

20. Reliable means of location obfuscation detection is not only technically feasible; it is commercially deployed at scale across multiple industries today, as is accurate geolocation verification that goes beyond simple VPN detection. Both capabilities are cost-effective, widely available, and already in use by companies of various sizes and sophistications operating under regulatory frameworks comparable to S.B. 73, such as the regulated iGaming, online sports betting, global media streaming, and international age verification industries.

## V.    FACTUAL STATEMENTS AND ANALYSIS

Statement 1: Location Obfuscation Detection Is Reliable and Viable

**Location Obfuscation Detection Is Technically Feasible and Commercially Proven**

21. Location obfuscation detection and multi-source geolocation are not theoretical capabilities. They are operating successfully today across heavily regulated industries, including in those where such systems are subject to independent certification. For over a decade, operators in the North American online sports betting and iGaming industries have been required by regulation to integrate both location obfuscation detection and geolocation systems and technologies. Likewise, federal financial system regulators encourage the use of VPN detection tools to support sanctions compliance and other national security objectives.[3]

22. Technical feasibility is not in question: it is happening at scale, and it has been for years. Since 2017 GeoComply has made available GeoGuard, an anonymous IP detection product deployed by major streaming platforms including Amazon Prime, YouTube TV, and Disney+ that identifies and flags the use of VPNs, proxies, Tor exit nodes, smart DNS proxies, and other tools used to conceal a device's true location. It accomplishes this by maintaining a continuously updated anonymous IP database, accessible

---

[3] Office of Foreign Assets Control, U.S. Dep't of the Treasury, *Sanctions Compliance Guidance for the Virtual Currency Industry* (2021), https://ofac.treasury.gov/media/913571/download.

through real-time API lookups or downloadable databases for offline use, and is integrated with major content delivery networks, including Akamai and Amazon CloudFront, making it widely available and straightforward to deploy.

23. GeoGuard has been independently audited by Kingsmead Security, a firm specializing in the independent evaluation of content protection tools. Kingsmead's audit determined that the GeoGuard database could effectively detect "VPNs, public proxies, Tor exit nodes, smart DNS proxies, service-specific proxies and any IP address used by a data center known to host VPNs" in 99.8% of test cases, detecting 1,002 out of 1,004 anonymous IPs.[4] Critically, this level of accuracy is achieved without excluding valid users. Kingsmead found that "GeoGuard achieved a false positive rate of 0% from a set of 6,296 random IP addresses generated from the IP ranges assigned to three ISPs in the US and three ISPs in the UK."

24. Mr. Graham Collie, while acknowledging that Aylo itself receives information about whether a user's IP address may be affiliated with known VPN providers or proxy servers, suggests this information is "necessarily under-inclusive" because no third party can identify every VPN provider or proxy server.[5] No industry standard that I am aware of requires a content service provider to identify every VPN provider or proxy server nor, to my knowledge, does S.B. 73 impose that standard. The applicable standard is reliable and reasonable detection, not perfect detection. As demonstrated by the Kingsmead audit, GeoGuard approaches near-universal accuracy under that standard.

25. Location obfuscation detection is a proven, reliable, and cost-effective first layer of a broader geolocation architecture. It answers the threshold question: Is this user using a location obfuscation tool? What it cannot answer on its own is where that user is actually located. That second question, whether a user employing a VPN can have their true location reliably determined, is addressed in Statement 2. The answer, as will be demonstrated herein, is yes.

## Location Obfuscation Tools Are Widely Available in a Competitive Marketplace

26. The robustness of the market for location obfuscation tools, and in which GeoComply operates, is itself evidence of the technology's viability. A competitive market does not emerge or sustain itself around solutions that do not work. The fact that multiple well-capitalized companies have independently developed, commercialized, and continuously invested in anonymous IP detection products, each serving major enterprise clients, reflects broad industry confidence in the underlying approach.

27. In addition to GeoGuard, competitive anonymous IP detection tools are offered by IPInfo ("Accurate VPN, Relay and Tor Detection")[6], Maxmind ("Detect and classify anonymous IPs like proxies and VPNs")[7],

---

[4] Appendix: Kingsmead Security. GeoGuard Effectiveness Testing - Final Test Report

[5] *See* Collie Decl. ¶¶ 15-18.

[6] *The Trusted Source for IP Address Data*, IPinfo, https://ipinfo.io (last visited June 4, 2026).

[7] *Proxy, VPN, and fraud prevention services*, MaxMind, https://www.maxmind.com/en/solutions/proxy-vpn-fraud-detection (last visited June 4, 2026).

Transaction ID: CBJCHBCAABAA3Lh1ig7ZZI-jkBHgYCmNOWUUqe4fqvgT

and IP2Location ("IP2Proxy Proxy Detection Database")[8], among others. Each maintains continuously updated databases and claims broad detection efficacy. Minor variations in accuracy exist across providers, as would be expected in any competitive technology market. What is consistent across all providers, however, is the fundamental premise: location obfuscation detection works, it is commercially deployable, and it is in active use across multiple industries at scale.

**Location Obfuscation Tools Are Already a Critical Standard Across Regulated and Non-Regulated Industries**

28. The use of location obfuscation detection technologies and services is not merely a technical decision, it is an industry best practice routinely codified in major studio specifications and binding contractual obligations across the content distribution ecosystem, and a regulatory requirement across every U.S. jurisdiction with regulated online gaming.

29. In the media and entertainment industry, content licenses vary by jurisdiction, giving rights holders a direct commercial interest in ensuring distributors limit access to licensed geographies. In 2024, MovieLabs, a technology joint venture of the major Hollywood studios, issued their "MovieLabs Specification for Enhanced Content Protection" standard, stating that "Services shall use effective geo-filtering and VPN/proxy detection at the CDN to restrict access to the licensed geographies." Content rights holders formalize this standard contractually. Paramount, for example, requires distributors to comply with the following as a condition of license:

    "For Internet Delivery, Licensee shall use geo-filtering technology with virtual private network (VPN), anonymizer and proxy detection and blocking, to determine that the Authorized Device is within the Territory. IP, VPN, anonymizer and proxy address look-up tables, databases or services shall be updated no less than once per week. Licensee shall ensure that IP address verification shall be executed at playback license acquisition and at reasonable intervals during playback."

30. This prescriptive language, specifying detection technology, update frequency, and verification intervals, is common across the industry. Other major studios, sports leagues, and content rights holders rely on substantially similar contractual requirements.

31. In the online gaming industry, employing location obfuscation detection and geolocation technologies and systems are not just best practices. They are legal prerequisites, mandated by regulation and enforced through independent certification. Every U.S. jurisdiction with regulated online gaming requires geolocation vendors to be licensed, tested, and continuously certified. The standard is not aspirational. It is enforced.

---

[8] *IP2Location IP GeoLocation and IP2Proxy Databases*, IP2Location, https://www.ip2location.com/database (last visited June 4, 2026).

32. From binding contractual requirements in media and entertainment to mandatory regulatory certification in online gaming, location obfuscation detection and geolocation technologies have been unequivocally established across major industries not as optional safeguards, but as fundamental operating requirements.

<u>Statement 2: Location Verification Is Already Regulated, Enforced, and Proven at Scale</u>

**Below the VPN: How Geolocation Uses Device-Level Signals to Reveal True Location**

33. Aylo's position reduces to a single premise: VPNs mask IP addresses, and IP addresses are the only reliable geolocation, therefore a user's true location is unknowable. That premise is outdated.

34. The question before this Court is not whether a VPN can defeat IP-based geolocation. It can, and that is not in dispute. The question is whether a user's true location can be reliably determined even when a VPN is active. That question has a clear answer: yes, through multi-source geolocation.

35. Modern multi-source geolocation systems operate independently of IP address data. To do this, they aggregate multiple independent data sources, none of which are routed through or affected by a VPN tunnel. A VPN encrypts and reroutes internet traffic, concealing a user's IP address from the destination server. It does not alter the GPS coordinates reported by a device's hardware, the Wi-Fi networks visible to that device, or the cell towers to which it is connected. These signals exist at the physical and operating system layer of a device, below the network layer at which VPNs operate. They reflect the device's actual physical location regardless of what the IP address shows.

36. Multi-source geolocation operates across two layers, each designed to minimize user impact while maximizing accuracy.

37. The first layer is entirely passive. Before any location permission is requested from a user, GeoComply's system analyzes a range of device and network signals freely available without user consent. These signals, some straightforward such as device time zone and language settings, others more technical in nature, collectively provide a reliable approximation of a user's likely jurisdiction to a reasonable degree of confidence. This passive assessment requires no action from the user and creates no perceptible change to their experience. For the vast majority of users on any global platform, including all users outside Utah and Utah users not employing a VPN, the compliance process would begin and end here without any user-facing interaction whatsoever.

38. The second layer is triggered only when passive signals indicate a meaningful probability of Utah presence combined with the use of a location obfuscation tool. In that narrow circumstance, the platform presents a standard location permission prompt, the same type of prompt users encounter daily on ride-sharing, mapping, and banking applications. For mobile devices, this leverages GPS, Wi-Fi, and cell tower signals. For desktops, Wi-Fi is the primary data point. In both cases, approximately 350 data integrity checks are conducted to affirm the user's true location. Content service providers typically integrate geolocation

technology, such as that supplied by GeoComply, for mobile apps via a Software Development Kit (SDK), and for browser-based applications via a JavaScript integration. No installation is required by the end user.

39. In his declaration, Dr. Rattray suggests that account-based characteristics, such as verified account information, billing addresses, payment processor checks, and login history, provide a baseline for assessing anomalous sessions.[9] To the contrary, location compliance is determined solely by device and network signals. Indeed, under current gaming regulations, the indicators noted by Dr. Rattray cannot be used for location determinations and so the technology has been developed accordingly.[10] The passive signals described above are distinct from account-based characteristics and operate at the device layer, not the account layer.

40. The technical process described above reflects geolocation as it operates in regulated online gaming. The Division of Consumer Protection may adopt different implementation standards while achieving the same compliance objectives. What the record establishes, regardless of implementation approach, is that reliable geolocation is technically proven, minimally burdensome, and already operating at scale in environments directly analogous to the one Utah's law contemplates.

## Technical Certification Confirms Reasonable Geolocation Technologies Are Reliable

41. Technical assurance systems are, as Dr. Rattray acknowledges, "estimation-based." That characterization is not entirely inaccurate, but it is incomplete. In every U.S. jurisdiction with regulated online gaming, the regulatory expectation is not absolute perfection. It is that "reasonable" technology, in the context of available tools and emerging location-spoofing techniques, produces a sufficiently reliable determination of the device and user locations to uphold the integrity of the state's regulatory framework. Location verification technologies have met that standard consistently, as confirmed by comprehensive licensing, testing, and auditing requirements across all 32 jurisdictions.

42. New York's gaming regulations illustrate the standard applied.[11] They require geolocation systems to ensure that authorized sports bettors are physically located within New York when wagering, that the system reasonably detects physical location and blocks unauthorized access throughout the wagering session, and

---

[9] *See* Rattray Decl. ¶¶ 55-56

[10] See, for example, 16 Me. Code Rules § 62; Md. Code Reg. 36.10.05.04;  Mich. Admin. Code R. 432.731; 58 Pa. Code § 809a.7

[11] *See* N.Y. Comp. Codes R. & Regs. Tit. 9 § 5330.44, which requires, among other things:

(a) *Independent testing laboratory and requirements*. Geolocation software used by mobile sports wagering licensees shall be approved by a licensed independent testing laboratory, including applicable field testing, before the software is deployed in this State. Geolocation requirements include:

[...]

(2) the systems used to reasonably detect the physical location of an authorized sports bettor attempting to place a sports wager with the skin and block unauthorized attempts to access the licensee's platform throughout the duration of the wagering session;

that any mechanisms used to circumvent the location requirement are detected. This is not a passive or aspirational standard. It is an active, enforced requirement with licensing consequences for non-compliance.

43. In all 32 states and territories with regulated online sports betting, geolocation vendors must be licensed by the relevant state or tribal authority. Licensing is contingent on demonstrated geolocation effectiveness as determined by independent testing. GeoComply holds licenses in all 32 jurisdictions. As a condition of those licenses, a geolocation vendor's systems are tested on a regular basis by an independent testing and certification body, such as Gaming Laboratories International (GLI).

44. GLI's Standards for Event Wagering Systems require that geolocation systems "reasonably detect and dynamically monitor the location of a player attempting to place a wager" and "enable the blocking of unauthorized attempts." The technical specifications underlying these standards, including GLI-33, the dedicated geolocation standard for online gaming, were developed in direct collaboration with geolocation technology providers and reflect the practical requirements of operating reliable geolocation at scale across multiple jurisdictions. A geolocation technology that does not meet this standard is not permitted to operate. GeoComply's certification record across all 32 jurisdictions reflects consistent compliance with the applicable reasonable effectiveness standard, maintained under mandatory independent oversight that includes regular penetration and subversion testing specifically designed to challenge the technology's limits.

45. The real-world data from Utah makes the case plainly. In 2025, GeoComply detected and blocked over 1.63 million attempted sports betting and iGaming transactions originating from Utah, all of which would have been illegal under state law. Of the 1.63 million blocked transactions, 60.4% involved IP addresses that did not correspond to a Utah location. In other words, more than half of the users attempting to place illegal bets from Utah were already masking their true location through location obfuscation, including nearly 27,000 transactions linked directly to VPNs. Had these companies been blocking users based solely on IP address, the majority of these illegal transactions would never have been identified or blocked.

46. This is the core problem S.B. 73 is designed to solve, and this data supports that the solution works. IP address geo-blocking alone is not sufficient. It misses the users who matter most: those who are physically present in a restricted jurisdiction but are actively concealing that fact. Location obfuscation detection combined with multi-source geolocation closes that gap. It is not theoretical. It is not experimental. It is operating in Utah right now, catching over 1.63 million violations annually that IP-only systems would miss.

## Geolocation is Proven at Scale

47. Every U.S. jurisdiction with regulated online sports betting has adopted multi-source geolocation as a legal and/or regulatory requirement. Thirty-two independent state regulatory bodies have determined that these systems produce a sufficiently reliable determination of user location to uphold the integrity of their regulatory frameworks. That determination has been validated through mandatory independent certification, including regular penetration and subversion testing specifically designed to probe the system's limits.

48. Aylo's position, if accepted, would invalidate not only Utah's S.B. 73 but every geolocation-dependent regulatory framework in the United States. That is not what reasonable effectiveness requires, and it is not what any effected regulatory body has concluded. The existence of spoofing techniques does not undermine the reliability of multi-source geolocation systems. It is precisely why those systems conduct integrity analysis across multiple independent signals simultaneously: defeating one signal layer does not defeat the system.

49. Dr. Rattray further suggests that the gaming and financial services comparison is inapt because those industries involve cooperative, account-based user relationships that ordinary websites lack.[12] This argument mischaracterizes the step-up geolocation architecture described above that could be leveraged to ensure S.B. 73 compliance. The passive layer of that architecture requires no account relationship and no user cooperation. It analyzes signals already present in the device environment without any user interaction. The active layer requests a standard location permission prompt, the same prompt that Google Maps requests from a first-time anonymous user. That is not the full account verification infrastructure Dr. Rattray describes. It is a minimal, targeted request directed at a narrow subset of users, and it is well within the capability of any platform already operating at Aylo's scale.

50. Dr. Rattray also suggests that evasion techniques continuously evolve, making today's effective methods obsolete over time.[13] That is true of every compliance technology in every regulated industry. It is an argument for ongoing investment in detection capability, not for exempting platforms from the obligation to make reasonable efforts today. The gaming regulatory framework exists precisely because the evasion landscape evolves, and it works precisely because it creates a continuous obligation to keep pace with that evolution. S.B. 73 asks for nothing more.

51. Location verification systems that combine location obfuscation detection with multi-source geolocation have demonstrated accuracy sufficient to meet regulatory certification standards across 32 U.S. jurisdictions. This accuracy holds despite regular and frequent penetration and subversion testing conducted by independent laboratories as part of a regulated certification mandate. This certification record across every U.S. regulated online gaming jurisdiction is not a theoretical benchmark. It is the most rigorous real-world validation available, and it directly refutes the assertion that reliable location verification is technically impossible.

52. Even outside of gaming, the regulatory challenge Utah faces is not unique. In late 2025, Australia passed a minimum age law for social media, requiring platforms to take "reasonable steps to prevent Australians under the age of 16 from creating or keeping an account."[14] VPN-enabled circumvention was immediately identified by leading policymakers as a potential vector for evasion of age controls in the lead-up to

---

[12] *See* Rattray Decl. ¶¶ 55-56.
[13] *See* Rattray Decl. ¶¶ 65.
[14] *Social Media Age Restrictions*, Australian eSafety Commission, https://www.esafety.gov.au/about-us/industry-regulation/social-media-age-restrictions.

implementation. Prime Minister Anthony Albanese stated that "Some people have said that [the social media minimum age laws] will be difficult because people can change, with VPN numbers having escalated in places like the United States, where this has been tried, which is why we need to make sure that we absolutely get it right."[15] eSafety Commissioner Julie Inman Grant stated that "The platforms covered under the scheme will likely need to actively prevent expected circumvention techniques, including via VPNs."[16]

53. The Australian government's independent Age Assurance Technology Trial ("AATT") was unequivocal: "The law does not say 'you must deny access to minors unless they use a VPN' — it says that regulated entities must prevent unlawful access, full stop. The use of a VPN by a minor does not exempt platforms or providers from responsibility under Australian or international law. In this context, geolocation services offer a practical and established method to detect and respond to VPN usage, ensuring that digital compliance systems are not circumvented."[17]

54. The implementing guidance issued by the eSafety Commission, based largely on the AATT findings, confirmed that "Providers can determine an end-user's likely country of residence based on a combination of digital signals, many of which are already shared by users. Systems typically aggregate multiple data points, including but not limited to, an end-user's IP address, GPS signals, Wi-Fi network information, mobile phone tower connections and device and browser fingerprinting."[18] This is precisely the multi-source architecture described in this declaration, independently evaluated and endorsed by a government body as both practical and effective.

## Statement 3: Location Obfuscation Detection and Geolocation Technologies Can Be Implemented at Reasonable Cost with Minimal Burden

55. Understanding the architecture of a properly designed compliance system is essential to evaluating Aylo's claimed burden.

56. Critically, the integration of location obfuscation detection and geolocation technology into an existing platform is neither technically demanding nor time-consuming. Modern solutions are purpose-built for seamless deployment, supported by comprehensive onboarding teams, detailed documentation, and release packages that guide organizations implementing these technologies through every step of the process. Real-

---

[15] *Questions Without Notice: Cybersafety*, 44th Parl., House of Representatives Deb. (9 Oct. 2024) (Austl.), https://www.aph.gov.au/Parliamentary_Business/Hansard/Hansard_Display?bid=chamber/hansardr/28031/&sid=0093.

[16] Julie Inman Grant, Commissioner, eSafety Comm'r, *Swimming Between the Digital Flags: Helping Young Australians Navigate Social Media's Dangerous Currents,* Address at the National Press Club, Canberra, Austl. (June 24, 2025), https://www.esafety.gov.au/newsroom/blogs/swimming-between-the-digital-flags-helping-young-australians-navigate-social-medias-dangerous-currents.

[17] Age Check Certification Scheme, *Age Assurance Technology Trial: Part D – Age Estimation* (Aug. 2025) (Austl.), https://ageassurance.com.au/wp-content/uploads/2025/08/AATT_Part_D_DIGITAL.pdf.

[18] eSafety Comm'r, *Social Media Minimum Age Regulatory Guidance* (Sept. 16, 2025) (Austl.), https://www.esafety.gov.au/sites/default/files/2025-09/eSafety-SMMA-Regulatory-Guidance.pdf.

time validation and customizable workflows further streamline setup. In practice, a full integration typically requires no more than a few days to a few weeks depending on the technical resources available, a modest investment by any measure.

57. Regarding the user experience, in practice, the compliance process begins with a passive assessment layer that requires no user interaction and creates no perceptible friction. A range of device and network signals, available without user consent, are assessed automatically in the background. These signals, some straightforward such as device time zone and language settings, others more technical in nature, collectively allow the system to approximate a user's likely jurisdiction to a reasonable degree of confidence.

58. To illustrate: a user in Germany connecting through a VPN server in Chicago will present device and network characteristics consistent with a German location, not a Utah one. That user is triaged out of any further compliance action without ever receiving a prompt. The specifics of which signals are analyzed and how they are weighted is a function of the detection system's design, but the outcome is consistent: the vast majority of VPN users worldwide present passive signals that are clearly inconsistent with Utah presence and are excluded from any further action automatically.

59. Only users who both employ location obfuscation tools and whose passive signals are consistent with Utah presence proceed to any further step. That population is a small fraction of total platform traffic. For a platform with hundreds of millions of monthly active users globally, the subset who are simultaneously using a VPN, accessing from Utah, and presenting Utah-consistent passive signals is a fraction of a fraction. Furthermore, users who have already completed age verification through the platform's existing processes would not be subject to any additional prompt. This is the population to whom any user-facing action would apply, not the global user base Aylo invokes when describing its perceived harm.

60. To the extent Aylo anticipates widespread user friction and significant traffic loss from compliance, that concern reflects a compliance model built entirely around IP-based geo-fencing, which is Aylo's current architecture, not a model built around multi-signal step-up verification. That is an architectural choice, not a technical inevitability imposed by Utah's law.

### The Commercial Feasibility of Compliance

61. The cost of compliance with S.B. 73 is best understood in the context of the step-up architecture described above. It is not a flat cost applied to every user on a global platform. It is a tiered cost that scales with the narrowing population of users who progress through each layer of the compliance process.

62. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

63. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

64. It should be noted that anonymous IP detection alone is not a sufficient compliance tool. Should a platform apply high-friction actions to all detected anonymous IPs without further triage, this would create unnecessary disruption to the large global population of VPN users with no Utah nexus. The step-up architecture addresses this directly. Anonymous IP detection identifies who is using a VPN. The passive signal layer narrows that population to those likely in Utah. Precise verification confirms location for the residual subset. Each layer is proportionate to the compliance requirement, and the cost reflects that proportionality.

65. The overall burden on users mirrors this structure. The passive layer creates no friction for anyone. Users who have already completed age verification through the platform's existing processes are not subject to any additional prompt. The active layer presents a standard location permission prompt to a small residual subset, the same prompt type encountered daily across ride-sharing, mapping, and banking applications. Users who receive the prompt have three straightforward options: enable device location, voluntarily age-assure, or disable their VPN. None of these options require Aylo to fundamentally transform its business. Each is a targeted, proportionate response to a specific compliance scenario.

## VI.    CONCLUSIONS

66. This declaration provides factual information to address a single central question: is it technically and commercially feasible for a digital platform to detect VPN usage and verify the true location of users who may be in Utah, without imposing an unreasonable burden on its global user base? In my expert opinion, the answer, supported by independent audit data, regulatory certification records, international regulatory precedent, and real-world operational evidence, is yes.

67. Aylo's claim that no technology exists to reliably detect VPN usage or verify true location is not an accurate characterization of the technical landscape, as supported by the factual content shared herein. Anonymous IP detection operates at near-universal accuracy, independently audited at 99.8% with a zero false positive

rate. It is contractually required by major content rights holders, mandated by industry standards bodies, and actively deployed by the world's largest streaming platforms. The competitive market, with multiple well-capitalized providers, reflects sustained industry confidence in the industry's viability.

68. Geolocation technology that goes well beyond IP detection is equally well-established and readily available. Multi-source geolocation systems aggregate device signals, including GPS, Wi-Fi triangulation, and cell tower positioning, none of which are affected by VPN usage. These systems have been licensed, tested, and have been operating under state regulatory oversight across 32 U.S. jurisdictions for years. In 2025 alone, GeoComply detected and blocked over 1.63 million illegal transactions originating from Utah, more than 60% of which involved IP addresses that did not correspond to a Utah location. IP-based geo-blocking alone would have missed the majority of them.

69. The cost of implementing these tools is modest relative to the scale of any platform subject to S.B. 73. The burden on users, properly architected through a step-up approach, is limited to a small residual subset of traffic: VPN users presenting Utah-presence signals who have not already completed age verification. The vast majority of users on any global platform, including all users outside Utah and Utah users not employing a VPN, should experience no change whatsoever.

**Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based on my personal knowledge as of the date signed below. I hereby reserve the right to supplement this report and my statements as the proceedings continue to unfold and as I receive additional information.**

*Chad Kornett*
Chad Kornett (Jun 8, 2026 16:11:12 EDT)

**Name:** Chad Kornett
**Date:** June 8, 2026

**VII.    APPENDIX:**

<u>Kingsmead Security Ltd., GeoGuard Effectiveness Testing - Final Test Report, August 29, 2025</u>

See attached.

# FORMATTED - GeoComply Declaration for Utah AG (2026.06.08 - GeoComply Draft)

Final Audit Report                                          2026-06-08

| | |
|---|---|
| Created: | 2026-06-08 |
| By: | Travis Kelley (travis@geocomply.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA3Lh1ig7ZZI-jkBHgYCmNOWUUqe4fqvgT |

## "FORMATTED - GeoComply Declaration for Utah AG (2026.06.08 - GeoComply Draft)" History

📄 Document created by Travis Kelley (travis@geocomply.com)
2026-06-08 - 7:53:42 PM GMT

✉ Document emailed to Chad Kornett (chad.kornett@geocomply.com) for signature
2026-06-08 - 7:55:11 PM GMT

📄 Email viewed by Chad Kornett (chad.kornett@geocomply.com)
2026-06-08 - 8:08:15 PM GMT

✍ Document e-signed by Chad Kornett (chad.kornett@geocomply.com)
Signature Date: 2026-06-08 - 8:11:12 PM GMT - Time Source: server - Signature Appearance Selected: TYPE

✅ Agreement completed.
2026-06-08 - 8:11:12 PM GMT

Powered by
Adobe
Acrobat Sign