September 30, 2026

Via Electronic Mail (dcprules@utah.gov)

Katherine Hass, Division Director
Utah Division of Consumer Protection
Heber Wells Building
160 East 300 South
P.O. Box 146704
Salt Lake City, Utah 84114-6704

**Re: Comments of Aylo on Proposed Rule R152-78B, Liability for Publishers and Distributors of Material Harmful to Minors Rule (Filing ID 58148), Utah State Bulletin No. 2026-17 (Sept. 1, 2026)**

Dear Director Hass:

Aylo Freesites Ltd ("Aylo"), on behalf of itself as well as its parent company Aylo Group Ltd and its affiliates, respectfully submits these comments on the Utah Division of Consumer Protection's (the "Division") proposed rule R152-78B (the "Proposed Rule"), published in the Utah State Bulletin on September 1, 2026. Aylo's comments are further supported by citations to the attached exhibits; the Division should consider these exhibits as part of Aylo's comments.[1]

As you know, Aylo operates free adult-entertainment online platforms, including well-known websites such as Pornhub, YouPorn, and RedTube. After Utah enacted S.B. 287, the Online Pornography Viewing Age Requirements, in 2023, Aylo concluded that the law did not sufficiently protect user privacy, and Aylo therefore chose to comply by seeking to withdraw from the market for free online adult content in Utah. To implement that compliance, Aylo uses IP-based geolocation—the industry-standard method for geolocating web users—to block all identified Utah-based users.

Earlier this year, the Utah Legislature enacted S.B. 73, which provides that "[a]n individual is considered to be accessing the website from this state if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location to make it appear that the individual is accessing a website from a location outside this state." Utah Code § 78B-3-1002(3) (hereinafter the "Deemed-Location Provision").

Under the plain text of that provision, Aylo could be held liable every time a Utah-based individual accesses one of its sites without undergoing age-verification, regardless of whether Aylo had any basis for thinking that the individual was masking their true location or was in Utah. No company, including Aylo, can reliably verify whether a user is masking their geographic location

[1] Utah State Bulletin, Vol. 2026, No. 17, Rule No. R152-78B (Sept. 1, 2026). Citations to the "Rule Analysis" refer to the Rule Analysis boxes listed in the Bulletin, and citations to "§ ___" refer to specific sections of the proposed rule R152-78B.

or determine that user's true location. The only way to avoid liability under Utah law is therefore to age-verify all users worldwide, which imposes impermissible extraterritorial burdens on Aylo. Aylo therefore brought suit in federal court challenging the Deemed-Location Provision as unconstitutional.

In response to that suit, the Utah Attorney General argued—on behalf of the Division of Consumer Protection—that the Deemed-Location Provision does not require perfection in determining users' locations, but only "reasonable efforts" to identify individuals located in Utah. And the Attorney General suggested that the Division would issue rules clarifying precisely what those "reasonable efforts" are for companies like Aylo.

The Division has now issued the Proposed Rule, but it does not eliminate the legal flaws inherent in S.B. 73's Deemed-Location Provision. Indeed, **a federal court has now concluded that enforcement of the Deemed-Location Provision is likely unconstitutional.** The statute "cannot be read to require only reasonable efforts at determining whether such individuals [visiting a site] are located in Utah," and therefore the statute "in practice requires an entity to perform age verification services for every user visiting its site from any location because the entity would violate the law if even one of those users happened to be obfuscating their location from Utah," which constitutes "too much direct regulation of wholly out-of-state conduct to be lawful under the dormant Commerce Clause."[2] The Proposed Rule seeks to implement an unconstitutional act, and should accordingly be withdrawn on that basis alone.[3]

Even apart from the recent court decision, however, the Proposed Rule suffers from numerous other flaws. The Division should withdraw the Proposed Rule for at least three independent reasons:

*First*, the Proposed Rule does not—and cannot—provide a safe harbor for companies like Aylo that blocks (rather than age-verifies) identified Utah-based users. The Proposed Rule introduces the concept of a "commercially reasonable geolocation obfuscation detection system," § 201(2)(a), but it never provides that a company using such a system (or any other system) will avoid liability for any Utah-based users it fails to detect. The rule's only operative provision—the safe harbor in § 202—is available only to companies that *also* age-verify their users. The Proposed Rule thus leaves in place S.B. 73's *de facto* worldwide mandate to age-verify everyone, which is unconstitutional.

---

[2] Ex. 1, Opinion Granting Aylo's Preliminary Injunction ("PI Op."), at 15, 31, ECF No. 67, *Aylo Freesites Ltd. et al. v. Utah Division of Consumer Protection et al.*, No. 26-cv-340-DBB-JCB (D. Utah Sept. 24, 2026). All ECF number citations refer to filings in this case.

[3] In addition to the Dormant Commerce Clause, Aylo maintains that the Deemed-Location Provision is unconstitutional on other grounds as well, including violating principles against extraterritorial legislation and the Foreign Commerce Clause, as Aylo has explained in its lawsuit. *See generally* Ex. 2, Complaint, ECF No. 1; Ex. 3, Pls.' Mot. for Prelim. Inj. and Memo. in Support, ECF No. 3 ("PI Br."); Ex. 4, Pls.' Reply Memo. in Support of Mot. for Prelim. Inj., ECF No. 53 ("Reply Br."). Given the court's sealing orders in *Aylo Freesites Ltd. v. Utah Div. of Consumer Prot.*, Aylo includes only the publicly available, redacted versions of each relevant filing as exhibits to this comment. As a party to the case, however, the Division of Consumer Protection has access to the unredacted versions and Aylo refers the Division to these sealed filings in further support of its comment.

*Second*, the Proposed Rule's definition of a "commercially reasonable geolocation obfuscation detection system" is unreasonable, unsupported, and contrary to law. There is no identified method that meets the Division's specified 95% standard; there is no realistic way of measuring compliance with that standard; and the Division's suggested factors would produce a wildly over-inclusive method that unlawfully burdens the rights of the billions of individuals worldwide who have no connection to Utah. The Division's approach fails to engage with what is actually "commercially reasonable" in this context, which is IP-based geolocation—as independent experts confirm—and the Division also fails to substantiate how the complex and overinclusive system defined in the rule is superior to the simple and proportional standard of IP-based geolocation. Indeed, S.B. 73 itself contemplates IP-based geolocation as the default method that websites will use for identifying users' locations, which further supports not taking action against companies that implement IP-based geolocation to restrict access.

*Third*, the Proposed Rule fails to comply with the Utah Administrative Rulemaking Act ("UARA") in at least four respects. The Division has not disclosed any of the factual or technical data on which its 95% accuracy standard rests, depriving interested parties of a meaningful opportunity to comment. The Division's fiscal analysis is inadequate, declaring costs "inestimable" without any apparent effort to gather readily available data. The rule's costs plainly exceed the $2 million, five-year threshold for a "substantial fiscal impact," which means the Proposed Rule in its current form cannot be implemented, and at a minimum would require legislative review before the rule takes effect. And the rule's enormous burdens vastly outweigh its minimal benefits, given that individuals deterred from accessing compliant platforms will simply migrate to non-compliant platforms that have made no effort to restrict access by Utah minors in the three and a half years since S.B. 287 took effect, and that have much weaker safety and content-moderation protocols, thereby making it *more* likely that Utah-based individuals will encounter harmful, violent, and other inappropriate content.

Accordingly, Aylo urges the Division not to finalize the Proposed Rule. It is an effort to further an unconstitutional law, and it is unsupported, unreasonable, and contrary to law. Aylo has demonstrated its good faith by voluntarily seeking to withdraw from the Utah market and implementing IP-based geoblocking, the industry-standard compliance approach and the very method contemplated by S.B. 73 itself. The Proposed Rule should not penalize that effort. If the Division nonetheless moves forward with this rulemaking, the Division should confirm that it will not take enforcement action against any company that uses IP-based geolocation to block identified Utah users.

## I. The Proposed Rule Implements a Law that a Federal Court Has Already Declared Likely Unconstitutional, and Should Therefore Be Withdrawn.

On September 24, 2026, the United States District Court for the District of Utah granted Aylo's motion for a preliminary injunction and enjoined enforcement of the Deemed-Location

Provision, Utah Code § 78B-3-1002(3).[4] The Division should withdraw this Proposed Rule, which seeks to implement a law that a federal court has already declared likely unconstitutional.

In particular, the court held that the "plain and unambiguous" language of the Deemed-Location Provision "does not contain any reasonable efforts qualifier," and that the statute "now essentially imposes strict liability for entities like [Aylo] when it comes to determining the location of its websites' users."[5] Based on that understanding, the court held that the Deemed-Location Provision is likely unconstitutional on two separate grounds. *First*, because "[t]he law requires geolocation perfection" and "the parties agree that current technological advancements do not allow" for such perfection, the provision "in practice requires an entity to perform age verification services for every user visiting its site from any location because the entity would violate the law if even one of those users happened to be obfuscating their location from Utah"—which "likely creates too much direct regulation of wholly out-of-state conduct to be lawful under the dormant Commerce Clause."[6] *Second*, the provision likely fails *Pike* balancing: its "primary effect will be to burden interstate commerce outside of Utah," and Utah's own insistence that a reasonableness standard would serve its interests "effectively concede[s] that its interests could be served with a less burdensome impact on interstate activities."[7] The court found irreparable harm, concluded that the balance of equities and the public interest favor an injunction because "the [state] has no interest in keeping an unconstitutional law on the books," and enjoined enforcement of the Deemed-Location Provision.[8]Here, the Proposed Rule seeks to directly implement the Deemed-Location Provision. In light of the federal court's ruling declaring that provision likely unconstitutional, the Division should withdraw the Proposed Rule. State officials are bound by the Supremacy Clause and by their oaths to support the Constitution of the United States, and they have an independent obligation not to take action to implement a state law that a federal court has enjoined as likely unconstitutional.[9]

The Proposed Rule also cannot cure the Deemed-Location Provision's constitutional defects. The court did not consider the Proposed Rule because it was submitted after briefing and oral argument,[10] but the Proposed Rule would not have changed the outcome. Because the Deemed-Location Provision's "plain and unambiguous" language contains no "reasonable efforts" qualifier, the court held the provision was not "readily susceptible" to a narrowing construction,[11] and adding a reasonableness standard would "require 'rewriting' not just reinterpretation" of the

---

[4] PI Op. at 1–2, 40. The court referred to the Deemed-Location Provision as the "actual-location provision." *Id.* at 3 n.12. The defendants in the action are the Division; its Director, in her official capacity; the Utah Department of Commerce; and the Department's Executive Director, in her official capacity. *Id.* at 1.

[5] PI Op. at 14–15, 17.

[6] *Id.* at 30–31; *see also id.* at 33 (the provision "would regulate a massive amount of wholly out-of-state conduct with no connection to Utah").

[7] *Id.* at 34–36.

[8] *Id.* at 36–40 (quoting *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019)).

[9] U.S. Const. art. VI, cls. 2–3; Utah Const. art. IV, § 10.

[10] PI Op. at 14 n.73.

[11] *Id.* at 14

provision.[12] A rule cannot rewrite a statute, and therefore nothing in the Proposed Rule would (or could) mitigate the legal flaws inherent in the Deemed-Location Provision.[13] To the extent the Division believes that particular provisions of the Proposed Rule do not depend on the Deemed-Location Provision and can still be implemented, the Division should issue a new proposed rule limited to those provisions, with a new comment period, so that interested parties may evaluate that proposed rule in light of the court's ruling.[14]

## II. The Proposed Rule Still Embodies a *De Facto* Worldwide Age-Verification Mandate, Including for Companies that Have Sought to Leave the Utah Market.

Even apart from the federal court's ruling, the Proposed Rule is unlawful on its own terms. The Proposed Rule cannot provide a safe harbor that is inconsistent with S.B. 73 itself; the Proposed Rule does not even purport to provide that safe harbor for companies like Aylo that decline to engage in age-verification; that lack of a safe harbor is contrary to the Utah Attorney General's own representations at the preliminary-injunction hearing; and the Proposed Rule is unconstitutional under well-settled principles and precedent.

### A. The Division Lacks Authority to Create a Reasonableness "Safe Harbor" that Conflicts with the Governing Statute.

At the preliminary-injunction hearing in Aylo's lawsuit, Utah argued that S.B. 73 and the Deemed-Location Provision require only "reasonable efforts" to identify Utah-based users.[15] Even if the Proposed Rule purported to implement that standard as to Aylo, however, "[i]t is a longstanding principle of administrative law that an agency's rules must be consistent with its governing statute," and "a rule that is out of harmony with a governing statute is invalid."[16]

Here, as a federal court has now held, the "plain and unambiguous" text of S.B. 73 threatens companies with liability for *every* Utah-based individual they fail to detect and age-verify, regardless of whether their efforts to detect Utah-based individuals were "reasonable" or not.[17] In particular, the Deemed-Location Provision "does not contain any reasonable efforts qualifier."[18]

---

[12] *See id.* at 14 (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)).

[13] *Mt. Olympus Waters, Inc. v. Utah State Tax Comm'n*, 877 P.2d 1271, 1273 (Utah Ct. App. 1994) ("[A]n administrative interpretation out of harmony and contrary to the express provisions of a statute . . . in effect amend[s] that statute[,]" but "[i]t is up to the legislature, not [an agency], to [determine] the statutory language used.").

[14] Aylo does not concede that any such rule is lawful. The age-verification accuracy thresholds suffer from independent defects addressed in Part III.B, and any new proposed rule would need to comply with the UARA requirements discussed in Part IV.

[15] *See, e.g.*, Ex. 5, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 43 ("PI Opp'n") at 1; Ex. 6, Tr. of Prelim. Inj. Hr'g (July 30, 2026) ("Hr'g Tr.") at 40:25–41:01 ("So we know this is a reasonableness standard, and that's where we're operating from."), 85:4–6 ("[T]here is no suggestion of perfection. This is an example of a model, and it doesn't have to be perfect under the state's approach.").

[16] *Sanders Brine Shrimp v. Audit Div. of Utah State Tax Comm'n*, 846 P.2d 1304, 1306 (Utah 1993); *see also Mt. Olympus Waters*, 877 P.2d at 1273.

[17] PI Op. at 9–17.

[18] *Id.* at 14.

Unlike S.B. 73's age verification requirement, the Deemed-Location Provision "does not contain the word 'reasonable.'"[19] And neither the "definitions section nor any other part of the statute state that efforts to identify an individual's actual location need only be reasonable or provide a definition for what constitutes reasonable geolocation efforts."[20]

Accordingly, the statute leaves no room for the Division to add a reasonableness standard to the Deemed-Location Provision by rule. As noted, the court held doing so would "require 'rewriting' not just reinterpretation" of the provision.[21] Additionally, the rulemaking authority the Legislature conferred on the Division within the definition of "reasonable age verification methods" concerns "how the entity verifies an individual's age"—not how the entity determines an individual's location.[22] Thus, the Proposed Rule cannot alter the unambiguous meaning of the Deemed-Location Provision, which requires perfection in geolocation.

### B. The Proposed Rule Does Not Provide a Safe Harbor for Companies Like Aylo that Seek to Leave the Utah Market Rather than Age-Verify Users.

Even assuming the Division has authority to promulgate a rule inconsistent with the "plain and unambiguous" text of the statute, the Division's Proposed Rule does not even purport to provide a safe harbor for companies like Aylo that decline to engage in age-verification (and instead seek to block Utah-based users).

The Proposed Rule defines a "commercially reasonable" method of geolocation as one that is capable of identifying users' locations with at least 95% accuracy.[23] But the Proposed Rule does not create a safe harbor for companies based solely on their use of such a "commercially reasonable" geolocation technology; in fact, the safe harbor applies only to companies that use geolocation technology to then age-verify users. Specifically, under § 202(1), use of a "geolocation obfuscation detection system" is only one element required for the safe harbor; a company must *also* implement an "age verification system," *id.*, and that system must "produce outcomes that satisfy" certain false-positive criteria, and the company must also provide a means for "challeng[ing] an incorrect age verification result."[24]

Thus, use of a geolocation obfuscation detection system contributes to the safe harbor only if the company *also* agrees to implement age verification. Use of a geolocation obfuscation detection system to *block*, rather than age verify, Utah users does not qualify for the safe harbor.

---

[19] *Id.* at 11.

[20] *Id.*

[21] *See id.* at 14 (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)).

[22] *Id.* at 13 n.72.

[23] § 201(2)(a).

[24] § 202(1)(a)–(c). The Rule Analysis likewise describes the rule's purpose as "establish[ing] commercially reasonable age verification standards," without any mention of establishing geolocation standards for companies that have chosen to exit the Utah market. Rule Analysis, Box 3.B; *see also* § 101(1) (purpose is "to establish commercially reasonable age verification standards").

For a company that has chosen to exit the Utah market precisely because it concluded that Utah's age-verification regime does not adequately protect user privacy, that is no safe harbor at all.

For such a company, the Proposed Rule therefore changes nothing. The Deemed-Location Provision still declares a user to be in Utah "if the individual is actually located in the state, regardless of whether the individual is using a virtual private network, proxy server, or other means to disguise or misrepresent the individual's geographic location," and the statute imposes liability whenever a Utah-based individual accesses covered content without age verification.[25] A company that fails to detect a particular Utah-based user thus remains liable, no matter how reasonable its method. The only certain way to avoid that liability is to age-verify every user, everywhere.[26]

### C. The Proposed Rule Does Not Codify the Reasonableness Standard the State Represented to the Federal Court.

Even if the Deemed-Location Provision could be interpreted to include a reasonableness qualifier (contrary to its plain text), the Proposed Rule's failure to provide a safe harbor for companies like Aylo is at odds with the reasonableness standard the State represented to the court in defense of S.B. 73.

At the July 30, 2026 preliminary-injunction hearing in Aylo's lawsuit, the court asked counsel for the Attorney General to confirm that, in the State's view, a reasonableness standard "applies not only to the task of age verification, but also to the initial step of determining whether someone is in Utah or not," and Utah's counsel answered, "Yes, Your Honor."[27] The court then asked whether "the government [is] going on record and saying only a reasonableness standard will be applied," and counsel again confirmed: "Yes. We -- a reasonableness standard."[28] Later in the hearing, counsel for the Attorney General further represented that the State's client—the Division—"has represented to us that they will use the reasonableness standard."[29]

The Proposed Rule does not codify those representations. It defines a "commercially reasonable" geolocation obfuscation detection system, § 201(2), but it never provides that a company using that method—or any other—is protected from liability for Utah-based users it fails to detect. If the State genuinely believes that S.B. 73 imposes only a reasonableness standard on the location-detection question, the Division's rule should expressly say so, but it does not.

This inconsistency between the Attorney General's statements and the Proposed Rule deprives regulated companies of meaningful notice about how they can avoid liability under the law, and further confirms S.B. 73's invalidity.

---

[25] Utah Code § 78B-3-1002(1)(a), (3); *id.* § 78B-3-1003(1).

[26] *See* PI Br. at 2–3, 12–13; Reply Br. at 2, 8, 22; Ex. 7, Decl. of Graham Collie in Support of Pls.' Mot. for Prelim. Inj., ECF No. 3-2 ("Collie Decl.") ¶ 21.

[27] Hr'g Tr. at 50:04–12.

[28] *Id.* at 51:06–10.

[29] *Id.* at 89:8–9.

### D. The Proposed Rule Is Unlawful Under the Federal Constitution.

Because the Proposed Rule does not provide a safe harbor for companies like Aylo, it does not address S.B. 73's core defect: the Deemed-Location Provision imposes a *de facto* mandate to age-verify all users worldwide. As a federal court has now concluded, that mandate is likely unconstitutional.[30]

In particular, the Deemed-Location Provision offends the Dormant Commerce Clause. It directly regulates wholly out-of-state transactions by users with no connection to Utah, by "requir[ing] an entity to perform age verification services for every user visiting its site from any location because the entity would violate the law if even one of those users happened to be obfuscating their location from Utah."[31] And the law imposes "massive" burdens on interstate commerce that dwarf its local benefits.[32]

Beyond just the Dormant Commerce Clause violation, Aylo refers the Division to the briefing in the pending litigation for additional reasons the law is unconstitutional beyond those already found by the federal court.[33] To avoid these legal flaws—and to ensure that Utah's Deemed-Location Provision regulates only Utah-based conduct—the rule should expressly provide that a company is not liable for failing to age-verify any Utah-based individual whose location appears to the company to be outside the State of Utah, at least as long as the company uses IP-based geolocation to attempt to detect Utah-based users.

## III. The Proposed Rule's Definition of a "Commercially Reasonable Geolocation Obfuscation Detection System" Is Unreasonable, Unsupported, and Contrary to Law.

Even if the Proposed Rule did provide a safe harbor for companies that have exited the Utah market so long as they use a "commercially reasonable geolocation obfuscation detection system," the Proposed Rule's definition of such a system is seriously flawed on several levels. No identified system reliably satisfies the rule's 95% standard; there is no practical way to measure compliance with that standard; the signals the rule endorses would unlawfully sweep in millions of individuals wholly outside Utah; and the rule ignores the only method that actually *is* commercially reasonable in this context.

### A. No Identified System Reliably Satisfies the Proposed Rule's Standard.

The Proposed Rule defines a "commercially reasonable geolocation obfuscation detection system" as "a measure calculated to enable the commercial entity to identify with at least 95%

---

[30] PI Op. at 31; *see also id.* at 26–36.

[31] PI Op. at 26–33; *see also* PI Br. at 15–17; Reply Br. at 26.

[32] PI Op. at 33–36; *see also* PI Br. at 17–18; Reply Br. at 27–29.

[33] PI Br. at 10–15, 18-21; Reply Br. at 18–25, 30-34; *see also* Ex. 8, Graham Collie Supplemental Decl., ECF No. 53-2 ("Collie Supp. Decl.") ¶ 15; Ex. 9, U.S. Mission United Kingdom, *Government Response to the UK Consultation "Growing Up in the Online World"* (June 5, 2026), https://uk.usembassy.gov/u-s-governmentresponse-to-the-uk-consultation-growing-up-in-the-online-world/, ECF No. 53-10.

accuracy whether a person attempting to access a website . . . is in Utah."[34] But the Proposed Rule does not identify any particular method that meets that standard, and the Division, in fact, has conceded that no method allows a website operator to determine a user's location with perfect certainty.[35] Meeting the Proposed Rule's standard would require two distinct capabilities: first, reliably detecting whether a user is masking their location (discussed in Part III.A.1), and second, determining the user's true geographic location once location masking is detected (discussed in Part III.A.2). Even setting aside the impossibility of measuring compliance with the standard (discussed in Part III.B), no available method reliably accomplishes either task.

### 1. Impossibility of Identifying Location-Masking Technologies

To determine whether a person attempting to access a website is located in Utah, a company must first determine "whether a person's or device's location is masked."[36] But detecting the presence of location-obfuscation technology is extremely difficult, and it is becoming more difficult over time as consumers adopt more sophisticated tools such as residential proxy servers and lesser-known VPN providers. Commercial VPN lists are inherently incomplete and constantly changing; VPN providers operate thousands of servers and cycle their IP addresses specifically to evade detection; and much location-masking traffic comes from proxy services that no database has cataloged.[37]

In Aylo's federal lawsuit, the State pointed to the example of GeoComply, a commercial vendor that claims a 99.8% detection rate for VPNs.[38] But that detection rate is highly misleading. As an independent cybersecurity expert, Dr. Gregory Rattray,[39] explained, the audit underlying that figure "measures only the easiest cases," and "a controlled lab result against the easiest inputs says little about how the tool would perform against Aylo's actual users."[40] GeoComply does not purport to have a 95% accuracy rate under real-world conditions.

Indeed, the very security firm that audited GeoComply's detection testing—Kingsmead Security—has elsewhere acknowledged that the use of residential proxies by VPN vendors "is widespread and growing," that "detecting residential proxies is difficult as traffic from these IP

---

[34] § 201(2)(a).

[35] PI Op. at 4; *see also* Ex. 10, Expert Decl. of Chad Kornett, ECF No. 43-2 ("Kornett Decl.") ¶ 24.

[36] § 103(4)(a).

[37] Ex. 11, Prelim. Expert Decl. of Dr. Gregory J. Rattray, ECF No. 3-3 ("Rattray Decl."), ¶¶ 42–45; Ex. 12 Rebuttal Expert Decl. of Dr. Gregory J. Rattray, ECF No. 53-1 ("Rattray Supp. Decl.") ¶¶ 17–22; Collie Decl. ¶¶ 15, 17–18; Collie Supp. Decl. ¶ 26.

[38] Kornett Decl. ¶¶ 22–23.

[39] Dr. Rattray has more than thirty years of experience in cybersecurity, consulting, intelligence, and academia. He is the founder and a partner of a cybersecurity advisory firm and previously served as Global Chief Information Security Officer at JPMorgan Chase, as an intelligence and cyber officer in the U.S. Air Force (including commanding the Operations Group of the Air Force Information Warfare Center), and as Director for Cybersecurity on the National Security Council at the White House. Rattray Decl. ¶ 3.

[40] Rattray Supp. Decl. ¶¶ 8, 18, 45 ("The data and testing offered to show the method's accuracy do not demonstrate what is claimed. The Utah operational numbers are unverifiable as presented, and the headline 99.8% detection figure is derived from a test of the easiest cases rather than real-world conditions."); *see* Reply Br. at 3, 10.

addresses may be indistinguishable from genuine user traffic," and that "many VPNs can almost guarantee access to streaming services" because "when a streaming service is targeted with these technologies, detection rates fall quickly."[41] Kingsmead's bottom line is that "VPNs have now reached a maturity level where they can reliably avoid detection," such that "[w]here residential proxies are deployed to route VPN traffic, streaming operators have few options to defend themselves."[42]

These findings are further corroborated by other independent research and industry data. One peer-reviewed study demonstrated that the primary technique for detecting the use of residential proxies "can be trivially defeated," reducing detection accuracy to just 8%.[43] Similarly, GreyNoise Intelligence, a cybersecurity analytics firm, analyzed four billion internet sessions and found that residential proxies evaded detection through ordinary methods in 78% of cases.[44] According to the same analysis, approximately 89.7% of the residential proxy IP addresses were active for less than one month and spanned 683 different internet service providers, meaning that databases that compile IP addresses for detection purposes become outdated almost as soon as they are created.[45] The scale of this challenge is growing rapidly. The residential proxy services' market size reached approximately $1.71 billion in 2025 and is growing at a compound annual rate of roughly 16%.[46] Total active proxy IP addresses surpassed 160 million in 2024, with more than 75% linked to residential sources, and one major provider alone expanded its residential IP network to over 75 million IP addresses.[47] The Division's 95% accuracy standard thus requires companies to hit a target that is not only undemonstrated but is moving in the wrong direction.

### 2. Inability to Detect a User's True Geographic Location

Even if a company could reliably detect whether an individual is using geolocation-masking technology, it is doubtful that the company could identify the user's true location with 95% accuracy. Detecting that a user is masking his or her location reveals only that the apparent location is not the real one; it says nothing about where the user actually is.[48] And a company

---

[41] Ex. 13, Kingsmead Security Ltd., *Residential VPNs: A Rising Risk for OTT Services* (Sept. 2022), ECF No. 53-4 ("Kingsmead 2022 Whitepaper") at 22; Ex. 14, Kingsmead Security Ltd., *Enhancing Geolocation for Cutting-Edge Streaming Services* (2026), ECF No. 53-3 ("Kingsmead 2026 Whitepaper") at 7; *see* Rattray Supp. Decl. ¶¶ 19–20; Reply Br. at 10 & n.4.

[42] Kingsmead 2026 Whitepaper at 9; *see* Rattray Supp. Decl. ¶ 20.

[43] Temoor Ali et al., *Beyond RTT: An Adversarially Robust Two-Tiered Approach for Residential Proxy Detection*, at 1, 14 (Feb. 2026), https://www.ndss-symposium.org/wp-content/uploads/2026-f2086-paper.pdf

[44] Bill Toulas, *Residential Proxies Evaded IP Reputation Checks in 78% of 4B Sessions*, Bleeping Computer (Apr. 2, 2026), https://www.bleepingcomputer.com/news/security/residential-proxies-evaded-ip-reputation-checks-in-78-percent-of-4b-sessions/.

[45] *Id.*

[46] Wise Guy Reports, *Global Residential Proxies Service Market Research Report: Size, Share & Forecast to 2026–2035* (Aug. 2026), https://www.wiseguyreports.com/reports/residential-proxies-service-market.

[47] Industry Reports, Residential Proxy IP Network Market Size, Share, Growth, and Industry Analysis, By Type (Services, Software), By Application (Large Enterprises, SMEs), Regional Insights and Forecast to 2035 (last updated July 22, 2026), https://www.industryresearch.biz/market-reports/residential-proxy-ip-network-market-114474.

[48] Rattray Decl. ¶¶ 18, 21–29, 42, 46.

certainly could not identify a user's true location based on the "latent signals" that the Proposed Rule identifies—*i.e.*, "connection latency," "a device's or browser's time zone setting," and "other relevant data transmitted by the device or browser."[49] The Division, itself, acknowledges these signals are imperfect.[50]

Connection latency is not a meaningful indicator of whether a user's IP-based location matches the user's physical location, and it says nothing about where a user is physically located. Latency "can occur for any number of reasons independent of VPNs or proxy servers, such as geographic distance, network congestion, weak network connections, or other factors," and it is "not a meaningful predictor of a user's location—and certainly not with the specificity needed to identify a user as being located in a particular state."[51]

Neither is a device's time-zone setting. The Mountain time zone includes six States in their entirety—Arizona, Colorado, Montana, New Mexico, Utah, and Wyoming—and parts of eight more; roughly 23 million people live in the Mountain time zone, only about 3.54 million of them in Utah.[52] And time-zone settings can be changed by a user in seconds and may be set for reasons having nothing to do with current location.[53]

The Proposed Rule's final category—"other relevant data transmitted by the device or browser"—also does not assist. The Division does not say what that data is, and Dr. Rattray has explained that no combination of passively available device and network signals allows a company to reliably identify a user's true location; such signals "are still indirect and do not reflect direct observation of a person's physical presence," and "[a]ggregating more of these inputs may improve confidence in some cases, but it does not transform an inference into reliable proof of where a user actually is."[54]

Moreover, major web browsers are actively restricting access to the "latent signals" the Proposed Rule directs companies to use. In September 2025, Apple introduced a default feature in its native browser (Safari 26) to prevent browser fingerprinting.[55] Browser fingerprinting allows websites to distinguish users by tracking information like their time zone, system fonts, and other

---

[49] § 201(2)(b)(i)–(iii).

[50] *See* PI Op. at 5 (citing Kornett Decl. ¶¶ 37, 41).

[51] Rattray Supp. Decl. ¶ 24; *see* Rattray Decl. ¶ 45; Collie Supp. Decl. ¶ 28.

[52] 49 C.F.R. §§ 71.7–71.9; Rattray Supp. Decl. ¶ 27 ("[E]very device in the U.S. Mountain Time Zone would share Utah's time-zone setting, and that population is far larger than just Utah's.").

[53] Rattray Supp. Decl. ¶ 25 (time-zone and language settings "are user configurable and are routinely changed; they also frequently travel with a device rather than reflect current location"); Collie Supp. Decl. ¶ 29 (explaining how "any Windows user can change their time zone settings simply by navigating to settings"). Kingsmead Security agrees: device time-zone and language settings "can easily be changed by a user and therefore only provide very weak evidence of location." Kingsmead 2026 Whitepaper at 12; *see* Rattray Supp. Decl. ¶ 26.

[54] Rattray Decl. ¶¶ 49–54; Rattray Supp. Decl. ¶¶ 23, 29, 33 (explaining that, without disclosure of the signals used and how they are weighted, a claimed accuracy rate cannot be evaluated, and that additional signals can conflict with one another and reduce confidence).

[55] Gblock, *Safari 26 Now Injects Noise Into Every Fingerprinting Script—Here's What That Means for Tracking* (Mar. 23, 2026), https://www.gblock.app/articles/safari-26-fingerprinting-protection-privacy.

device settings.[56] But, as a result of Apple's new feature, each browsing session by the same device now returns different data, making identification of the device impossible.[57] Similarly, in November 2025, Mozilla rolled out new technology to prevent device fingerprinting, which cut the percentage of uniquely identifiable users nearly in half.[58]

The Proposed Rule's reliance on "latent signals" rests on a foundation that is eroding. The signals the Division envisions—time zone data, connection characteristics, and device information—are the kinds of signals privacy-focused browsers are now obscuring. A regulatory standard premised on the continued availability of these signals is not commercially reasonable; it is technologically obsolete.

Nor would the problem be solved even if an individual were to "share the person's location," § 202(2)(a)—an apparent reference to device-based signals such as GPS. Even GPS signals can be manipulated, spoofed, or obscured through device-based applications or external transmitters. Again, Kingsmead Security itself notes that "[s]ome device types allow the user to fake locations," and that "Android has many location faking apps, many of which have been downloaded millions of times"—one of them more than 50 million times.[59] Sharing location therefore does not guarantee that a company will accurately detect a user's true location 95% of the time.[60]

Notably, even GeoComply—the vendor whose product the Attorney General embraced in federal court as a model of compliance—does not claim that it can verify a person's presence in Utah with 95% accuracy.[61] And even if there were an identified method that satisfied a 95% accuracy standard today, meeting that standard will only become more difficult as technology continues to evolve. As Dr. Rattray has explained, location verification is "a technological arms race," and "methods that may appear effective today will degrade over time as the technical environment continues to change."[62]

Thus, it is doubtful that any method currently exists that reliably satisfies—and will continue to satisfy—the Proposed Rule's standard. If it is not possible to meet that standard, then the law continues to operate as a *de facto* requirement to age-verify everyone to avoid liability.

---

[56] Katarzyna Szymielewicz & Bill Budington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers* (June 19, 2018), https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers.

[57] Gblock, *Safari 26 Now Injects Noise Into Every Fingerprinting Script*.

[58] Ernestas Naprys, *Mozilla Rolls Out New Anti-Fingerprinting Protections in Firefox 145*, Cybernews (Nov. 11, 2025), https://cybernews.com/security/mozilla-updates-firefox-with-anti-fingerprinting-protections/.

[59] Kingsmead 2026 Whitepaper at 10–11; *see* Rattray Supp. Decl. ¶ 32.

[60] Rattray Decl. ¶¶ 36–37, 53; Rattray Supp. Decl. ¶ 32; Reply Br. at 15.

[61] Rattray Supp. Decl. ¶¶ 12, 43–44; Reply Br. at 11, 15–16.

[62] Rattray Decl. ¶¶ 38–39, 65; Rattray Supp. Decl. ¶¶ 20–21.

### B. There Is No Practical Way to Measure Compliance with the Proposed Rule's Standard.

The Proposed Rule requires "at least 95% accuracy" for a geolocation obfuscation detection system, § 201(2)(a), but the Proposed Rule never specifies how that accuracy rate is to be measured. For example, the Proposed Rule does not identify the population against which accuracy is to be measured (is it all users or only those using location-obfuscation technology?); the unit of measurement (per visit or per user?); or how errors are counted (are false positives—non-Utah users wrongly flagged as Utah-based—and false negatives—Utah users the system fails to detect—both counted and weighted equally?). The answers to these questions are far from obvious since there is "no universally accepted standard for measuring the accuracy of internet geolocation systems."[63] Different providers "use different methods, different reference data, and even different definitions of 'accurate.'"[64]

The Proposed Rule also does not specify how a company could determine the accuracy rate in advance without engaging in exactly the kind of sensitive data collection that companies like Aylo seek to avoid in order to protect their users' privacy and to comply with all applicable privacy laws governing data collection—including with respect to users outside Utah. A company cannot know whether its geolocation system is 95% accurate unless it knows where all of its users are physically located, including those using VPNs. Similarly, measuring the accuracy of a system for identifying "whether a person's or device's location is masked" requires knowing the truth about whether every user is, in fact, masking his or her location. But those facts are inherently unknowable to a website operator, which observes only indirect digital signals and not a user's physical presence.[65] Moreover, even to attempt to evaluate those statistics would require collecting additional location data from users—the very type of universal data-collection mandate that is unlawful, as explained below.[66]

The Proposed Rule's age-verification provisions suffer from the same defect. The rule requires 95% accuracy in identifying "whether a person . . . is a minor," and low "false positive" rates—ranging from 2% for seventeen-year-olds down to 0.1% for younger children—to qualify for the safe harbor.[67] But the Proposed Rule does not specify how a company could possibly measure these rates without implementing age verification for all of its users (including those outside Utah) and then somehow ascertaining the true ages of the users its system passed through.

Moreover, an authoritative study of six facial age-estimation algorithms found none of the algorithms met the accuracy standards in the Proposed Rule. The National Institute of Standards

---

[63] Rattray Supp. Decl. ¶ 44.

[64] *Id.*

[65] Rattray Decl. ¶¶ 16, 21–22, 40–41; Rattray Supp. Decl. ¶ 11. Indeed, as Dr. Rattray has explained, "[t]here is no universally accepted standard for measuring the accuracy of internet geolocation systems"; different providers "use different methods, different reference data, and even different definitions of 'accurate.'" Rattray Supp. Decl. ¶ 44.

[66] *See infra* Part III.C; Rattray Decl. ¶¶ 58–63 (explaining that efforts to increase confidence in location require "collecting and handling more information about users elsewhere as well," raising concerns under data-minimization principles).

[67] § 201(1); § 202(1)(a) & tbl.

and Technology ("NIST") evaluated six leading commercial facial age-estimation algorithms using approximately 11 million photographs.[68] Even the best-performing algorithm could not achieve a 0.1% false positive rate for 14-year-olds at any commonly used challenge threshold; the best result was 0.2%—double the Proposed Rule's required rate for 14-year-olds—and that figure is an average across all demographic subgroups, meaning certain populations experience materially higher error rates.[69]

The NIST data also reveals significant demographic disparities that compound the problem. For four of the six algorithms tested, false positive rates were "markedly lower in men than women," and, for one of the algorithms, the false positive rate was 7.5 times greater for females than males.[70] Disparities by region of birth were even more pronounced: for 17-year-old males, the false positive rate for individuals of West African origin was roughly 16.7 times higher than for individuals of East European origin, even using the best-performing algorithm.[71]

These results demonstrate that the Proposed Rule's false positive thresholds are not merely aspirational but technically unachievable with current technology, and that any attempt to meet them would disproportionately burden users on the basis of sex and race.

The Proposed Rule therefore does not provide a way for companies to structure their conduct in advance to avoid liability. The 95% accuracy mandates are a moving target as technology evolves, and no company—regardless of its efforts—can be confident that its current techniques will avoid liability. As was true before the Proposed Rule, the only way for companies to avoid liability is to age-verify everyone (and now, under the Proposed Rule, they must also hope that their age-verification system satisfies the Division's accuracy thresholds).

### C. The Proposed Rule's Geolocation Requirements Are Significantly Over-Inclusive, Regulating the Lawful Activities of Individuals Wholly Outside Utah.

Under the Proposed Rule, any "commercially reasonable geolocation obfuscation detection system" will inevitably restrict the lawful activities of users wholly outside Utah, making it unconstitutional.

To begin with, the "latent signals" that the Proposed Rule identifies will inevitably sweep in millions of individuals outside Utah—for example, simply because they reside in the same time zone—and subject them to Utah's requirements.[72] Aylo estimates that Pornhub alone receives approximately 1.26 million monthly visitors with English-language browsers from the six States wholly within the Mountain time zone; only about 2,100 of them appear, based on IP geolocation,

---

[68] Kayee Hanaoka et al., *Face Analysis Technology Evaluation: Age Estimation and Verification*, NIST Internal Report at 1–2 (May 2024), https://nvlpubs.nist.gov/nistpubs/ir/2024/NIST.IR.8525.pdf ("Face Analysis Technology Evaluation").

[69] *Id.* at 4 tbls. 3–4; *see also* § 202(1)(a) & tbl.

[70] Face Analysis Technology Evaluation at 3 tbl. 2.

[71] *Id.* at 4 tbl. 5.

[72] § 201(2)(b)(i)–(iii); PI Op. 5-6 (noting Utah's methods of estimation would sweep in millions of non-Utah users).

to be in Utah, and approximately 1.25 million of them are in Colorado and New Mexico, which have chosen not to require age verification for adult websites.[73] In the federal court litigation, Utah proposed the same latent signals as solutions to the constitutional defect in S.B. 73. But, as the court held, because those signals do not allow perfect geolocation detection, the Deemed-Location Provision "in practice requires an entity to perform age verification services for every user visiting its site from any location because the entity would violate the law if even one of those users happened to be obfuscating their location from Utah."[74]

Additionally, the Proposed Rule will effectively prohibit VPN users in other States from accessing adult-content platforms unless they comply with Utah's age-verification law. As the State argued in its legal briefs, and as the Proposed Rule itself provides in connection with the safe harbor, once a person is identified as using geolocation-obfuscation technology, the commercial entity "shall require the person to" either (a) "share the person's location to confirm the person is not located in Utah"; (b) "disable the person's geolocation obfuscation and age verify if the person is located in Utah"; or (c) "age verify."[75] Thus, the Proposed Rule effectively eliminates the option for individuals—the vast majority of whom are outside Utah—to access adult-content websites using VPNs and other legitimate privacy-protecting technologies. Users who value their privacy enough to use a VPN would be forced to surrender highly sensitive location data, disable a lawful privacy tool, or submit to age verification that their own State has chosen not to require, simply to view lawful, constitutionally protected content.[76]

Utah has no lawful authority to prevent a VPN user in another State—such as Colorado or New Mexico—from accessing Aylo's platforms, let alone to require that user to share precise location data, disable their VPN, or "voluntarily" age-verify.[77] But that is precisely the result under the Proposed Rule. Accordingly, the Proposed Rule is unconstitutional.[78]

Indeed, the Proposed Rule threatens to place companies like Aylo in conflict with the laws of other States and countries. Other States have adopted different legal rules regarding VPNs, age verification, and data privacy—including restrictions on the collection of precisely the type of geolocation data that the Proposed Rule would require companies to collect. Colorado, for example, imposes a duty of data minimization, requires consent for processing sensitive data like geolocation, and prohibits discriminating against users who exercise their data-privacy rights; Maryland prohibits processing geolocation data except where "strictly necessary" to provide a

---

[73] Collie Supp. Decl. ¶¶ 30–33 & tbl.; Reply Br. at 12; *see also* Rattray Supp. Decl. ¶¶ 27, 36–37 (the passive signals "flag essentially every English-speaking user across the Mountain Time Zone — a population far larger than Utah").

[74] PI Op. at 30–31.

[75] § 202(2)(a)–(c); *see* Reply Br. at 9, 19 n.10 (describing the Attorney General's identical "three options for compliance with Utah law").

[76] Collie Supp. Decl. ¶¶ 34–35, 40–42; Rattray Supp. Decl. ¶¶ 30–31, 34, 36; Rattray Decl. ¶¶ 35, 48; Reply Br. at 13, 23.

[77] Reply Br. at 3 ("Utah has no lawful authority to prevent a VPN user in New Mexico from accessing Aylo's platforms."); *id.* at 19, 23.

[78] *See supra* Part II.D; PI Br. at 10–19; Reply Br. at 18–31.

service the consumer requested; and numerous other States have similar laws.[79] Moreover, other countries—particularly those subject to the European Union's General Data Protection Regulation—carefully regulate location data and require that its collection be minimized. The worldwide reach of Utah's rule, in potential conflict with dozens of other jurisdictions' laws, underscores its unconstitutionality.[80]

### D. The "Reasonable" Approach in this Context Is IP-Based Geolocation.

The Proposed Rule purports to define a "commercially reasonable" method for detecting location. But in this context, the commercially reasonable method is IP-based geolocation.

IP-based geolocation is the "applicable commercial norm" for transient, unauthenticated web users, as Dr. Rattray has confirmed.[81] So has Kingsmead Security, the firm that audited GeoComply, which reports that "IP-based geolocation is the standard method used throughout the streaming industry and is essential for all streaming services," and that "[g]eolocation beyond IP is in place for some services, although usage remains rare."[82] Aylo's use of IP-based geolocation to comply with Utah's age-verification law by withdrawing from the Utah market is thus "consistent with industry standards," and Aylo's inability to verify users' true locations through other means is shared by companies in other industries, such as entertainment streaming.[83]

S.B. 73 itself assumes that platforms will implement IP-based geolocation to identify the location of users. The statute prohibits platforms from providing "means for individuals in this state to circumvent geofencing or blocking"—the very functions that IP-based geolocation performs.[84]

IP-based geolocation may not be perfect, but no method is; and IP-based geolocation does not restrict the lawful activities of out-of-state users in the way that the proposed rule's approach does.[85] The Division should therefore confirm that a company that blocks identified Utah-based individuals from accessing adult content will not be liable under S.B. 73 so long as it implements the industry standard of IP-based geoblocking.

---

[79] Reply Br. at 23–24 & n.12 (citing, *inter alia*, Colo. Rev. Stat. § 6-1-1308(1)(c), (3), (7), and Md. Code, Com. Law §§ 14-4701(gg), 14-4707(a)(1)); PI Br. at 14–15 & nn.5–6; Collie Decl. ¶¶ 30–31.

[80] PI Br. at 21, 24; Reply Br. at 33–34; Collie Decl. ¶ 32.

[81] Rattray Supp. Decl. ¶¶ 6, 15 ("In my opinion, IP-based geolocation, which Aylo already uses, is the industry-standard method for a free service involving transient users."); Reply Br. at 9.

[82] Kingsmead 2026 Whitepaper at 1, 13, 15; *see* Rattray Supp. Decl. ¶ 15. Even the State's own age-verification expert acknowledged that IP geolocation is "[o]ne of the most common forms of geolocation." Rattray Supp. Decl. ¶ 15 (quoting Allen Decl. ¶ 65, ECF No. 43-4).

[83] Reply Br. at 25; Collie Decl. ¶ 17.

[84] Utah Code § 78B-3-1002(4)(b); *see* Reply Br. at 2, 9.

[85] *See* Rattray Supp. Decl. ¶ 15 ("Being the standard does not make it reliable proof of a user's true location . . . . It is the norm precisely because the more intrusive, device-based alternatives are rare and . . . do not reliably solve that problem either."); Rattray Decl. ¶¶ 48, 54.

More broadly, to the extent the Division seeks to prevent minors from accessing age-restricted content, the most effective and least burdensome approach is device-based age assurance rather than website-by-website identity collection. Device-based solutions verify a user's age at the operating-system or browser level and transmit only a yes-or-no age signal to websites, without requiring websites to collect government-issued identification, biometric data, or precise geolocation. This approach is not hypothetical. In March 2026, Apple deployed its Communication Safety and Limit Adult Websites features for all users in the United Kingdom on devices running iOS 26.4 or higher, restricting adult content by default until a user is verified as an adult. Apple has since deployed materially similar age assurance and child safety controls in Australia, with its web content filtering feature automatically enabled for children, teenagers, and adults who have not confirmed that they are 18 or older. Aylo deployed its own solution in May 2026 to detect users on those devices and grant or restrict access accordingly, demonstrating that device-based age assurance can work in practice for web platforms. Google's Play Age Signals API similarly enables applications to receive a user's age-verification and supervision status, and Aylo has formally requested that Apple, Google, and Microsoft extend these capabilities to web platforms. In June 2026, the United Kingdom announced its intention to introduce legislation requiring operating system providers to enable child safety features by default for all unverified and minor users, further confirming the regulatory trajectory toward device-level solutions.

U.S. legislatures are moving in the same direction. California's Digital Age Assurance Act, signed into law on October 13, 2025, and amended earlier this month,[86] requires operating system providers to collect users' ages at account setup and then deliver age-bracket signals to application developers through a real-time API, with compliance required by January 1, 2027.[87] Utah's own Legislature has recognized this approach: the Children's Device Protection Act[88] requires smartphones and tablets activated by a minor to automatically enable content filters, and similarly the App Store Accountability Act,[89] requires app stores to verify users' age categories and share age and consent data with app developers. At the federal level, the Digital Age Assurance Act of 2026,[90] introduced on July 22, 2026, would require operating system providers to collect users' ages and would require application developers, website operators, and browser providers to request age signals from the operating system.

Device-based age assurance avoids many of the infirmities of the Proposed Rule, including because it does not require websites to collect sensitive data from users in other States or countries. It also addresses the Division's stated concern more effectively than the Proposed Rule: a device-level control applies across all websites and cannot be circumvented simply by visiting a non-compliant platform, whereas the Proposed Rule burdens only compliant providers while leaving non-compliant platforms entirely unaffected. The Division should consider this alternative rather than finalizing a rule that imposes enormous costs on regulated entities, collects sensitive data from billions of users worldwide, and ultimately fails to achieve its stated objective.

---

[86] AB 1856, 2025-2026 Reg. Sess. (Cal. 2025); AB 1856, 2026-2027 Reg. Sess. (Cal. 2026).

[87] Cal. Civ. Code § 1798.501(a).

[88] SB 104, 2024 Gen. Sess. (Utah 2024)

[89] SB 142, 2025 Gen. Sess. (Utah 2025), amended by HB 498, 2026 Gen. Sess. (Utah 2026).

[90] S. 5090, 119th Cong. (2026).

## IV. The Proposed Rule Fails to Comply with the Utah Administrative Rulemaking Act.

Beyond its flaws on the merits, the Proposed Rule also fails to comply with the UARA for at least four reasons: (1) the Division has not disclosed any of the factual or technical data on which its 95% accuracy standard rests; (2) the Division's fiscal analysis is inadequate; (3) the Proposed Rule cannot be implemented without legislative review; and (4) the Proposed Rule's burdens vastly outweigh its purported benefits.

### A. The Proposed Rule Does Not Allow a Meaningful Opportunity for Comment Because It Does Not Disclose the Key Factual Data on Which It Is Based.

Under the UARA, an agency must include "a summary of the proposed rule" in its rule analysis and must make the rule's text and rule analysis available for public comment for at least thirty days.[91] The Division's Proposed Rule does not provide a meaningful opportunity for comment, however, because it does not disclose any of the factual or technical data on which the Division relied in concluding that a 95% accuracy rate for a geolocation obfuscation detection system is "reasonable." The Rule Analysis states only that the rule "establishes the 'commercially reasonable' standard with respect to age verification and geolocation detection"; it identifies no study, no test, no vendor data, and no methodology supporting the 95% figure or the false-positive thresholds in the safe-harbor table.[92]

Without knowing the technical or factual basis for the Division's conclusion that a 95% accuracy rate is reasonable—or even how the Division proposes that such a rate be measured—it is impossible for interested parties like Aylo to comment meaningfully. Given that an agency decision "must rest upon some sound evidentiary basis," the Division should make available for comment the evidence supporting its technical conclusions.[93] Aylo has submitted two detailed expert declarations in the pending litigation—to which the Division is a party—explaining why no available method reliably identifies users' true locations.[94] If the Division has evidence to the contrary, the public is entitled to see it and comment on it before the rule is finalized.

Indeed, the UARA requires that any rule be "supported by substantial evidence when viewed in light of the whole administrative record."[95] Here, the Proposed Rule and any finalized version similar to the Proposed Rule would not be supported by substantial evidence (if any evidence) demonstrating that this 95% accuracy rate is appropriate, or even feasible. Thus, the Proposed Rule in its current form is invalid, and should not be finalized.

---

[91] Utah Code § 63G-3-301(8)(a), (11)(a).

[92] Rule Analysis, Box 3.C.

[93] *First Nat'l Bank of Bos. v. Cnty. Bd. of Equalization of Salt Lake Cnty.*, 799 P.2d 1163, 1166 (Utah 1990); *cf. Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) ("[I]t is especially important for the agency to identify and make available *technical studies and data* that it has employed in reaching the decisions to propose particular rules." (quotation marks omitted)).

[94] *See generally* Rattray Decl.; Rattray Supp. Decl.

[95] Utah Code § 63G-3-602(4)(a)(ii).

### B. The Proposed Rule's Cost Estimates Are Inadequate.

Before filing a proposed rule with the Office of Administrative Rules, the UARA requires that an agency "conduct a thorough analysis, consistent with the criteria established by the Governor's Office of Planning and Budget, of the fiscal impact the rule may have on businesses," including (i) "an estimate of the total number of businesses" and small businesses in the industry that "will be impacted by the proposed rule"; (ii) "the individual fiscal impact that would incur to a single business for a one-year period"; (iii) "the aggregated total fiscal impact that would incur to all businesses within the state for a one-year period"; and (iv) "the total cost that would incur to all impacted entities over a five-year period."[96] The Division's cost estimates fail to satisfy these criteria in at least three respects.

*First*, the Division fails to estimate the total number of businesses—and small businesses—that will be impacted by the rule. The Rule Analysis asserts that the number of covered small and non-small businesses "to which this rule will apply is not readily available and is fluid," and on that basis declares the rule's fiscal impact on businesses "inestimable" in every year from FY2027 through FY2031.[97] But the Governor's Office of Planning and Budget's rulemaking guide recognizes that "[m]any resources are available for gathering counts of affected individuals," and instructs that where data is not available from a source such as NAICS codes, "the rules coordinator should contact" impacted entities for "an estimate."[98] A figure should be treated as inestimable only if "the relevant data is unavailable and the cost of acquiring the relevant data is prohibitively expensive."[99] The Rule Analysis does not indicate that the relevant data was prohibitively expensive to acquire, or that the Division made any effort to consult regulated entities to collect it. And while the number of covered websites may be "fluid," that is true of numerous regulated sectors; the Division must still estimate the current fiscal impact based on current economic conditions and actors.

Indeed, the Utah Attorney General has affirmatively relied on statistics about this very industry in defending S.B. 73 in federal court—for example, asserting that "[t]he top three pornography websites in the United States each reportedly had more than 2.4 billion visits for the month of May 2023 alone worldwide, with over 500 million visits originating in the United States."[100] The Division could have relied on those same statistics, or similar ones, to estimate the number of covered entities and the scale of their traffic. Moreover, S.B. 73's own fiscal note estimated that the Act's 2% excise tax on covered transactions would generate approximately $800,000 per year beginning in FY2028—the first full year the tax would be in effect—implying

---

[96] Utah Code § 63G-3-301(5)(a).

[97] Rule Analysis, Boxes 5.C–D, 5.F; Rule Analysis, Box 6 (Regulatory Impact Summary Table).

[98] Governor's Office of Planning & Budget, *A Guide to Conducting a Regulatory Impact Analysis: The GOMB Criteria*, https://rules.utah.gov/wp-content/uploads/RegulatoryImpactAnalysisTraining-TheGOMBCriteria.pptx ("GOPB Rulemaking Guide"), at 17, 58.

[99] GOPB Rulemaking Guide at 10.

[100] PI Opp'n at 6.

an assumption of roughly $40 million in covered transactions annually.[101] That estimate necessarily relied on data about the volume of covered providers and anticipated transactions, and the GOPB Rulemaking Guide specifically instructs agencies to consider a bill's fiscal note.[102]

*Second*, the Division makes no attempt to analyze "the individual fiscal impact that would incur to a single business for a one-year period."[103] The Rule Analysis states that the Division "is unable to calculate the number of people who will attempt to access from Utah covered websites operated by covered commercial entities."[104] Yet the Division does estimate that "each age verification attempt will cost between $0.01 and $0.12, with those costs decreasing over time," and that "a covered commercial entity may spend approximately $0.01 per person who attempts to access a covered website for geolocation detection and geolocation obfuscation detection, with costs decreasing at larger scales."[105] Having estimated the per-user cost, the Division made no effort to estimate how many users[106] attempt to access a covered website—again, despite the statistics on which the Attorney General has relied.

The Division could readily have estimated the impact on at least Aylo's platforms, given that Aylo has submitted substantial factual information about its users and traffic in litigation to which the Division is a party. For example, "Aylo's platforms attract over 200 million visitors per month," and "[b]ased on IP addresses, approximately 86% of visitors to Aylo's platforms appear to be located outside of the United States"—meaning that approximately 14%, or roughly 28 million visitors per month, appear to be within the United States.[107] The Attorney General, for his part, has told the federal court that Aylo has the eighth-highest global internet traffic, citing a source reporting over 3.65 billion monthly visits to Pornhub.com alone.[108]

Under any version of the data, given the Division's own estimate that "geolocation detection and geolocation obfuscation detection" cost "approximately $0.01 per person," the costs would be staggering. If Pornhub.com has 3.84 billion monthly visits, as the Attorney General has suggested, the cost of geolocation detection alone would be approximately $38.4 million per month. Alternatively, using Aylo's figure of 200 million visitors per month across its platforms, the cost would be approximately $2 million per month. Even if costs decrease at larger scales as the proposed rule asserts, the amount for geolocation detection alone, for one company, would be enormous. And on top of those costs, Aylo would then also be responsible for any costs of age-

---

[101] Legislative Fiscal Analyst, Fiscal Note, S.B. 73, 2026 Gen. Sess., https://pf.utleg.gov/public-web/sessions/2026GS/fiscal-notes/SB0073S03.fn.pdf. The Rule Analysis itself references the Fiscal Note to S.B. 73 in disclaiming any impact on the state budget. Rule Analysis, Box 5.A.

[102] GOPB Rulemaking Guide at 58.

[103] Utah Code § 63G-3-301(5)(a)(ii); *see* Rule Analysis, Boxes 5–6.

[104] Rule Analysis, Box 5.F.

[105] Rule Analysis, Boxes 5.C–D, 5.F.

[106] Although the Rule Analysis refers to costs "per person," the cost to Aylo and similar companies would need to be calculated per *visit*. Visitors to Aylo's free sites are overwhelmingly transient users who do not create an account or log in; Aylo estimates that approximately 95% of its visitors are transient in this manner. Collie Decl. ¶¶ 13–14. Aylo would therefore need to perform geolocation detection each time such a user visits an Aylo site.

[107] Collie Decl. ¶ 12.

[108] PI Opp'n at 2 n.4 (citing https://www.semrush.com/trending-websites/global/all).

verification, at $0.01 to $0.12 per verification attempt.[109] The Division should, at a minimum, have attempted to estimate the costs to Aylo's platforms given the substantial data available to it.

*Third*, where a rule has a negative fiscal impact on small businesses, the UARA requires the agency to consider establishing less stringent compliance or reporting requirements for those businesses, including whether they should be exempted from the rule entirely.[110] The Rule Analysis acknowledges that the proposed rule "may have a fiscal impact on small businesses," but it contains no analysis of any effort by the Division to reduce that impact.[111]

### C. The Proposed Rule Cannot Be Implemented—Particularly Without Legislative Review—Because It Will Cost Far More Than $2 Million Over a Five-Year Period.

Under the UARA, an agency "may not file [a] rule" that "is estimated to have substantial fiscal impact" unless the "agency cannot implement a statute" without doing so.[112] This Proposed Rule is not needed to implement S.B. 73, as discussed further below. But the Proposed Rule would undoubtedly have a "substantial fiscal impact," which is defined as "the anticipated cost of a proposed rule of at least $2,000,000 over a five-year period."[113]

The Proposed Rule here would cost far more than $2,000,000 over the next five years. As shown above, performing *just* geolocation obfuscation detection—without any age verification—for Aylo's platforms would cost approximately $2 million per month at the Division's own per-user estimate. And using the Attorney General's claimed statistics about the number of visitors to Pornhub.com, the cost could reach approximately $460 million per year for a single platform.[114]

These costs are unnecessary, because the Division could implement S.B. 73 without making this particular rule. At the outset, S.B. 73 does not *mandate* that the Division undertake rulemaking; it provides only that, "[i]n accordance with Title 63G, Chapter 3, Utah Administrative Rulemaking Act, the division *may* make rules."[115] Moreover, as discussed above, IP-based geolocation is a commercially reasonable method for detecting a user's location, and a rule embracing that method would not impose the same costs because IP-based geolocation is the default baseline already implemented by responsible providers.[116] Because the Proposed Rule is not the only way for the Division to implement S.B. 73, the Division lacks authority to make it given the rule's substantial fiscal impact.

---

[109] Rule Analysis, Boxes 5.C–D, 5.F.

[110] *See* Utah Code § 63G-3-301(6).

[111] Rule Analysis, Box 5.C

[112] Utah Code § 63G-3-301(13)(d).

[113] Utah Code § 63G-3-102(28).

[114] *See supra* Part IV.B; Rule Analysis, Box 5.F.

[115] Utah Code § 78B-3-1005 (emphasis added).

[116] *See supra* Part III.D; Collie Decl. ¶ 9; Rattray Supp. Decl. ¶¶ 6, 15; *cf.* GOPB Rulemaking Guide at 18 (costs should be estimated against the current baseline).

Separately, the UARA provides that an agency may not make a proposed rule effective without first "submit[ting] to the appropriations subcommittee and interim committee with jurisdiction over the agency the agency's proposed rule for review, if the proposed rule, over a five-year period, has an anticipated cost . . . of more than $1,000,000 statewide."[117] Thus, even if this rule were otherwise permissible, its costs would require that it be submitted to those legislative committees before it could take effect. The Division's stated intention to potentially make the rule effective on October 8, 2026—just one week after the close of the comment period—does not appear to contemplate either that required legislative review (or the time necessary to "review and evaluate all public comments," as the UARA separately requires). Taken together, the compressed timeline raises serious questions about whether the Division intends to engage meaningfully with the comments it receives or to satisfy the procedural prerequisites for a rule of this magnitude.[118]

### D. The Proposed Rule's Burdens Vastly Outweigh Its Limited Benefits.

Even assuming S.B. 73, which authorizes the Division to promulgate rules governing reasonable age verification methods, also authorized the Division to promulgate rules concerning reasonable geolocation detection, the Proposed Rule's geolocation detection standards are not reasonable.[119] Reasonableness ordinarily requires some weighing of benefits against burdens. As the Supreme Court has explained in the analogous federal context, "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions."[120]

The costs discussed above are overwhelming—and they are only the direct, out-of-pocket costs. Implementing unproven geolocation technologies that depart from the ordinary commercial approach would also inflict substantial business and reputational harm on compliant companies and risk placing them in conflict with the privacy and consumer-protection laws of other jurisdictions.[121] Moreover, the benefits of imposing those costs on adult-content providers that seek to comply with the law (like Aylo) are minimal. Many platforms available to individuals in Utah make no attempt to geolocate users, do not age-verify users, and have weak or nonexistent content-moderation policies. As of April 2026, numerous competitor sites—which collectively received more than 1.9 billion visits in March 2026 alone—were providing adult content in Utah without requiring age verification or blocking Utah-based IP addresses.[122] Yet, to Aylo's knowledge, the Division has taken no enforcement action against any of these non-compliant companies.[123]

---

[117] Utah Code § 63G-3-301(13)(a)(i).

[118] Utah Code § 63G-3-301(11)(b); Rule Analysis, Boxes 11–12.

[119] *See* Utah Code § 78B-3-1005(2); Reply Br. at 7.

[120] *Michigan v. EPA*, 576 U.S. 743, 753 (2015).

[121] PI Br. at 21–24; Reply Br. at 34–35; Collie Decl. ¶¶ 24–33; Collie Supp. Decl. ¶¶ 36, 40–42.

[122] Collie Supp. Decl. ¶ 13; *see* Reply Br. at 28–29; Collie Supp. Decl. ¶ 15 ("[M]any companies have continued to offer free adult content without attempting to comply with Utah law . . . .").

[123] Collie Supp. Decl. ¶ 16.

Finalizing the Proposed Rule would place still more burdens on compliant platforms like Aylo, while having no effect on non-compliant platforms that continue to serve illegal, harmful, or obscene content, including to individuals in Utah. Aylo invests substantial personnel and resources in content moderation and safety measures to ensure its platforms are free of such material—including deploying automated detection tools to exclude harmful content, as well as content-moderation teams that remove such material.[124] But, when users are deterred from accessing sites because of age verification or related measures, they do not give up. Instead, they migrate to sites—like those that continue to flout Utah law—that have few or no safety or moderation processes, where they are more likely to be exposed to harmful content.[125] Finalizing the Proposed Rule would thus make it *more* likely, not less, that individuals within Utah will be exposed to harmful content. A rule that imposes enormous costs on compliant providers, without obtaining any corresponding benefit given the widespread availability of more harmful content on non-compliant platforms, is not "reasonable" by any measure.

Rather than continuing to impose additional burdens on compliant platforms, therefore, the Division should withdraw the Proposed Rule and focus its resources on enforcement against those platforms that make no effort whatsoever to comply with Utah law—as the Utah Attorney General suggested the Division would.[126] To date, Aylo is still not aware of any efforts by the Division to enforce the law against such platforms. Unless and until the Division enforces Utah law evenhandedly, it is not reasonable to impose still more burdens on compliant platforms, at least beyond the commercial norm of IP-based geolocation.

## CONCLUSION

For the foregoing reasons, the Division should not finalize the Proposed Rule. It seeks to implement a statute that a federal court has already enjoined as likely unconstitutional; it leaves in place S.B. 73's *de facto* worldwide age-verification mandate; it adopts a definition of "commercially reasonable" geolocation that no available method can reliably satisfy, that cannot be measured, and that would burden billions of individuals with no connection to Utah; it conflicts with the United States Constitution; and it fails to comply with the Utah Administrative Rulemaking Act.

At most, the Division should confirm that a company will not face an enforcement action under S.B. 73 for any Utah-based individual whose location appears to the company to be outside the State of Utah, provided that the company uses IP-based geolocation to block identified Utah-based users.

---

[124] Aylo devotes nearly 20% of its workforce to trust and safety and expects to spend more than $12 million this year on efforts to keep its platforms free of illegal and non-consensual material. Collie Supp. Decl. ¶¶ 5–11.

[125] Collie Decl. ¶ 28; Collie Supp. Decl. ¶¶ 12, 14; Reply Br. at 28–29.

[126] Hr'g Tr. at 46:24–47:07 ("[W]hen arguing about the benefit, Aylo says, Well, there really isn't – there's no benefit because users will just go to another website. They'll find something worse out there. Well, there's now state enforcement. So these websites that are being pointed to us, okay, users are going to go there, well, they're also subject to enforcement now. This law applies evenhandedly across sites. So that concern goes out of the way.").

Aylo appreciates the Division's consideration of these comments and would welcome the opportunity to discuss them further.

Respectfully submitted,

*/s/ Daniel Schwei*

Lindsay C. Harrison
Jessica Ring Amunson
Daniel Schwei
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
lharrison@jenner.com
jamunson@jenner.com
dschwei@jenner.com

Annika L. Jones (16483)
Brandon S. Fuller (17215)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101-1004
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
aljones@swlaw.com
bfuller@swlaw.com

*Counsel for Aylo*

(exhibits submitted separately)

cc: Lance Sorenson, Utah Attorney General's Office (lancesorenson@agutah.gov)